UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL LEE MOORE and KAREN MOORE, husband and wife,<br><br>        Plaintiffs,<br><br> v.<br><br>THE CITY OF BONNERS FERRY, BRIAN ZIMMERMAN, MARTIN RYAN, MICHAEL VAN LEUVEN, GARY TOLLESON, and JOHN and JANE DOE I-X, as agents of BONNERS FERRY POLICE DEPARTMENT,<br><br>        Defendants. | Case No. 2:22-cv-00376-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Several motions are pending before the Court. Plaintiffs Daniel Moore and Karen Moore ask to amend their complaint. Dkt. 27. Defendants move for judgment on the pleadings as to Counts I and II. Dkt. 22; Dkt. 23. For the reasons explained below, the Court will partially grant and partially deny the plaintiffs' motion and will grant the defendants' motions.

**MEMORANDUM DECISION AND ORDER - 1**

## RELEVANT BACKGROUND[1]

Chiropractor Brian Drake was murdered just after seeing his last patient on the evening on March 12, 2020. The killer fired the fatal shot through the window of Dr. Drake's Bonners Ferry office.

Soon after, on March 24, 2020, Idaho State Police Detectives interviewed Plaintiff Daniel Moore. Dr. Moore, who is also a chiropractor with a practice in Bonners Ferry, denied having any involvement with Dr. Drake or his death. Following the interview, law enforcement learned that three days after the murder, a gas leak at Dr. Moore's office had left him unconscious. Law enforcement suspected that Dr. Moore had killed Dr. Drake and had attempted suicide because of overwhelming moral distress. Pursuing this theory, on May 6, 2020, detectives again interviewed Dr. Moore at his office. Once more, Dr. Moore denied having met or murdered Dr. Drake.

Months later, on August 27, 2020, law enforcement decided to have another go at Dr. Moore. Defendants Van Leuven and Tolleson requested that Dr. Moore bring his wife's .380 APC Ruger handgun to the Boundary County Sherriff's

---

[1] As discussed below, both issues before the Court require applying what is functionally a Rule 12(b)(6) standard. As such, the Court must take all well-pleaded allegations of material fact as true and construe the facts in a light most favorable to the plaintiffs. Accordingly, this recitation of the facts is drawn from the complaint.

annex for inspection in connection with their investigation into Dr. Drake's death. Upon Dr. Moore's arrival, law enforcement instructed him to empty his pockets, frisked him, took his car keys, and explained that they would take him to a secure area to check for weapons.

In the secure area—an interrogation room—Detectives Van Leuven and Tolleson began questioning Dr. Moore. Soon, Detective Van Leuven told Dr. Moore that law enforcement suspected he had murdered Dr. Drake and then attempted to kill himself because he felt guilty. Dr. Moore denied both accusations. About eight minutes into the interrogation, Detective Van Leuven informed Dr. Moore of his *Miranda* rights. Dr. Moore reiterated that he did not have a relationship with Dr. Drake and or a part in his death.

The accusation-and-denial back and forth continued for some time. Eventually, Dr. Moore said, "Well, I didn't shoot him and I'm sorry but that's what it is." He raised both his palms facing the detectives in a stop gesture and said, "so I guess if you're gonna do that [i.e. charge him with murder], then I need to get an attorney." In response, Detectives Van Leuven and Tolleson left the room, telling Dr. Moore to sit tight and promising that they would be right back.

Forty-five minutes later, another law enforcement officer—Defendant Ryan, who had social connections to Dr. Moore—came into the room. He reinitiated the

interrogation, which followed the same pattern: Assistant Chief Ryan leveled accusations and Dr. Moore repeated his denials. Eventually, Dr. Moore said, "I need to talk to an attorney then." Assistant Chief Ryan said he was done with the interrogation and asked Dr. Moore if he wanted to continue. Yet again, Dr. Moore said, "I think I need to talk to an attorney."

Assistant Chief Ryan stood at the door and told Dr. Moore, "I want the truth. I want you to admit the truth. . . . You're killing me man." Dr. Moore asked whether Assistant Chief Ryan wanted to speak to him without an attorney. Assistant Chief Ryan said he did not want Dr. Moore to do anything against his will and that "I'm not trying to pull anything from you but the truth." The interrogation continued along these lines at length. Eventually, Assistant Chief Ryan left the room and Dr. Moore took a bathroom break.

Dr. Moore and Assistant Chief Ryan both returned to the room and the interrogation continued. Assistant Chief Ryan suggested the prior requests for counsel were ambiguous and told Dr. Moore he needed to "tell me what you want to do." Dr. Moore responded that he wanted to speak with Assistant Chief Ryan, who he trusted, but reaffirmed his desire to have a lawyer present. Assistant Chief Ryan asked him to elaborate. Dr. Moore again said he would like to speak with Assistant Chief Ryan, but asked whether, given the circumstances, it would be

prudent to consult with counsel about his options. Finally, Assistant Chief Ryan left the room.

Almost immediately thereafter, an ISP detective brought Dr. Moore water and a blanket. Dr. Moore asked what was happening to his car and his property. The detective explained that law enforcement was towing his automobile and searching his homes. Dr. Moore then asked to speak with Assistant Chief Ryan "one more time."

When Assistant Chief Ryan came back, Dr. Moore asked what he should do if he "doesn't have an attorney." Assistant Chief Ryan and Dr. Moore went back and forth about counsel over and over. Finally, eventually, Dr. Moore stopped asking for counsel and confessed to the murder. The total interrogation lasted about three hours.

Law enforcement charged Dr. Moore with second degree murder that day. At the preliminary hearing on October 2, 2020, the confession was the only evidence presented that implicated Dr. Moore in Dr. Drake's death. Dr. Moore moved to suppress his confession as a violation of his *Miranda* rights. The District Court granted that motion on February 12, 2021, finding that law enforcement violated his *Miranda* right to counsel *and* coerced the confession. Dr. Moore then moved to dismiss the charges. The District Court granted that motion.

The prosecution appealed the District Court's finding of coercion and decision to dismiss the criminal charges, but not the finding of a *Miranda* violation. The Idaho Supreme Court issued an opinion on August 31, 2022 finding that Dr. Moore's *Miranda* rights were violated but that he was not coerced into making the confession. *State v. Moore*, 516 P.3d 1054, 1069 (Idaho 2022).

In the case now before the Court, Dr. Moore brings claims under § 1983 for alleged violations of his constitutional rights and state law claims for negligent inflection of emotional distress.

### AMENDMENT OF THE COMPLAINT

The Moores have moved to file an amended complaint. Dkt. 27. The proposed amendments first clarify that the claims in Counts I and II concern only Dr. Moore. *Id.* at ¶ 166; ¶ 182-85; ¶ 200. Amendments further correct a typo, *id.* at ¶ 162, and add reference to the Idaho Supreme Court decision issued after this case was filed, *id.* at ¶ 164. Defendants do not oppose these changes. Dkt. 29; Dkt. 32. The Court will grant the motion with respect to those paragraphs.

The new complaint also adds details about the alleged impact of Defendants'

actions on Ms. Moore.[2] Dkt. 27 at ¶ 5, ¶ 27. Ms. Moore further seeks to add a

§ 1983 claim for violation of her substantive and due process rights against

Defendants Ryan, Van Leuven, Tolleson, and John and Jane Doe I-X. Proposed

Count VI "incorporates each of the allegations of this Complaint as if fully set

forth herein and further allege[s]" that "[t]he injuries inflicted upon Dr. Moore by

the Defendants under color of state law as described and detailed herein adversely

impacted the endurance, intimacy, way of life and harmony of the Moores'

marriage. Said Defendants actions as detailed herein thereby improperly interfered

with Karen Moore's personal right to the services, society and companionship of

her husband, denying her due process of law." *Id.* at ¶ 224-26. Defendants oppose

those proposed amendments. Dkt. 29; Dkt. 32.

        Because the Moores timely filed the motion to amend their complaint, Rule

15(a)(2)'s liberal standard for amendment governs. The rule permits a party to

---

[2] The proposed addition to ¶ 5 explains, "The Moores strong and close marriage of over 40 years was severely, negatively impacted by the incarceration of Dr. Moore, the very serious criminal charges lodged against him and the emotional distress created by such charges. Karen Moore lost her husband's companionship, love and affection during his incarceration and the period thereafter in which the impact of the Defendants' wrongful conduct toward Dr. Moore caused emotional distress to them both. This emotional distress and loss of consortium continues."

        The proposed addition to ¶ 27 asserts, "Additionally, Karen Moore lost her personal right to the services, society and companionship of her husband due to the emotional impact of the Defendants' conduct on her husband."

amend its pleadings as a matter of course, with the opposing party's written

consent, or with "the court's leave." Fed. R. Civ. P. 15; *Ramirez v. Cty. of San*

*Bernardino*, 806 F.3d 1002, 1007 (9th Cir. 2015). A trial court should allow

amendment under Rule 15(a)(2) "when justice so requires." *Id.*

      The Ninth Circuit directs courts to apply this policy with "extreme

liberality." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1161-62 (9th Cir.

2021) (citing *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th

Cir. 2001)). "In determining whether leave to amend is appropriate, the district

court considers . . . four factors: bad faith, undue delay, prejudice to the opposing

party, and/or futility." *Id.* Generally, a court must make a determination "with all

inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.*, 170

F.3d 877, 880 (9th Cir. 1999). Here, the first three factors indisputably weigh in

favor of granting leave to amend. Defendants have not asserted, much less shown,

that there is bad faith, undue delay, or that they will suffer prejudice. The only

issue raised is futility.

      "A motion for leave to amend may be denied if it appears to be futile or

legally insufficient." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir.

1988). "A proposed amendment is futile only if no set of facts can be proved under

the amendment to the pleadings that would constitute a valid and sufficient claim

**MEMORANDUM DECISION AND ORDER - 8**

or defense." *Id.* In assessing futility, the Ninth Circuit directs the Court to use an "identical" test "to the one used when considering the sufficiency of a pleading challenged under Rule 12(b)(6)." *Id.* (quotation and citation omitted); *see also Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013) (finding that amendments were futile because the new allegations would be conclusory and insufficient under pleadings standards set out in *Twombly* and *Iqbal*).[3]

Defendants argue that Count VI is futile because it is barred by qualified immunity. Ms. Moore does not engage the substance of this argument. Instead, she exclusively argues that qualified immunity is not properly raised at this juncture. That is incorrect. An amendment is futile if it cannot survive 12(b)(6) analysis, which includes consideration of qualified immunity. *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). Under 12(b)(6), dismissal on qualified immunity grounds is appropriate if the Court "can determine, based on the complaint itself, that qualified immunity applies." *Id.* (quoting *Groten v. California*, 251 F.3d 844, 851

---

[3] Although there are only a few Ninth Circuit cases setting out this standard, it is consistently applied in other circuits as well. *See, e.g.*, *Parker v. Landry*, 935 F.3d 9, 13-19 (1st Cir. 2019) (finding leave to amend properly denied because proposed amended complaint did not state plausible claim for relief); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc*., 525 F.3d 370, 376 (4th Cir. 2008) (finding leave to amend not warranted when proposed amended complaint failed to state claim under False Claims Act that would survive a 12(b)(6) motion to dismiss); *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354–355 (7th Cir. 2017) (finding proposed amendments futile because they would not establish plausible claim under Fair Debt Collection Practices Act).

**MEMORANDUM DECISION AND ORDER - 9**

(9th Cir. 2001)). However, because it can be difficult to analyze qualified immunity "aided only by the skeletal factual picture sketched out in the complaint . . . . district courts sometimes delay a decision on qualified immunity until the parties have had the opportunity to develop a more comprehensive factual record." *Mohamed Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 44 F.4th 867, 892 (9th Cir. 2022) (cleaned up) (citation and quotation omitted). Thus, the Court can properly consider the issue of qualified immunity at this juncture, so long as it carefully applies Rule 12(b)(6)'s strict standard.

Officers are not entitled to qualified immunity if "the facts, viewed in the light most favorable to the plaintiff, demonstrate that the deputies violated a constitutional right" and "that right was 'clearly established' at the time of the alleged constitutional violation." *Peck v. Montoya*, 51 F.4th 877, 887 (9th Cir. 2022) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014)). To be clearly established, the "rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quotation and citation omitted). The Court may exercise "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019).

MEMORANDUM DECISION AND ORDER - 10

Here, Count VI asserts a claim for spousal loss of consortium. A recent Ninth Circuit case shows that the constitutional right to spousal companionship is not clearly established. In *Peck v. Montoya*, the Ninth Circuit explained that it has left open "the possibility of substantive due process claims by a parent or child who claims loss of companionship and society of the decedent." 51 F.4th 877, 892 (9th Cir. 2022). But *Peck* "involve[d] a familial-association claim asserted by a spouse, rather than a parent or child." *Id.* at 893. The Circuit explained that "[w]e have not previously held whether a substantive due process right exists in that context, and other courts of appeals have reached conflicting conclusions." *Id.* It ultimately did not decide the issue, finding instead that the asserted claim failed even under the existing familial-association caselaw.

Because the Ninth Circuit has plainly stated that a spousal loss of consortium claim is not clearly established,[4] the officers are entitled to qualified

---

[4] This court reached the same conclusion a decade ago. *Bach v. Idaho Bd. of Medicine*, 2012 WL 175417 *7 (D. Idaho 2012). Other courts agree. *See, e.g.*, *Engebretson v. Mahoney*, 2010 U.S. Dist. LEXIS 36176, 2010 WL1490362 *5-6 (D. Mont. March 3, 2010) (majority of federal courts addressing issues of whether spouse's loss of consortium rises to the level of a constitutionally protected liberty interest cognizable under § 1983 have concluded that it does not); *Edwin v. Simpson*, 2009 WL 10673448 at *2-3 (D. Ariz. June 4, 2009) (the court agreed with the majority of courts that considered spousal consortium claims under § 1983 and declined to recognize a spouse's right to loss of consortium as a constitutional right protected by 42 U.S.C. § 1983); *Meaney v. Dever*, 170 F. Supp. 2d 46, 64 (D. Mass. 2001) ("A spouse of a (Continued)

immunity and the proposed amendment is futile. Moreover, Ms. Moore did not cite any holding—from the Ninth Circuit, Supreme Court, or any other court—that she has such a constitutional right.

Finally, the Court notes that although Ms. Moore agrees that Count VI asserts "a spousal loss of consortium claim," she argues that it goes further. She claims it also alleges "a broad claim under 42 U.S.C. § 1983 for violations of Karen Moore's substantive and procedural due process rights" because the claim incorporates facts "relating to Karen Moore's own banishment from her community by law enforcements conduct not just toward her husband but toward her family and her husband's business, the impact on her marriage of 40 years, and loss of her own personal property by the Defendant's actions." Dkt. 33 at 4-5. The problem with this argument is that the text of the claim itself addresses only the spousal loss of consortium issue. To the extent these injuries are incorporated, they

_____

federal civil rights victim is not permitted to raise a separate ancillary cause of action for loss of consortium based solely upon the federal civil rights violation.") *reversed and remanded on other grounds* by *Meaney v. Dever*, 326 F.3d 283 (1st Cir. 2003); *Niehus v. Liberio*, 973 F.2d 526 (7th Cir. 1992) (declined to recognize spousal consortium as constitutionally recognized liberty interest); *Rzayeva v. U.S.*, 492 F.Supp.2d 60, 83 (D. Conn. 2007); *Norcross v. Town of Hammonton*, 2006 U.S. Dist. LEXIS 51599, 2006 WL 1995021 at *3 (D. N. J. July 13, 2006) (holding that "there exists no constitutional interest in the consortium of one's spouse"); *Quitmeyer v. Southeastern Pennsylvania Transp. Authority*, 740 F.Supp. 363, 370 (E. D. Pa.1990) ("[T]here is no authority to permit spousal recovery for loss of consortium based on violations of other spouse's civil rights."); *Stallworth v. City of Cleveland*, 893 F.2d 830, 838 (6th Cir. 1990).

are framed around the marital relationship. What is more, what Ms. Moore relies on here—text stating a "§ 1983 claim for violation of Karen Moore's substantive & procedural due process rights" coupled with discussion of Ms. Moore's banishment from her community or loss of personal property in other parts of the complaint—is so vague that it obviously fails under Rule 12(b)(6). Nevertheless, the Court will exercise its discretion to deny the present motion to amend without prejudice with regard to a claim concerning those issues.

## JUDGEMENT ON THE PLEADINGS

Defendants have moved for judgement on the pleadings as to Counts I and II of the Complaint. Count I alleges a § 1983 claim for violation of Dr. Moore's Fifth Amendment right to counsel against Defendants Ryan, Van Leuven, Tolleson, and John and Jane Doe I-X. Count II alleges a § 1983 claim for violation of Dr. Moore's Fifth Amendment Due Process rights through a coerced false confession against Defendants Ryan, Van Leuven, Tolleson, and John and Jane Doe I-X.

A motion for judgment on the pleadings brought pursuant to Federal Rule of Civil Procedure 12(c) is "functionally identical to a Rule 12(b)(6) motion." *Gregg v. Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quotation and citation omitted). "A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a

matter of law." *Id.*

Before taking up the substance of defendants' motions, the Court must address two preliminary matters.

First, much of the briefing focuses on whether Ms. Moore has standing as to Counts I and II. In initially responding to the motion, the Moores argued that she did. However, as discussed previously, the proposed amendments to the complaint clarify that the claims in Counts I and II concern only Dr. Moore. Consequently, Court finds that the motion for judgment on the pleadings as to Ms. Moore is moot.

Second, the Court will take judicial notice of the Idaho Supreme Court's decision in *State v. Moore*, 516 P.3d 1054 (Idaho 2022). "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond. . . . A court may, however, consider certain materials"—including "matters of judicial notice"—"without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003) (quotations and citations omitted). A court may take judicial notice of another court's opinion "not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its

authenticity." *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (quotation and citation omitted); *see also Kourtis v. Cameron*, 419 F.3d 989, 994 n.2 (9th Cir. 2005) ("[C]ourt records from related proceedings can be taken into account without converting a motion to dismiss into a summary judgment motion.").

### A.    Count I: Fifth Amendment Right to Counsel

Count I of the complaint indisputably pleads a violation of Dr. Moore's Fifth Amendment right to counsel. In short, he alleges that during the August 27, 2020 interrogation, he "clearly and unequivocally requested counsel" multiple times, but law enforcement continued the custodial interrogation. Dkt. 27 at 28-30. The question now before the Court is whether § 1983 provides a cause of action for that constitutional violation. The Court reluctantly finds that it does not.

#### 1.  *The Fifth Amendment Right to Counsel*

The Fifth Amendment does not directly create a constitutional right to counsel. Rather, the Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V.

In *Miranda v. Arizona*, the U.S. Supreme Court determined that the Constitution requires the provision of "procedural safeguards effective to secure

the privilege against self-incrimination" to individuals subject to custodial

interrogation by law enforcement. 384 U.S. 436, 444 (1966). Relevant here, those

safeguards include the right to an attorney. *Id.* at 445. As a result, the Fifth

Amendment right to counsel might be viewed purely as the product of *Miranda*.

*See Davis v. United States*, 512 U.S. 452, 457 (1994) ("The right to counsel

established in Miranda was one of a 'series of recommended procedural safeguards

. . . [that] were not themselves rights protected by the Constitution but were instead

measures to insure that the right against compulsory self-incrimination was

protected.'") (quoting *Michigan v. Tucker*, 417 U.S. 433, 443-444 (1974)).

 Even so, some Supreme Court caselaw suggests the Fifth Amendment right

to counsel is more extensive than the parameters suggested in *Miranda*. In

*Edwards v. Arizona*, the Supreme Court held that

> [W]hen an accused has invoked his right to have counsel
> present during custodial interrogation, a valid waiver of that
> right cannot be established by showing only that he responded
> to further police-initiated custodial interrogation even if he has
> been advised of his rights. We further hold that an accused,
> such as Edwards, having expressed his desire to deal with the
> police only through counsel, is not subject to further
> interrogation by the authorities until counsel has been made
> available to him, unless the accused himself initiates further
> communication, exchanges, or conversations with the police.

451 U.S. 477, 484-485 (1981). In later cases, the Supreme Court teased out the

*Edwards* presumption: once a suspect invokes his Fifth Amendment right to

MEMORANDUM DECISION AND ORDER - 16

counsel, "it is presumed that any subsequent waiver . . . is itself the product of the inherently compelling pressures and not the purely voluntary choice of the suspect." *Arizona v. Roberson*, 486 U.S. 675, 681 (1988) (quotation and citation omitted); *see also McNeil v. Wisconsin*, 501 U.S. 171, 176-77 (1991) (once a suspect has invoked his right to counsel, "[i]f the police do subsequently initiate an encounter in the absence of counsel . . . the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."). Accordingly, *Edwards* "superimposed" a "second layer of prophylaxis"—the presumption of involuntariness—beyond *Miranda* to specifically protect the Fifth Amendment right to counsel. *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (quoting *McNeil* v. *Wisconsin*, 501 U.S. 171, 176 (1991)).

Supreme Court caselaw thus suggests that *Miranda* and *Edwards* are conjoined twins that together and separately create the Fifth Amendment right to counsel.

### 2. *Vega v. Tekoh*

In *Vega v. Tekoh*, the U.S. Supreme Court recently concluded that "a violation of *Miranda* is not itself a violation of the Fifth Amendment, and . . . we see no justification for expanding *Miranda* to confer a right to sue under §1983."

142 S. Ct. 2095, 2108 (2022). This ruling prevents Dr. Moore from proceeding on his claim.

On the one hand, *Vega* bars Dr. Moore's claim because the Fifth Amendment right to counsel is a product of *Miranda*. In *Vega*, the Supreme Court might have issued a narrow ruling limited to the facts of the case—a § 1983 claim arising from a failure to give *Miranda* warnings. It did not. On the contrary, the Court extended *Vega*'s holding to *any* claim arising from "a violation of the *Miranda* rules." *Id.* at 2101. Because the Fifth Amendment right to counsel is a "procedural safeguard" established in *Miranda*—one that, to be sure, was expanded in later cases, but is nevertheless grounded in *Miranda*—it falls within *Vega*'s holding.

On the other hand, even if the Court disregards that language as dicta and reads *Vega* as limited to its facts, the case's reasoning still bars Dr. Moore's claim. The Supreme Court's decision largely rested on the determination that *Miranda* is a prophylactic, rather than constitutional, rule.

> This conclusion [that *Miranda* is a prophylactic rule] does not necessarily dictate reversal because a §1983 claim may also be based on "the deprivation of any rights, privileges, or immunities secured by the . . . *laws*." (Emphasis added.) It may thus be argued that the *Miranda* rules constitute federal "law" and that an abridgment of those rules can therefore provide the ground for a §1983 claim. . . . As we have noted, '[a] judicially crafted' prophylactic rule should apply "only where its benefits

> outweigh its costs," *Shatzer*, 559 U. S., at 106, and here, while the benefits of permitting the assertion of *Miranda* claims under §1983 would be slight, the costs would be substantial.
>
> *Miranda* rests on a pragmatic judgment about what is needed to stop the violation at trial of the Fifth Amendment right against compelled self-incrimination. That prophylactic purpose is served by the suppression at trial of statements obtained in violation of *Miranda* and by the application of that decision in other recognized contexts. Allowing the victim of a *Miranda* violation to sue a police officer for damages under §1983 would have little additional deterrent value, and permitting such claims would cause many problems.

*Id.* at 2106-07.

In sum, the Supreme Court held that for the purposes of § 1983, *Miranda* did not establish a right secured by the Constitution *because of* its prophylactic nature. The same reasoning applies to *Edwards*, which the Supreme Court has "frequently emphasized . . . is not a constitutional mandate, but judicially prescribed prophylaxis." *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010). Put simply, in the face of *Vega*'s reasoning, there is no meaningful distinction between *Edwards* and *Miranda*. The rule's prophylactic nature is dispositive. An *Edwards* violation cannot form the basis for a § 1983 claim.

This Court reaches its conclusion with deep misgivings. *Vega* denies individuals like Dr. Moore the ability to seek a remedy for violations of their Fifth Amendment right to counsel. In so doing, "[t]he majority here, as elsewhere,

**MEMORANDUM DECISION AND ORDER - 19**

injures the right by denying the remedy." *Id.* at 2111 (Kagan, J., dissenting).[5] It is illogical and perverse to insist that the Constitution guarantees a right while stripping the people of their ability to hold government officials civilly accountable for violating it.

The *Vega* decision is also ahistorical. In the leadup to the Supreme Court's adoption of the exclusionary rule, opponents of the rule argued that it was unnecessary because of the availability of "remedies of private action." *Wolf v. Colorado,* 338 U.S. 25, 31 (1949). Indeed, civil suits, whether based on common law or statutory claims, have always been viewed as an appropriate means of protecting constitutional rights. *Vega* ignores this historical fact in favor of an enforcement mechanism which relies wholly, and exclusively, on the exclusion of the evidence at trial. To support this outcome, the Supreme Court offers only Justice Alito's personal view that civil remedies "would have little additional

---

[5] *See also Egbert v. Boule*, 142 S.Ct. 1793 (2022) (holding that no *Bivens* liability exists to recover damages from Border Patrol agents); *Shinn v. Ramirez*, 142 S.Ct. 1718 (2022) (holding that there is no remedy for a habeas petitioner whose postconviction counsel failed to develop evidence in support of an ineffective assistance of trial counsel claim); *Hernandez v. Mesa*, 140 S. Ct. 735 (2020) (holding that no remedy exists to recover damages from federal officers for an allegedly unconstitutional cross-border shooting); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (holding that claims of unconstitutional partisan gerrymandering present nonjusticiable political questions).

deterrent value, and permitting such claims would cause many problems." *Vega,*
142 S. Ct. at 2107.

      *Vega* is thus an example of judicial activism. The Supreme Court could, and
should, have limited itself to the facts of the case. But it did not. Rather, it used
sweeping language that precludes the Court from considering whether there is a
meaningful distinction between cases where the police failed to read the accused
their *Miranda* rights, and cases where the police ignored an affirmative request for
counsel. The Court sees a significant difference in those two scenarios. However,
the Supreme Court's decision forecloses further analysis of that distinction. This
Court must follow precedent and finds the Supreme Court's broad holding in *Vega*
binding. The Court therefore will reluctantly grant defendants' motions for
judgment on the pleadings as to Count I.

      **B.    Count II: Fifth Amendment Due Process**

      In Count II, Dr. Moore alleges that Defendants Ryan, Van Leuven, Tolleson
and John and Jane DOE I-X violated his Fifth Amendment Due Process rights by
using techniques and methods that prompted a coerced, false confession. Dkt. 27 at
31-33. Defendants argue that this claim is barred by collateral estoppel because the
Idaho Supreme Court found that the confession was "voluntary and uncoerced."
*State v. Moore*, 516 P.3d 1054, 1069 (2022). The Court agrees.

The Constitution's Full Faith and Credit Clause requires the Court to "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Ed.,* 465 U.S. 75, 81 (1984). In § 1983 cases, issue preclusion (sometimes called collateral estoppel) requires that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). To determine the preclusive effect of a state court judgment, the Court follows the state's rules of preclusion. *Kremer v. Chem. Const. Corp.,* 456 U.S. 461, 482 (1982). Idaho law sets out five factors that must be met "for collateral estoppel to bar the relitigation of an issue determined in a prior proceeding." *Rodriguez v. Dept. of Correction*, 29 P.3d 401 (Idaho 2001). Those factors are:

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

*Id.*

The question here is whether these factors are met as to the state criminal

case against Dr. Moore. He concedes that the second, third, fourth, and fifth factors are met.[6] Dkt. 24 at 17-18; Dkt. 25 at 17-18. The only remaining issue is whether the first factor is met.

Dr. Moore was and is a party in both proceedings. He argues, however, that he did not have a full and fair opportunity to litigate the voluntariness of his confession. Specifically, he explains that he "never argued a due process or coercion claim before the state trial court." Dkt. 25 at 16. Instead, the trial court sua sponte reached that conclusion, which he then had to defend before the Idaho Supreme Court. He argues that he could not fully litigate the issue because his "role on appeal was constrained to defending the criminal trial court's opinion based on the record developed at the trial court level. Thus, Moore was not able to rely, for example, upon Ninth Circuit authority that this Court would apply on the due process question in federal court." *Id.* at 17. This argument is not persuasive.

Dr. Moore does not point to any evidence, either generally or specifically, which he would have relied on had it been in the record. Indeed, it appears there is none. The record included a "video and written transcripts of Moore's entire

---

[6] Dr. Moore concedes specifically that the fifth factor is met as to him, but not as to Ms. Moore. However, because the claim is no longer asserted as to Ms. Moore, the Court does not need to address that issue.

interrogation." *Moore*, 516 P.3d at1064. It is difficult to imagine any additional evidence that would provide a fuller or fairer opportunity to litigate the voluntariness of the confession.

Similarly, Dr. Moore does not cite *any* authority for his proposition that although he may have fully and fairly litigated the issue under Idaho law, he now deserves the opportunity to litigate it under Ninth Circuit law. That assertion is not supported. Quite the contrary, the Supreme Court has "repeatedly held . . . that issues actually decided in valid state-court judgments may well deprive plaintiffs of the 'right' to have their federal claims relitigated in federal court." *San Remo Hotel, L.P. v. City & Cty. of S.F.*, 545 U.S. 323, 342 (2005)

The Ninth Circuit's opinion in *Zamarripa v. City of Mesa* is illuminating. In that case, a criminal defendant unsuccessfully moved to suppress his confession as involuntary in the state court, was acquitted by a jury of the underlying charges, then brought a § 1983 claim alleging that his confession had been coerced and that law enforcement had violated his Fifth Amendment right not to incriminate himself. *Zamarripa v. City of Mesa*, 125 F.3d 792, 793 (9th Cir. 1997). The issue on appeal was whether the state court's holding that the confession was voluntary had a preclusive effect on the § 1983 claim. *Id.* The Ninth Circuit held that because "the question was actually litigated at a multi-day hearing prior to Zamarripa's

criminal trial," the only issue was "whether the trial court's finding that the confession was voluntary was a *final* judgment." *Id.* Implicitly, the Circuit found that the question had been fully and fairly litigated, even though the state court hearing applied state law. Other federal courts have reached the same result.[7]

In this case the Idaho Supreme Court's decision makes clear that the issue was "actually litigated" because it was "raised, contested, and submitted for determination." *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019). That is sufficient to show the first factor is met. Accordingly, the Court will grant defendants' motions for judgment on the pleadings as to Claim II.

## ORDER

1.  Defendants' motions for judgment on the pleadings (Dkt. 22; Dkt. 23) are GRANTED.

2.  Plaintiffs motion to amend the complaint (Dkt. 26; 27) is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE consistent with the above discussion.

---

[7] *See, e.g., Simmons v. O'Brien*, 77 F.3d 1093 (8th Cir. 1996) (holding that § 1983 claim concerning a coerced confession was barred by issue preclusion because the claims were already fully and fairly litigated at the state court suppression hearing); *Wallace v. City of Chi.*, 472 F. Supp. 2d 942, 943 (N.D. Ill. 2004) (same).

**MEMORANDUM DECISION AND ORDER - 25**

DATED: July 17, 2023

B. Lynn Winmill
U.S. District Court Judge