BOLTON LAW, PLLC
111 N. 7th St, #3386
Coeur d'Alene, Idaho 83816
Telephone: (208) 306-3360
Facsimile: (208) 519-3974
K. Jill Bolton ISBN: 5269
reception@kjboltonlaw.com

Attorneys for Plaintiff

---

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL LEE MOORE & KAREN MOORE, husband and wife,<br><br>    Plaintiffs,<br><br><br>v.<br><br>THE CITY OF BONNERS FERRY, BRIAN ZIMMERMAN; MARTIN RYAN, MICHAEL VAN LEUVEN, GARY TOLLESON, and JOHN and JANE DOE I-X, as agents of BONNERS FERRY POLICE DEPARTMENT<br><br><br>    Defendants. | CASE NO.: 2:22-CV-376-BLW<br><br>SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL |

SECOND AMENDED COMPLAINT AND JURY DEMAND

## COMPLAINT AND JURY DEMAND

Plaintiffs, Dr. Daniel Moore and Karen Moore, by and through their attorneys, the law firm, Bolton Law, PLLC for their cause of action against the Defendants allege as follows:

## INTRODUCTION

1.  Plaintiff, Dr. Daniel Moore (Dr. Moore) has, since August 27, 2020, lived the unimaginable nightmare of having been wrongfully arrested and charged with Second Degree Murder and suffering the disgrace and degradation of having provided a false confession to a crime he did not commit.

2.  The false confession was extracted by law enforcement in violation of clearly established law that requires that police cease all questioning of a suspect in custody when the suspect requests counsel.

3.  The false confession was extracted by the overreaching and abusive tactics employed by law enforcement that coerced the false statement in violation of Dr. Moore's due process rights.

4.  After extracting the false confession, law enforcement broadcast their apprehension of a confessed killer and charged Dr. Moore with Second Degree Murder.

5.  Consequently, Plaintiffs, Dr. Moore and his wife, Karen Moore (Mrs. Moore) (collectively The Moores) have lost their ability to continue to live and work in what was their home and in the community in which they had raised their children and prospered. They have been shunned, badgered and banished and their lives have been threatened.

6.  Dr. Moore, a chiropractic physician, purchased his chiropractic business in Bonners Ferry in 1997 and operated his chiropractic clinic very successfully for well over 20 years until

he was forced to close his business and leave the community he loved due to the egregious and unlawful actions of the Defendants as set forth herein.

7.      After raising their children at home, Mrs. Moore, a registered nurse, served as the public school nurse in the Bonners Ferry community from 2012 until her retirement in 2020. Mrs. Moore lived in the community until she too was spurned and rejected after law enforcement broadcast their apprehension of her husband whom they labeled a confessed killer.

8.      The Moores had been pillars of the Bonners Ferry Community until their lives were forever shattered by the unlawful conduct of the Defendants described herein.

9.      Dr. Moore's false confession, and his arrest and detention following the wrongfully brought and pursued murder charges, were the direct result of egregious misconduct by Defendant officers of the Bonners Ferry Police Department ("BFPD") and the Idaho State Police ("ISP"). These officers deliberately denied Dr. Moore his Constitutionally secured rights by ignoring his multiple requests for the assistance of counsel, threatening first degree murder charges if he didn't confess and using other abusive, overreaching and coercive techniques to extract a false confession.

10.     On August 28, 2020, Defendant Martin Ryan, Assistant Chief of Police of the BFPD, wrongfully charged Dr. Moore by Idaho criminal complaint with Murder in the Second Degree, a Felony.

11.     The murder charges alleged that Dr. Moore had shot and killed Brian Drake ("Drake"), a fellow chiropractor, on March 12, 2020.

12.     The murder charges were brought after RYAN, with the consent and encouragement of ISP Detectives VAN LEUVEN and TOLLESON unlawfully extracted a false confession

from Dr. Moore during a custodial interrogation of him on August 27, 2020.

13.   The false confession followed a lengthy custodial interrogation in which Dr. Moore

requested counsel no less than 4 separate times, but counsel or an opportunity to contact

counsel was not supplied.

14.   The false confession followed the threat that Dr. Moore would be charged with First

Degree Murder, a crime carrying the death penalty in Idaho, if Dr. Moore did not

abandon his request for counsel and adopt the narrative the officers fed him during their

interrogation about how Drake was murdered.

15.   The false confession followed Ryan's use of other highly coercive interrogation

techniques designed to overbear Dr. Moore's will and force his false confession.

16.   Absolutely no physical or forensic evidence tied Dr. Moore to the crime; the only evidence

offered against him at his preliminary hearing was his false confession.

17.   Dr. Moore was arrested and incarcerated from the time of his falsely extracted confession

on August 27, 2020 until he was able to post bond to secure his release on October 13,

2020.

18.   Dr. Moore incurred the significant expense of having to hire counsel to obtain the

suppression of his unlawfully obtained false confession and to obtain the dismissal of the

wrongfully brought murder charges.

19.   In her February 12, 2021 Memorandum Decision and Order Granting Dr. Moore's

Motion to Suppress, First Judicial District Judge Buchanan recounted the egregious facts

and circumstances of law enforcement's extraction of the false confession and found that

"the foregoing facts establish a pattern of badgering and overreaching by Assistant Police

Chief Martin Ryan in order to wear down the accused [Moore] and persuade him to

incriminate himself notwithstanding his earlier request for counsel's assistance." Further, that "[c]onsidering the totality of these circumstances, this Court finds that Moore's will was overborne by the badgering and overreaching of police such that his waiver of his Miranda right to counsel was not made knowingly, voluntarily, and intelligently. The Court further finds that Moore's subsequent confession was not voluntary, but rather, was the product of police coercion."

20.    After the only evidence against Dr. Moore was suppressed, he was finally able to secure the dismissal of the charges against him on May 12, 2021.

21.    But suppression of the falsely extracted confession and dismissal of the criminal chargedid not end the nightmare for the Moores.

22.    While Dr. Moore attempted resumption of his chiropractic business and his life in the community of Bonners Ferry after he was released from detention and after his charges were dismissed, doing so was not effectively possible because of Defendants' actions and inactions.

23.    Defendants Chief of Police ZIMMERMAN, Assistant Chief RYAN, ISP Detectives VAN LEUVEN and TOLLESON have failed to undertake reasonable efforts to locate the actual perpetrator of Drake's murder, thereby failing to fully exonerate Dr. Moore.

24.    Instead,  ISP Detectives VAN LEUVEN and TOLLESON and BFPD ZIMMERMAN and RYAN have stood by their position that Dr. Moore is the perpetrator.

25.    After Dr. Moore's release from jail and after his criminal charges were dismissed for a period spanning approximately one year, Officers of the BFPD, at the direction and under the supervision of Defendants ZIMMERMAN and RYAN persistently stalked Dr. Moore's business, driving their marked patrol vehicles up and down the alleyway next to

SECOND AMENDED COMPLAINT AND JURY DEMAND                    5

his business and parking their vehicles in public view of the location of Dr. Moore's business in Bonners Ferry.

26.     Further, even today, long since Dr. Moore's criminal charges were finally dismissed by the District Court, the CITY OF BONNERS FERRY and the ISP have maintained custody over personal property secured during the execution of warrants to search Dr. and Mrs. Moore's personal residence, business and real properties, refusing multiple requests that the Moores' personal property, including Mrs. Moore's personal computer, be returned. Further, some of the Moores' property seized by law enforcement that was returned had been damaged or destroyed by law enforcement.

27.     As a direct and proximate effect of the Defendants' actions and omissions, the Moores' sustained injuries and damages, including loss of Dr. Moore's freedom, his business reputation, loss or damage to the Moores' personal property, damage to the Moores' personal reputations and standing in the community, loss of their ability to enjoy life or continue to live in the community they called home for over 20 years, pain, mental anguish, emotional distress, indignities, and degradation which was the direct result of the egregious misconduct by Defendant officers and agents of the BFPD, the CITY OF BONNERS FERRY and the officers of the ISP.

28.     Even if the CITY OF BONNERS FERRY and/or the individual Defendants may not have expected or intended to cause the events described or the serious injuries that resulted, defendants are nonetheless legally responsible under 42 U.S.C. § 1983 because these injuries are the foreseeable result of the defendants' recklessness, negligence, or deliberate indifference to Dr. and Mrs. Moore's rights, their policies and procedures, their failure to train and supervise employees and agents and their own policy-making

authority.

29.    Dr. Daniel Moore and Mrs. Karen Moore bring this lawsuit to hold those accountable who illegally caused the unlawful extraction of a false confession, the filing of criminal charges based on the false confession and the resulting incarceration for a crime Dr. Moore did not commit.

JURISDICTION AND VENUE

30.    This action is brought pursuant to 28 U.S.C. § 1983 to redress the deprivation under color of law of Moore's rights as secured by the United States Constitution.

31.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

32.    Venue is proper in this district and division under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district and because Defendants reside in this district and division.

33.    The Moores have complied with the requirements of the Idaho Tort Claims Act § 6-901 et seq. and served notice of these claims with the CITY OF BONNERS FERRY on March 23, 2021.

34.    The Moores respectfully demand a jury trial on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and under Federal Rule of Civil Procedure 38(b).

PARTIES

35.    Plaintiff DANIEL MOORE is a resident of Bonner County, Idaho.

36.    Plaintiff KAREN MOORE is a resident of Brevard County, Florida.

37.    Defendant, CITY OF BONNERS FERRY is a municipal corporation incorporated under the laws of the State of Idaho.

38.   At all times relevant hereto, Defendant BRIAN ZIMMERMAN was employed as the Chief of the BFPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the CITY OF BONNERS FERRY. He is sued in his individual capacity.

39.   At all times relevant hereto, Defendant MARTIN RYAN, was employed as the Assistant Chief of the BFPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the CITY OF BONNERS FERRY. He is sued in his individual capacity.

40.   At all times relevant hereto, Defendant MICHAEL VAN LEUVEN was employed as a Detective with the ISP and an agent of the BFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the ISP and the CITY OF BONNERS FERRY. He is sued in his individual capacity.

41.   At all times relevant hereto, Defendant GARY TOLLESON was employed as a Detective with the ISP and an agent of the BFPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the ISP and the CITY OF BONNERS FERRY. He is sued in his individual capacity.

42.   At all times relevant hereto, JANE AND JOHN DOE, whose names are currently unknown, were agents of the BFPD acting under color of law and in his/her individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the CITY OF BONNERS FERRY. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### *The Murder of Brian Drake*

43.   Dr. Brian Drake ("Dr. Drake") was a practicing chiropractor who lived in Hayden, Idaho with his wife, Jennifer Drake, and their four children.

44.   Dr. Drake worked alone with offices in which he saw patients in Hayden, Sandpoint and Bonners Ferry, Idaho.

45.   During the period that included the early months of 2020, Dr. Drake would spend approximately 2 nights per week in Bonners Ferry where he would see patients and spend the night away from his family in Hayden, about 71 miles away.

46.   During one such trip to Bonners Ferry on March 12, 2020, not long after seeing his last patients of the evening, Dr. Drake was shot through the window of his office and struck with a bullet in his back causing his death.

47.   Dr. Drake's office was situated approximately 16 feet from a building to the southwest known as the Far North Coffee Lodge. The space between Drake's office and the Far North Coffee Lodge was utilized as a drive through window for the coffee shop. The Far North Coffee Lodge was owned and/or operated by Defendant RYAN's brother-in-law and RYAN's wife worked at the coffee shop's drive through window.

48.   While RYAN's brother-in-law and his wife would naturally have some information about Dr. Drake and his business and patients coming and going from his offices, no investigative interviews of these witnesses were supplied to Dr. Moore's defense team.

49.   Dr. Drake saw his last patients on March 12, 2020, Eldora Gatchell and her brother Caleb Kekoa Nazara around 7:17 p.m. that night. Time stamps from Dr. Drake and his wife's

telephone conversation made by Drake after his patients left, established that Drake was shot at approximately 7:26 pm.

50.    Eldora Gatchell and Caleb Kekoa Nazara would report seeing a two-toned white and tan Ford style pick-up truck near Drake's office building when they were leaving.

51.    Dr. Moore's vehicle at the time of Dr. Drake's shooting death was an all-white four-door 2019 Toyota Tundra. In his sworn affidavits for probable cause to search Dr. Moore's residence, storage unit, business and vehicles and also to establish probable cause to charge him with Second Degree Murder, VAN LEUVEN would not accurately describe the patients' description of the pickup truck as a two-tone white and tan Ford style pick-up truck. Instead, VAN LEUVEN described it as simply a "white, large pickup truck" so that the description would match the description of Dr. Moore's all white Toyota Tundra pickup truck.

### *Eyewitnesses describe "running man" and do not identify Moore in line-up*

52.    An eyewitness named Isaac Funderburg was outside his apartment in Bonners Ferry when he reported by 911 call having heard a gunshot across the street – the location of Drake's office. Funderburg reported seeing an adult male dressed in dark colored clothing walking northwest from between Dr. Drake's building and a fence on the north side of the building immediately after hearing the shot. The figure he saw reminded him of a clerk he knew from a local gas station – a description wholly inconsistent with Dr. Moore's appearance. When Funderburg yelled "hey, was that you?" referring to the gun shot, he saw this person run away toward a business located not far from Dr. Moore's office.

53.    Funderburg's fiancé, Allieah Sandelin also heard the shot and observed the figure running away to the northeast.

54.    Funderburg and Sandelin were later each shown a photographic line up that contained Dr. Moore's photograph. Neither identified Dr. Moore as the person they saw running from the scene of the shooting of Drake. Indeed, their description of the "running man" was of a person with different skin and hair color and entirely different stature.

### *Crime Scene Evidence*

55.    The scene of Dr. Drake's murder established that he had been shot through the window of his office in his back and his body was found on the floor of his office.

56.    The bullet fired came from the direction and location of the Far North Coffee shop near that shop's drive through window.

57.    Dr. Drake's phone was recovered and the call times with his wife confirmed.

58.    Inside Dr. Drake's vehicle, parked at his business, was his gym bag containing a bottle of vodka that had been partially consumed.

59.    Dr. Drake's blood alcohol content as determined by his autopsy toxicology report was .081, over the legal limit to legally drive an automobile in the State of Idaho.

### *Alibi Witness Mickey "Mick" Mellet*

60.    During their investigation, law enforcement spoke with Dr. Moore two times prior to calling him into their offices for a custodial interrogation.

61.    Dr. Moore disclosed that he had spent the evening of March 12, 2020, with his close friend

and the Boundary County Coroner, Mick Mellet.

62.     On May 19, 2020, ISP Detectives Alderson and VAN LEUVEN interviewed Mick Mellet who confirmed that the Moores were close friends and spent time at his home frequently. Further, Mr. Mellet confirmed that Dr. Moore was at his home on the evening of Dr. Drake's shooting from at least 6:15 p.m. until around 8:30 p.m., after the shooting had occurred.

63.     After charging Dr. Moore with Second Degree Murder, RYAN confronted Mick Mellett in a hostile way about having provided an alibi for Dr. Moore's whereabouts on the evening of Dr. Drake's murder. RYAN suggested that Mellett's alibi was causing people in the law enforcement community to not want to work with him in his professional capacity as County Coroner. This contact was egregiously designed to harass and dissuade Mr. Mellett from providing an alibi for Dr. Moore and violated the laws of the state of Idaho which prohibit efforts to intimidate witnesses to prevent their testifying in criminal proceedings.

### The Drake Family & Jennifer Drake

64.     At the time of Drake's death, his family was suffering financial hardship resulting from Dr. Drake's inability to meet the family's expenses with his business income.

65.     At or near the time of Drake's tragic death, the Drake family had resorted to seeking financial assistance from their Church.

66.     At the time of Dr. Drake's death, Dr. Drake had developed an alcohol dependence which greatly distressed his wife, Jennifer.

67.     The Drake marriage had also suffered some setbacks relating to inappropriate conduct by Dr. Drake.

68.     The Drake family had moved to Idaho from Austin, Texas after Dr. Drake had inappropriate contact with a female patient in Austin. This female patient, through her legal counsel, had made a demand for payment for the injuries Dr. Drake had caused her and threatened legal action. Dr. Drake attempted to resolve this dispute on his own and offered money to the female patient to resolve the dispute.

69.     Jennifer Drake had also discovered other conduct by her husband that involved a serious violation of her trust.

70.     Jennifer Drake had secured a one-million-dollar life insurance policy covering the life of her husband, Brian Drake, prior to Dr. Drake's death and said policy was in effect when Drake was shot.

71.     Prior to starting his own business, Dr. Drake had previously practiced with other chiropractors in the Hayden and Coeur d'Alene area and, upon information and belief, left those practices after inappropriate physical contact with a female staff member at one of the offices and pursuant to a dispute he had with one of the managing Chiropractors at another office.

72.     Jennifer Drake reported to law enforcement that she believed one local chiropractor with whom Dr. Drake had worked previously was the likely shooter because her husband had taken several of the chiropractor's patients when Dr. Drake left the practice to open his own practice.

73. This was a theme ISP and BFPD would pursue at Jennifer Drake's insistence, rather than pursuing Jennifer Drake as a suspect.

74. Notwithstanding the potential for Jennifer Drake's involvement in the death of her husband law enforcement failed to competently investigate her as a suspect.

75. Rather than competently investigate Jennifer Drake as a potential suspect in her husband's death,  Defendants provided her details of the investigation, including engaging in regular text messaging with her, and following the leads she proposed they follow, including the lead that the person who killed her husband was likely another chiropractor who lost patients and business to her husband.

### *Interviews with Dr. Moore – March 24, 2020 and May 6, 2020*

76. On March 24, 2020, Dr. Moore cooperated with an interview with ISP Detective Alderson and Lehman. ISP did not record the interview. Dr. Moore offered his full cooperation and denied any involvement with Dr. Drake or the crime they were investigating relating to his death.

77. On May 6, 2020, Detectives Alderson and VAN LEUVEN met with Dr. Moore at Moore's office again to ask him questions. At this interview, like the one before, Dr. Moore denied having ever met Dr. Drake and denied having anything to do with his murder.

78. This second visit by law enforcement focused on a gas leak that had occurred at Dr. Moore offices on Sunday March 15, 2020, that had rendered him unconscious.

79. After Dr. Moore truthfully described the gas leak incident, VAN LEUVEN and other law enforcement officers developed the unfounded theory that Dr. Moore had attempted suicide

from his overwhelming sense of moral distress over having killed fellow chiropractor Drake.

80.  Officers would later learn that members of Dr. Moore's staff had suffered headaches and complained of gas smell near the time of the gas leak that Dr. Moore had described, consistent with Dr. Moore's description of the event.

81.  Officers also learned during their May 6, 2020, questioning of Dr. Moore, that he had suffered a leg injury that had rendered him incapable of running, long before the murder of Drake.

### *Surveillance Footage*

82.  During law enforcement's investigation into Dr. Drake's death, they compiled what they purported to be surveillance footage showing the whereabouts of Dr. Moore's white Toyota Tundra on the evening of Drake's murder.

83.  VAN LEUVEN swore in an affidavit that the footage showed Dr. Moore driving his Toyota Tundra near the area of Dr. Drake's shooting on the night of the shooting and in the same time frame as the shooting.

84.  However, none of this footage is accurately time stamped.

85.  None of this footage shows Dr. Moore driving the white truck depicted in the footage.

86.  None of the surveillance footage depicts a license plate of a vehicle which belonged to Dr. Moore.

### *August 27, 2020 Custodial Interrogation*

SECOND AMENDED COMPLAINT AND JURY DEMAND                                    15

87.   Desperate to name a suspect in their long-running investigation into Dr. Drake's death, law enforcement lured Dr. Moore to the Boundary County Sheriff's Annex for a custodial interrogation on August 27, 2020.

88.   During the custodial interrogation, Defendants RYAN, VAN LEUVEN and TOLLESON colluded to extract a coerced false confession from Dr. Moore.

89.   This false confession followed a custodial interrogation of Dr. Moore, which exceeded three hours from the time law enforcement lured him to the Sheriff's Annex to the end of the custodial interrogation and his formal arrest.

90.   The custodial interrogation was continued by law enforcement despite Dr. Moore's repeated requests for counsel first made just 15 minutes into the interview and repeated at least 3 additional times during the course of the interrogation.

91.   On the date of the interrogation, VAN LEUVEN and TOLLESON with the assistance of other officers and agents of the Idaho State Police and the Bonner's Ferry Police Department lured Dr. Moore to the Boundary County Sheriff's Annex via a request that he provide law enforcement with his wife's .380 APC Ruger handgun for inspection in connection with their investigation into Drake's death.

92.   Law enforcement was aware that this firearm was not involved in Dr. Drake's death.

93.   After a brief wait at the Sheriff's Annex, Dr. Moore was confronted by multiple law enforcement officers, some in uniform, who instructed him to empty his pockets.

94.   Law enforcement then frisked Dr. Moore and explained that they were taking him to a "secure area" requiring them to check for weapons. Law enforcement secured the keys to the car Dr. Moore had driven to get there. Dr. Moore cell phone was left inside his car.

SECOND AMENDED COMPLAINT AND JURY DEMAND                                    16

95. Apart from two subsequent bathroom breaks, law enforcement recorded the entirety of their interrogation of Dr. Moore on videos.

96. Less than five minutes into the interrogation of Dr. Moore, VAN LEUVEN informs Dr. Moore that he is suspected of killing Dr. Drake and attempting suicide via gas poisoning due to a sense of guilt.

97. Dr. Moore is quick to deny his involvement in Dr. Drake's death and, naturally, any consequential feelings of guilt or desires to self-harm.

98. Following this accusation, VAN LEUVEN and TOLLESON ask Dr. Moore a series of questions establishing his ownership of a white Toyota Tundra pick-up, that he exclusively drives that vehicle, his presence at Mick Mellett, a family friend's, home several blocks away from Drake's clinic on the evening of the shooting, and a brief trip he took to his own office.

99. Roughly 8 minutes into the interrogation, VAN LEUVEN belatedly informs Dr. Moore of his *Miranda* rights.

100. After being read his rights, Dr. Moore reaffirms his noninvolvement in Dr. Drake's death and his total lack of relationship with the man.

101. Dr. Moore does readmit that he drove to Mick Mellet's house on the evening of March 12, 2020, in his white truck, and that he did so by himself.

102. Following Dr. Moore's repeated assertions of innocence, the detectives present him with an exaggerated accounting of the State's evidence they claimed implicated him in Drake's homicide.

103. After Dr. Moore continues to deny any involvement in Drake's death, VAN LEUVEN

suggests that the shooting was a mistake and that Dr. Moore simply wanted to "scare" the other chiropractor out of town due to some variety of professional disagreement.

104.    Over Dr. Moore's denials, VAN LEUVEN falsely asserts that they had sufficient evidence to convict him of first-degree murder at a jury trial, pointing to surveillance video footage they claimed put him in and around the scene of the crime at the time the shot was fired through Drake's window.

105.    However, VAN LEUVEN assured Dr. Moore  that he would be facing a lesser homicide charge if he would simply admit that he had only intended to scare Dr. Drake when he shot into his window and did not mean to kill him.

106.    VAN LEUVEN then informs Dr. Moore that law enforcement was, at that moment, serving warrants at his residences and businesses and that his truck was also towed down to Coeur d'Alene pursuant to a warrant.

107.    Following several minutes in which the detectives apply pressure by telling Dr. Moore that they have proof of first-degree murder and if he doesn't explain himself, they will bring those charges against him, Dr. Moore says: **"Well, I didn't shoot him and I'm sorry but that's what it is…"** Dr. Moore then raises both his palms facing the detectives in a stop gesture and says:

**"so I guess if you're gonna do that [i.e. charge him with murder], then I need to get an attorney."**

108.    The clarity and lack of any ambiguity in the assertion of his right to counsel is well understood by VAN LEUVEN and TOLLESON. The detectives sigh in obvious displeasure at the required termination of their interrogation, gather their things, stand up

and leave the room.

109.    While leaving the interrogation room, VAN LEUVEN asks Dr. Moore if he has a cell phone on his person. Dr. Moore responds in the negative and states that it is in his vehicle. Before exiting the room. Van Leuven instructs Dr. Moore to "sit tight" and indicated they would be "right back".

110.    Law enforcement did not come right back.

111.    While Dr. Moore sat isolated in the secure room at the Sheriff's Annex, he was not supplied with a phone to call an attorney nor any means of communicating with the outside world.

112.    Dr. Moore sat in the room for approximately 45 minutes with no contact from anyone.

113.    While Dr. Moore sat in the interrogation room, VAN LEUVEN and TOLLESON met with RYAN who had been monitoring the interrogation of Dr. Moore.

114.    During this period of Dr. Moore's isolation, VAN LEUVEN, TOLLESON and RYAN decided that what Dr. Moore said was somehow unclear and that the interrogation would continue.

115.    But neither VAN LEUVEN nor TOLLESON reentered the interrogation room to seek clarification from Dr. Moore about his request for counsel. Instead, the collective decision was made to send RYAN in to resume the interrogation and leverage his preexisting relationship with Dr. Moore as they had known each other for many years and their children were involved in common activities in the community.

116.    When RYAN resumed the interrogation, he did not seek clarification of Dr. Moore's request for counsel, nor provide him with any opportunity to call counsel, but instead simply reinitiated the interrogation from a new angle employing coercive tactics and

techniques, including moral appeals for an admission of guilt.

117.   Dr. Moore maintains his innocence throughout and provides explanations for accusations made by RYAN.

118.   RYAN demonstrates frustration and disdain for Dr. Moore's assertions of innocence and continues to press Dr. Moore for an admission of guilt.

119.   After a prolonged exchange, repeated accusations, discussions about how RYAN believed Dr. Moore had committed the crime and that it must have been an accident, combined with frequent moral admonitions, RYAN finally asks "are we there?" prompting Dr. Moore's response of:

 **"I need to talk to an attorney then."**

120.   Instead of scrupulously honoring what is now Dr. Moore's second, unequivocal request for counsel, RYAN feigns that Dr. Moore was unsure and had said "I think" regarding his request for counsel, gaslighting Dr. Moore.

121.   Despite his repeated assertions that he does not want to violate Dr. Moore's rights and that he was "done" with the interrogation, RYAN fails to leave the room. When RYAN asks if Dr. Moore wants to continue the interrogation, Dr. Moore once again references his desire for counsel, stating: **"I think I need to talk to an attorney."**

122.   Despite Dr. Moore's statement that he wished to speak with legal counsel now a third time, RYAN still does not leave the room or provide access for Dr. Moore to secure an attorney. Rather, RYAN states his intent to leave but, upon reaching the door, turns to Dr. Moore and says "I want the truth." RYAN then instructs Dr. Moore that "I want you to admit the truth . . . you're killin' me man, okay buddy?".

SECOND AMENDED COMPLAINT AND JURY DEMAND                                20

123.    Dr. Moore responds by asking if RYAN wants him to speak without an attorney.

124.    In turn, RYAN says he doesn't want Dr. Moore to do anything he doesn't want to do, but that he wants to be able to tell the community the "truth".

125.    Expanding on his comment, RYAN admits that he is still attempting to interrogate Dr. Moore, despite his request for counsel, stating "I'm not trying to pull anything from you but the truth" thereby indicating his intent to keep the Dr. Moore talking so that truth can be "pulled out" from him.

126.    At one-point RYAN comments that "When I walk out this door, you are going to jail." RYAN then claims that Dr. Moore's only chance of avoiding jailtime is to waive his right to counsel and continue to speak with him, stating that "you are going to jail without a whole lot more explanation."

127.    Less than a minute later, RYAN tells Dr. Moore that he "can get an attorney here" thereby characterizing himself as a route through which Dr. Moore can speak to legal counsel, but then indicates that doing so would be fruitless, representing that "you can talk to a lawyer and explain it to him, or however you want to do it, but you *have* to want to tell us . . .because I -I wanna know. . . you gotta be booked for somethin', you gotta be held accountable, right?"

128.    After some additional rumination on the prudence of spanking children and the merits of individual moral responsibility, RYAN once again attempts to secure a confession, urging Dr. Moore to "[g]et it off your chest and be done with it. Whatever happens, happens. But just get it off your chest if that's what you wanna do."

129.    Then RYAN promises Dr. Moore that he won't be charged with first degree murder if only

he makes a statement. "But I promise you this: if you do, I promise you, I'll go talk to him about what booking we're looking at. I promise you that. And-and it won't be first degree murder, I can guaran-damn-tee."

130.   At this point, an unknown law enforcement officer knocks on the door, prompting RYAN to exit the interrogation room.

131.   Dr. Moore requests to use the restroom, which was granted roughly two minutes later. Following this brief bathroom break and despite his prior assertions that he would leave, RYAN returns to the room and continues his interrogation of Dr. Moore.

132.   Returning to the topic of Dr. Moore's request for counsel, RYAN mischaracterizes his three prior clear and unequivocal requests for counsel as somehow ambiguous. After RYAN asserts his supposed respect for constitutional rights several more times, he instructs Dr. Moore to "tell me what you want to do."

133.   In response, Dr. Moore states that he wants to speak with Ryan, as he trusts him, but reaffirms his desire to have a lawyer present. Again, and notwithstanding Dr. Moore's clear request for counsel, yet again, Ryan asks him to explain his request.

134.   Dr. Moore states that he'd like to speak with RYAN, but inquires if, given the circumstances, it would be prudent to consult with an attorney about his options.

135.   RYAN once again affirms his intent to leave, but asks for additional clarification, as if Dr. Moore's now numerous requests for counsel were somehow insufficient. In doing so, RYAN belittles Dr. Moore's attempts to exercise his fundamental constitutional right to counsel, saying he's done "playing games".

136.   Finally, after  dozens of past statements about his intent to "leave" and his desire to "not

infringe upon anything," RYAN finally leaves the interrogation room.

137.   Dr. Moore is left alone in the room for roughly half a minute before an ISP detective enters the room to give him some water and a blanket.

138.   Concerned about his property and pets, Dr. Moore asks the detective what is happening to his car and how the officers are searching his properties. The detective explains that his automobile is being towed and that his homes were being searched.

139.   After being told that his property was being seized and expressing concern about the safety of his pets, Dr. Moore requests to speak with RYAN "one more time."

140.   Upon RYAN's return, Dr. Moore, befuddled and stuttering, his will overborne, asks RYAN what he should do if he "doesn't have an attorney" which he at this point has asked for repeatedly but had been repeatedly ignored.

141.   At this point, RYAN urges Dr. Moore onwards, not answering his questions about his rights to counsel, but instead reinitiating the interrogation and discussion about the crime, mentioning the killing's impact on Bonners Ferry and ultimately back to asking about Dr. Drake's shooting itself.

142.   RYAN continues berating Dr. Moore for requesting his right to counsel, referring to it as a "guilt trip".

143.   After referencing the need to heal the community, RYAN once again accuses Dr. Moore of "laying a trip on him" when inquiring about legal counsel.

144.   After nearly four more minutes of badgering by RYAN, Dr. Moore attempts to ask a question, stating "I just don't understand why….", but is interrupted by perturbed grunting from RYAN.

145. Unable to finish, Dr. Moore falls silent, prompting RYAN to continue onwards with another torrent of badgering.

146. Eventually, after refusing to confess, RYAN accuses Dr. Moore of calling him back into the room for nothing. In response Dr. Moore once again brings up the topic of legal counsel which provokes RYAN to feign disgust and stand up.

147. Dr. Moore explains that he wants an attorney so that he can be aware of his rights and expresses confusion as to why RYAN is not providing him with one.

148. RYAN deflects by implying that a lawyer would not help Dr. Moore, as his only viable option is confession.

149. Following this exchange, RYAN attempts to incentivize further communications with him by suggesting a confession would allow Dr. Moore to be booked for a lesser offense than murder in the first degree – a crime which carries the death penalty in Idaho.

150. Having been badgered repeatedly about his request for counsel, law enforcement repeatedly failing to scrupulously honor his request for counsel, and repeatedly being told that he would be charged with first degree murder absent an explanation to a lesser charge, Dr. Moore's will is ultimately overborne by RYAN.

151. Dr. Moore then gradually adopts the elements of VAN LEUVEN, TOLLESON and RYAN's narrative, which law enforcement fed to him over the course of the interrogation, implicating himself in Dr. Drake's death.

152. Following Dr. Moore's coerced false confession, law enforcement booked him into the Boundary County Jail on charges of Murder in the Second Degree on August 27, 2020.

153. Dr. Moore's arrest and subsequent imprisonment were the direct result of the unlawful

extraction of a false confession by Defendants RYAN, VAN LEUVEN and TOLLESON.

154. On August 28, 2020, Defendant RYAN swore out a criminal complaint charging Dr. Moore with Murder in the Second Degree, alleging violations of Idaho Code §§ 18-4001, 18-4002, 18-4003 and 19-2520, a Felony.

155. By August 29, 2020, law enforcement broadcast Dr. Moore's arrest and named him the perpetrator of the murder of Dr. Drake. ISP told the local press that they had uncovered "compelling evidence" implicating Moore as well as a potential motive for the shooting.

156. Neither ISP, nor BFPD had uncovered any physical or forensic evidence to tie Dr. Moore to Drake's shooting.

157. At preliminary hearing on October 2, 2020, the only evidence presented that implicated Dr. Moore in Dr. Drake's death was the coerced false confession.

158. In granting Dr. Moore's motion to suppress his confession, the District Court found in its February 12, 2021, Memorandum Decision and Order Granting Motion to Suppress that: "Moore's will was overborne by the badgering and overreaching of police such that his waiver of his *Miranda* right to counsel was not made knowingly, voluntarily, and intelligently…Moore's subsequent confession was not voluntary, but rather, was the product of police coercion."

159. Notwithstanding the loss of their only hope of prevailing on a Second-Degree Murder charge, law enforcement persisted with their prosecution of Moore and did not propose dismissal.

160. After Dr. Moore was forced to file his own Motion to Dismiss the charges, the District Court found that "the only evidence the State presented at the October 2, 2020, preliminary

hearing connecting Moore to Brian Drake's death was the videotaped interview…[t]herefore, there is no admissible evidence in the record to establish that Moore committed the crime for which he stands charged."

161. If law enforcement had substantial and competent evidence of Dr. Moore's guilt, they could, at any time, bring charges against him. They have not done so.

162. The Idaho Attorney General appealed to the Idaho Supreme Court the District Court's finding of coercion and the District Court's decision to dismiss the criminal charges. They did not appeal the finding that Dr. Moore's right to counsel was violated, nor that the State may not use Dr. Moore's false confession in their case in chief in any subsequent criminal prosecution.

163. In their November 12, 2021, opening brief to the Idaho Supreme Court, the Idaho Attorney General admitted that RYAN's conduct in extracting Dr. Moore's statements on August 27, 2020, was "condemnable."

164. The Idaho Supreme Court issued its opinion on August 31, 2022, in *State v. Moore*, 516 P.3d 1054 (2022).

165. Title 42 United States Code Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

## COUNT I:
**42 U.S.C. § 1983 Claim for Violation of the Right Against Self-Incrimination in Violation of the Fifth and Fourteenth Amendment – Right to counsel**
***Against Defendants Ryan, Van Leuven, Tolleson and John and Jane DOE I-X***

166.   Plaintiff, Dr. Daniel Moore, hereby incorporates each of the allegations of this Complaint as if fully set forth herein and further allege as follows:

167.   On August 27, 2020, Dr. Moore was subjected to a custodial interrogation by law enforcement officers VAN LEUVEN, TOLLESON, and RYAN.

168.   VAN LEUVEN, TOLLESON, RYAN and other unknown agents acted under color of state law in the investigation of the death of Dr. Brian Drake.

169.   VAN LEUVEN and TOLLESON were acting as agents of the Idaho State Police and at the request of the BFPD and the CITY OF BONNERS FERRY in their capacity as duly sworn law enforcement officers in the State of Idaho.

170.   RYAN was acting as the agent of the CITY OF BONNERS FERRY and the BFPD as that agency's Assistant Chief of Police as a duly sworn law enforcement officer in the State of Idaho.

171.   As the subject of a custodial interrogation, Dr. Moore had several well-established rights guaranteed by the United States Constitution, including the right to remain silent and not self-incriminate and have counsel present during the interrogation upon his request.

172.   The Fifth Amendment protects individuals against compelled testimony in criminal cases as "[n]o person … shall be compelled in any criminal case to be a witness against himself," including interrogations, and is applied to the states via the Fourteenth Amendment

173.   The law was well-established at the time of the custodial interrogation of Dr. Moore that when a suspect in custody has requested counsel, all questioning must stop until counsel is provided. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

174.   Dr. Moore clearly and unequivocally requested counsel during the August 27, 2020, interrogation.

175.   Dr. Moore's clear and unequivocal request for counsel was made, as the Idaho First

Judicial District Court found, at approximately 15 minutes and 19 seconds into the custodial interrogation.

176.  In violation of Dr. Moore's privilege against self-incrimination and his concurrent right to counsel as guaranteed by the Fifth and Fourteenth Amendments, RYAN, acting in concert with VAN LEUVEN and TOLLESON, resumed the interrogation of Dr. Moore despite his clear and unequivocal request for counsel.

177.  Though it was RYAN who appears alone on the video-taped interrogation of Dr. Moore, VAN LEUVEN and TOLLESON encouraged the interrogation to proceed and watched as the interrogation continued without making any effort to intervene and stop the Constitutional violations that continued as RYAN's interrogation continued.

178.   VAN LEUVEN and TOLLESON, had a duty to intercede when fellow law enforcement officers violate the constitutional rights of a suspect. *Tobias v. Arteaga*, 996 F.3d 571, 583 (9th Cir. 2021).

179.  Yet VAN LEUVEN and TOLLESON stood by and failed to intervene as they watched RYAN continue to interrogate Dr. Moore despite not only his first unequivocal request for counsel, but his multiple subsequent requests for counsel.

180.  The acts of the Defendants in pursuant to the interrogation after Dr. Moore's unequivocal request for counsel deprived Dr. Moore of his Fifth and Fourteenth Amendment right against self-incrimination.

181.  The acts of the Defendants in continuing and encouraging the ongoing interrogation after Dr. Moore's after his clear and unequivocal requests for counsel deprived Dr. Moore of his Fifth and Fourteenth Amendment right to counsel.

182.  As a direct and proximate result of these violations of Dr. Moore's constitutionally secured rights by Defendants, Dr.  Moore has been damaged.

183.    The Defendants' acts and omissions in their individual capacities were the direct and proximate cause of Dr. Moore's injuries. Defendants knew or should have known that their conduct would result in Dr. Moore's wrongful arrest, prosecution, and detention.

184.    Further, the Defendants VAN LEUVEN, TOLLESON and RYAN in their individual capacities knew or should have known that Dr. Moore's arrest, murder charges and detention, combined with the subsequent public pronouncements of Dr. Moore as the murderer of Dr. Drake would result in the grievous personal injuries and damages against Dr. Moore as described above.

## COUNT II

### 42 U.S.C. § 1983 Claim for Violation of Due Process of the Fifth and Fourteenth Amendment-
### Coerced False Confession
### *Against Defendants Ryan, Van Leuven, Tolleson and John and Jane DOE I-X*

185.    Plaintiff, Dr. Daniel Moore, hereby incorporates each of the allegations of this Complaint as if fully set forth herein and further allege as follows:

186.    Although Dr. Moore had nothing to do with Dr. Drake's murder and repeatedly professed his innocence while also repeatedly requesting the assistance of counsel during Defendants' custodial interrogation of him on August 27, 2020, Defendants denied his multiple requests and persisted with their interrogation.

187.    The Fifth Amendment protects individuals against compelled testimony in criminal cases as "[n]o person …. shall be compelled in any criminal case to be a witness against himself," including interrogations, and is applied to the states via the Fourteenth Amendment.

188.    Many of the techniques and methods used by Defendants in interrogating Plaintiff have

been established as inherently coercive.

189.    Defendant RYAN employed the inherently coercive technique of repeatedly denying Dr.

Moore counsel despite his multiple unambiguous requests for counsel's assistance.

190.    Defendants VAN LEUVEN and TOLLESON intentionally refrained from intervening to

protect Plaintiff's right to counsel and against compelled self-incrimination despite hearing

multiple unambiguous requests for counsel.

191.    VAN LEUVEN, TOLLESON, RYAN and other unknown agents acted under color of state

law in the investigation of the death of Dr. Brian Drake and in their involvement in the

interrogation of Dr. Moore.

192.    VAN LEUVEN and TOLLESON were acting as agents of the Idaho State Police and at the

request of the BFPD and the CITY OF BONNERS FERRY in their capacity as duly sworn

law enforcement officers in the State of Idaho.

193.    RYAN was acting as the agent of the CITY OF BONNERS FERRY and the BFPD as that

agency's Assistant Chief of Police as a duly sworn law enforcement officer in the State of

Idaho.

194.    The acts of the Defendants in continuing the interrogation after Dr. Moore's unequivocal

request for counsel involved overreach and overbearing techniques which coerced the false

confession from Dr. Moore in violation of his Fifth and Fourteenth Amendment right

against compelled self-incrimination.

195.    By repeatedly violating Dr. Moore's unequivocal requests for counsel during the custodial

interrogation, pretending that Dr. Moore's requests were vague or ambiguous, RYAN

generated "a feeling of helplessness" in Dr. Moore which made him a "prisoner in a

totalitarian nightmare, where the police no longer obeyed the Constitution, but instead

followed their own judgment, treating suspects according to their whims." *Cooper v.*

SECOND AMENDED COMPLAINT AND JURY DEMAND                                    30

*Dupnik*, 963 F.2d 1220, 1243 (9th Cir. 1992).

196.   The Fourteenth Amendment bars as part of substantive due process the use of techniques which "shock the conscience" to extract a confession from a suspect.

197.   Defendant RYAN's gas-lighting or attempting to convince Plaintiff Moore that he had not clearly requested an attorney when he had unambiguously done so multiple times, was a constitutionally impermissible technique which would shock the conscience of any reasonable observer.

198.   Despite the clearly established law that police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect, Detectives VAN LEUVEN and TOLLESON did not intervene to interrupt RYAN's coercion of a false confession and repeated violations not only of Dr. Moore's right to counsel but his procedural due process rights.

199.   Defendant VAN LEUVEN, TOLLESON and RYAN's actions in their individual capacities were both a proximate and but-for cause of Plaintiff Moore's arrest, detention and prosecution and the resulting damages and injuries to Dr. and Mrs. Moore described above.

200.   Further, the Defendants VAN LEUVEN, TOLLESON and RYAN in their individual capacities knew or should have known that Dr. Moore's arrest, murder charges and detention, combined with the subsequent public pronouncements of Dr. Moore as the murderer of Dr. Drake would result in the grievous personal injuries and damages against Dr.  Moore as described above.

**COUNT III**

**42 U.S.C. § 1983 *Monell* Claim for Acts of Final Policymaker
*Against Defendant City of Bonners Ferry***

SECOND AMENDED COMPLAINT AND JURY DEMAND                    31

201.   Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein and further allege as follows:

202.   The CITY OF BONNERS FERRY is liable under the *Monell* doctrine and related doctrines for depriving Dr. Moore of his constitutional rights through Defendant RYAN's actions and of any as-yet unascertained officers who witnessed RYAN violate Moore's rights and did not intervene on Dr. Moore's behalf.

203.   The BFPD is an agency of the CITY OF BONNERS FERRY.

204.   Defendant RYAN acted as the Assistant Chief and sometimes the interim Chief of the BFPD and acted in that capacity under color of state law.

205.   The acts of RYAN described herein, under color of state law, deprived Dr. Moore of his Fifth and Fourteenth Amendment rights as guaranteed by the United States Constitution.

206.   RYAN had final policymaking authority from the CITY OF BONNERS FERRY concerning these acts.

207.   When RYAN engaged in these acts, he was acting as final policymaker for defendant CITY OF BONNERS FERRY.

208.   The acts of RYAN caused the deprivation of Dr. Moore's rights, that is RYAN's acts were so closely related to the deprivation of Dr. Moore's rights as to be the moving force that caused the ultimate injuries complained of herein.

209.   Defendant RYAN set the specific policy for whether Moore's interrogation was to continue or not after a clear invocation of his right to counsel on August 27, 2020.

210.   Because the CITY OF BONNERS FERRY's final policy-maker's decisions led to the deprivation of Plaintiff Moore's constitutional rights, which has caused him and his wife to suffer extensive harm, the CITY OF BONNERS FERRY is liable under § 1983 for

SECOND AMENDED COMPLAINT AND JURY DEMAND                                    32

damages.

## COUNT IV

### 42 U.S.C. § 1983 *Monell* Claim for Official Policy, Practice or Custom
### *Against Defendant City of Bonners Ferry*

211.    Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein and further allege as follows:

212.    The CITY OF BONNERS FERRY is liable under the *Monell* doctrine and related doctrines for depriving Dr. Moore of his constitutional rights through Defendant RYAN's actions and of any as-yet unascertained officers who witnessed RYAN violate Moore's rights and did not intervene on Dr. Moore's behalf.

213.    The BFPD is an agency of the CITY OF BONNERS FERRY.

214.    Defendant RYAN acted as the Assistant Chief and sometimes the interim Chief of the BFPD and acted in that capacity under color of state law.

215.    The acts of RYAN described herein, under color of state law, deprived Dr. Moore of his Fifth and Fourteenth Amendment rights as guaranteed by the United States Constitution.

216.    The careless, ignorant, or intentional actions of Assistant Chief RYAN in denying Plaintiff Moore's rights indicates an unwritten city custom or policy of denying interrogees their Fifth Amendment right to counsel and right against compulsory self-incrimination.

217.    The fact that Assistant Chief RYAN readily violated Moore's rights implies the existence of a longstanding BFPD practice or custom of the CITY OF BONNERS FERRY to continue to interrogate suspects in custody notwithstanding their request for counsel in violation of the suspect's Fifth and Fourteenth Amendment rights and well-established law preventing such policies and practices.

218.   The CITY OF BONNERS FERRY's widespread or longstanding practice or custom

caused the deprivation of Dr. Moore's rights by the BFPD Assistant Chief RYAN, that is,

the widespread or longstanding practice or custom is so closely related to the deprivation

of the plaintiff's rights as to be the moving force that caused the ultimate injury to Dr. and

Mrs. Moore.

**COUNT V**

**State Law Claim for Negligent Infliction of Emotional Distress**

***Against Defendants Zimmerman, Ryan, Van Leuven and Tolleson***

219.   Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth

herein and further allege as follows:

220.   Dr. Moore and Mrs. Moore have suffered and continue to suffer serious and severe

emotional distress as a direct and proximate result of Defendants ZIMMERMAN, RYAN,

VAN LEUVEN and TOLLESON's negligent acts in unlawfully extracting a false

confession, pursuing Dr. Moore's detention and prosecution, and persisting in efforts to

banish Dr. Moore and his family from the Bonners Ferry community even after his charges

were dismissed.

221.   Defendant ZIMMERMAN committed this misconduct while acting in the scope of his

employment with the BFPD and the CITY OF BONNERS FERRY.

222.   Defendant RYAN committed this misconduct while acting in the scope of his employment

with the BFPD and the CITY OF BONNERS FERRY.

223.   Defendants VAN LEUVEN and TOLLESON committed this misconduct while acting in

the scope of their employment with the ISP and as law enforcement agents acting at the

request of the BFPD and the CITY OF BONNERS FERRY.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiffs demand jointly and severally against Defendants as follows:

A. That the Court award compensatory damages to Plaintiffs and against the Defendants, jointly and severally, in an amount to be determined at trial that exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this action;

B. That the Court award punitive damages to Plaintiffs and against all individual Defendants in an amount to be determined at trial that will deter such conduct by the Defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of Plaintiffs costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E. For any and all other relief to which the Plaintiffs may be entitled.

DATED: August 17, 2023

Respectfully submitted,

By:    /s/ K. Jill Bolton
       K. Jill Bolton
       Bolton Law, PLLC
       111 N. 7th Street. #3386
       Coeur d'Alene, ID 83816

SECOND AMENDED COMPLAINT AND JURY DEMAND                    35