BOLTON LAW, PLLC
111 N. 7th St, #3386
Coeur d'Alene, Idaho 83816
Telephone: (208) 306-3360
Facsimile:  (208) 519-3974
K. Jill Bolton ISBN: 5269
reception@kjboltonlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL LEE MOORE & KAREN MOORE, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF BONNERS FERRY, BRIAN ZIMMERMAN; MARTIN RYAN, MICHAEL VAN LEUVEN, GARY TOLLESON, and JOHN and JANE DOE I-X, as agents of BONNERS FERRY POLICE DEPARTMENT<br><br>Defendants. | CASE NO.: 2:22-CV-376-BLW<br><br>PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN DISPUTE |

Comes now Plaintiffs and hereby submit their material facts in dispute pursuant to Fed. R. Civ. P. 56 and Dist. Idaho Loc. R. 7.1(c).

1. Defendants herein involved in the interrogation of Dr. Daniel Moore on August 27,

2020, violated Moores' *Miranda* and 5th Amendment rights as set forth in the written opinion of the Idaho Supreme Court in *State v. Moore*, 516 P.3d 1054 (2022).

2. Dr. Moore was subjected to a custodial interrogation from the start of his interrogation by Defendants Van Leuven and Tolleson. (Declaration of Counsel, Ex. 4).

3. Dr. Moore unequivocally invoked his right to counsel to Van Leuven and Tolleson at approximately 15 minutes into the interrogation, prior to Ryan entering the interrogation room. (Declaration of Counsel, Ex. 1, 4).

4. The video-taped interrogation shows that Van Leuven and Tolleson understood that Moore invoked his right to counsel as they closed their notepads, got up and left the room. (Declaration of Counsel, Ex. 1, 4).

5. Van Leuven testified at the hearing on the motion to suppress that he terminated the interview because it sounded to him like Moore asked for an attorney. (Declaration of Counsel, Ex. 4).

6. As conceded by the Idaho Attorney General, representing the Defendants on appeal to the Idaho Supreme Court, law enforcement conduct in continuing the interrogation of Dr. Moore after he asserted his right to counsel was "condemnable for the *Miranda* violation." (Declaration of Counsel, Ex. 3, p. 10).

7. "After Moore's clear and unequivocal invocation of counsel at 15 minutes and 19 seconds into his interview with Van Leuven and Tolleson, Van Leuven asked Moore if he had a cell phone on his person. Moore said his phone was in his car. Van Leuven told him to 'sit tight'; he terminated the interview and the two detectives left the room." (Declaration of Counsel, Ex. 4, p. 406).

8. Instead of cutting off questioning, Van Leuven "sends in Assistant Police Chief Ryan – who knows Moore from their many years in the Bonners Ferry community – to continue the interrogation of Moore. Moore had not asked to talk to Ryan. Ryan entered the room and continued the interrogation of Moore without ever mentioning Moore's request for an attorney." (Declaration of Counsel, Ex. 4, at p. 406).

9. Dr. Moore did not knowingly and intelligently waive his right to counsel. (Declaration of Counsel, Ex. 4).

10. The interrogation of Dr. Moore by the Defendants "establish a pattern of badgering and overreaching by Assistant Police Chief Ryan in order to 'wear down the accused [Moore] and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " (Declaration of Counsel, Ex. 4, p. 410).

11. The state district court found that:"When Ryan entered the room to continue the interrogation of Moore, about 1 hour and 1 minute had elapsed since the interview started. A summary of the events from that point follows:

    **01:01:00** - Assistant Police Chief Ryan enters the room and continues the interrogation. He does not mention Moore's request for an attorney. He repeatedly entreats Moore to 'do the right thing' for the town and for Drake's family, and to admit the shooting was an accident or a mistake. Id.. at 405.
    **01:12:24** - Moore (in response to Ryan asking him: 'Are we there, Daniel?') makes a second unequivocal invocation of his right to counsel, saying: <u>"I need to talk to an attorney then."</u>
    **01:12:25:** In response to this second invocation, Ryan first says: 'Okay. I understand. Then, we're done,' but quickly adds: <u>'I know a minute ago you said I think</u>, but now you are telling me you want to talk to an attorney, you don't want to talk to me anymore?' The video is clear: Moore never said 'I think.' He unequivocally stated 'I need to talk to an attorney.' **01:12:25 to 01:13:47** - Ryan does not terminate the interview but pretends that Moore's invocation of counsel was ambiguous. He continues to ask Moore to clarify or decide whether he wants to talk to Ryan or to an attorney, saying: 'Do you want to talk to me or not, yes or no?'
    **01:13:48**- Moore responds by saying: 'I think I need to talk to an attorney.'
    **01:13:49 to 01:16:45** - Ryan initially acknowledges Moore's statement by indicating that he is terminating the interview, saying: 'Well, you do that then,

thank you. All right, brother. Okay. I'm going to go, okay.' Moore replies, 'Thank you.' Ryan stands up and walks to the door but does not leave. Instead, he turns to Moore and restarts the conversation, saying: 'At this point.' Moore then looks up at him and asks: 'Yes, sir. What do you want me to do?' Ryan replies: 'I want the truth,' and then, 'I want you to admit the truth that- Jesus, man, you're killing me, man.'

**01:16:46 to 01:20:38**-Ryan leaves the room. Moore is allowed to use the bathroom.

**01:20:39** - Ryan comes back in and picks up right where he left off, disregarding Moore's two prior unequivocal requests for an attorney, and continuing to claim that Moore has not made his desire to cease the interview and consult an attorney clear. Ryan tells Moore: 'I will continue to talk to you, but you never ever - 'cause you won't clearly say what you want to do.' *Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVl-0038),* at 20:31 to 20:36.

**01:23:43** - Moore responds to Ryan's repeated calls for clarity, by saying <u>'I want to be able to talk to somebody who gives me my legal rights.'</u> This is Moore's third unequivocal invocation of his right to counsel. To which Ryan responds, 'Okay, there it is. I understand.'

**01:24:20**-Ryan leaves the room.

**01:24:21 to 01:24:39**- Moore is left seated alone in the room.**01:24:40 to 01:25:40** - Tolleson comes in and gives Moore a blanket and a bottle of water; and in response to a question from Moore, explains that search warrants are being executed on Moore's residence, cars, and office. Moore asks to talk to Ryan one more time.

**01:26:28 to 1:41:29** - Ryan reenters the room, and Moore starts talking about why he needs an attorney to help him in this interrogation. Ryan says: "I don't know what you want me to say." He tells Moore that he "knows" and is "positive" that Moore killed Dr. Drake, and he continues to exhort Moore to "do the right thing," and to "tell the truth." He asks Moore to: "Just explain it. Get it out, and be done with it, please." Moore explains why he needs an attorney to help negotiate with the police during this interrogation. To which Ryan replies, "You have a right to an attorney. But when I leave, and you call me back in and say I want to talk to you again, well then, we restart everything again." Ryan then asks Moore to "prove" his love for the town by admitting his guilt.

**01:41:20** - Moore makes his first incriminating statement. He says 'I did not go there to murder him.' Ryan goes on to elicit more incriminating statements from Moore about the crime."

(Declaration of Counsel, Ex. 4, pp. 405-406).

12. Defendant Ryan then initiated criminal proceedings against Dr. Moore by filing a criminal complaint in Boundary County on August 28, 2020. (Declaration of Counsel, Ex. 2).

13. Defendants relied solely on the unlawfully obtained statements of Dr. Moore in their

effort to establish probable cause for the charges of second-degree murder. *Moore*, 516 P.3d 1054, 1071 (2022).

14. The state district court found in its Memorandum Decision and Order Granting Motion to Suppress that Defendant Moore's motion, grounded in the Fifth Amendment, should be granted. (Declaration of Counsel, Ex. 4).

15. The State of Idaho appealed the state district court's decision in so far as it found that Moore's statements were not voluntarily given and the product of coercion in violation of due process. It also appealed the district court's order granting Moore's motion to dismiss. However, the State conceded the district court's Fifth Amendment findings relating to *Miranda*. The Idaho Attorney General in their appellate brief to the Idaho Supreme Court not only conceded the Fifth Amendment violations but identified law enforcement conduct as "condemnable" for the violations of Moore's asserted right to counsel. (Declaration of Counsel, Ex. 3, p. 10).

16. Though the lead detective, Van Leuven, would typically call the county prosecutor for legal advice when a question as important as whether a murder suspect had invoked his Fifth Amendment right to counsel arose, he did not do so before he Tolleson and Ryan made the collective decision to send Ryan into the interrogation room to continue questioning Dr. Moore. (Declaration of Counsel, Ex. 7).

17. The Idaho Supreme Court found that the State of Idaho conceded that Ryan violated Moore's *Miranda* rights and his Fifth Amendment right to counsel. *Moore,* 516 P.3d 1054,1071.

18. The tactics employed by law enforcement in extracting Dr. Moore's statements on August 27, 2020, are tactics identified by scientific literature as likely to produce a

false confession. (Declaration of Counsel, Ex. 6).

19. Dr. Moore had an alibi from Boundary County Coroner Mick Mellett who placed Moore with him in his home on the date and time of the shooting of Brian Drake and Dr. Moore did not leave Mellet's house until after the shooting had occurred. Mellet was certain of the times because Moore had been at his house since 6:15 that night and was there when Mellet's pager went off indicating that ambulances had been dispatched to the Drake murder scene. Mellett confirmed that Moore left after his pager went off and had complained of not feeling well. He returned to Mellett's house about 15-20 minutes later and asked him if he had any Imodium. Mellett gave him Imodium, Moore grabbed a sprite and then left. (Declaration of Counsel, Ex. 8).

20. Mick Mellett found Dr. Moore after the gas leak in his office. Dr. Moore had become woozy after attempting to change the air filter on his furnace. It was apparent to Mellett there was a gas leak in the office that led to Dr. Moore becoming woozy. Mick Mellett confirmed that Dr. Moore did not have a good sense of smell and it was not unusual that he did not smell that there was a gas leak in his office. Dr. Moore was a close friend of Mick Mellett and Mellett never heard him mention, let alone complain of Dr. Drake or of Drake taking his patients. He would have mentioned such a concern to Mellett. (Declaration of Counsel, Ex. 8).

21. An eyewitness, SpainIreland (aka Funderberg) identified a "running man" coming from the area of the gunshot he heard at the time of Drake being shot. When shown a photo line-up which contained Moore's photo, SmithIreland did not identify Moore as the person he saw running from the crime scene, nor did he identify anyone in the photo array as the man he saw that night. SmithIreland told the officer conducting the

photo line-up that he remembered the suspect to be a black male, having darker skin.

(Declaration of Counsel, Ex. 9).

Dated this 12th day of October 2023.

>*/s/ K. Jill Bolton*
>K. Jill Bolton
>Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I certify that on October 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Defendants' Attorneys:

Bentley G. Stromberg
bstromberg@clbrmc.com , bmckinley@clbrmc.com
Michael J. Kane
mkane@ktlaw.net , tpresler@ktlaw.net

>*/s/ K. Jill Bolton*
>K. Jill Bolton