BOLTON LAW, PLLC
111 N. 7th St, #3386
Coeur d'Alene, Idaho 83816
Telephone: (208) 306-3360
Facsimile:  (208) 519-3974
K. Jill Bolton ISBN: 5269
reception@kjboltonlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DANIEL LEE MOORE & KAREN MOORE, husband and wife,<br><br>　　Plaintiffs,<br><br><br>　v.<br><br>THE CITY OF BONNERS FERRY, BRIAN ZIMMERMAN; MARTIN RYAN, MICHAEL VAN LEUVEN, GARY TOLLESON, and JOHN and JANE DOE I-X, as agents of BONNERS FERRY POLICE DEPARTMENT<br><br><br>　　Defendants. | CASE NO.: 2:22-CV-376-BLW<br><br><br>DECLARATION OF COUNSEL |

K. Jill Bolton hereby makes the following declaration.

1. I am an adult citizen of the United States and competent to make this
   Declaration based upon personal knowledge.

2. I am counsel for Plaintiffs in this matter.

3. Filed herewith as **Exhibit 1** is a true and correct copy of the video taped

interrogation of Daniel Moore conducted by Defendants in this matter on August 27, 2020.

4. Attached hereto as **Exhibit 2** is a true and correct copy of the criminal complaint filed by Defendant Martin Ryan on August 28, 2020 in State of Idaho v. Moore, initiating Boundary County case number CR11-20-1076.

5. Attached hereto as **Exhibit 3** is a true and correct copy of the Brief of Appellant filed by the State of Idaho in their appeal of the decision of the state district court in Boundary County case number CR11-20-1076, dismissing the criminal charges against Daniel Moore.

6. Attached hereto as **Exhibit 4** is a true and correct copy of the state district court's memorandum decision and order granting Daniel Moore's motion to suppress in Boundary County case number CR11-20-1076.

7. Attached hereto as **Exhibit 5** is a true and correct copy of Bonners Ferry documents with Bates numbers 2.0004-2.0006, produced in response to Plaintiffs' requests for production of the job descriptions for the City of Bonners Ferry police department.

8. Attached hereto as **Exhibit 6** is a true and correct copy of the opinion of Defendants' retained expert witness, Matt Jones, a police policies and practices expert.

9. Attached hereto as **Exhibit 7** is a true and correct copy of excerpts of the transcript on appeal of the state court hearing on the motion to suppress in which defendant Van Leuven admits that he did not follow his normal

practice of contacting the county prosecutor when he had legal questions, such as the important question of whether Dr. Moore had asserted his right to counsel during the August 27, 2020 custodial interrogation.

10. Attached hereto as **Exhibit 8** is a true and correct copy of the transcript of the May 19, 2020 interview by the Idaho State Police of Moore's alibi witness, Boundary County Coroner, Mick Mellett.

11. Attached hereto as **Exhibit 9** is a true and correct copy of the report of interview of eyewitness SpainIreland (aka Funderburg) and results of the photo array shown him in which he failed to identify Moore as the person he saw running from the crime scene after Drake was shot.

Dated this 12th day of October 2023.

BOLTON LAW, PLLC

/s/K. Jill Bolton
K. Jill Bolton
Attorney for Plaintiffs Daniel Moore
and Karen Moore

<u>CERTIFICATE OF SERVICE</u>

I certify that on October 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Defendants' Attorneys:

Bentley G. Stromberg
bstromberg@clbrmc.com , bmckinley@clbrmc.com
Michael J. Kane
mkane@ktlaw.net , tpresler@ktlaw.net


*/s/ K. Jill Bolton*

K. Jill Bolton

# Exhibit 1 –

placeholder

(video of Dr. Moore interrogation 8.27.20)

Exhibit 2 –

(8.28.20 Criminal Complaint filed by Martin Ryan)

PROSECUTOR'S OFFICE
BOUNDARY COUNTY
P.O. BOX 1148
BONNERS FERRY, ID 83805
208-267-7545
208-267-5284 (Fax)
prosecutor@boundarycountyid.org

STATE OF IDAHO
COUNTY OF BOUNDARY
FILED 5/28/2020 AT 11:10am
GLENDA POSTON, CLERK
BY _____
DEPUTY CLERK

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE
STATE OF IDAHO, IN AND FOR THE COUNTY OF BOUNDARY
MAGISTRATE DIVISION

| | |
|---|---|
| STATE OF IDAHO, | ) CASE NO.: CR11-20-1076 |
| Plaintiff, | ) **CRIMINAL COMPLAINT** |
| | ) **MURDER IN THE SECOND DEGREE** |
| vs. | ) (I.C. 18-4001, 18-4002, |
| | ) 18-4003 and 19-2520), |
| DANIEL LEE MOORE, | ) a Felony. |
| DOB: 05/14/1957, | ) |
| SS#: XXX-XX-9509, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

PERSONALLY APPEARED before me this 28th day of August

2020, MARTY RYAN, who being first duly sworn, complains and

says:

That the defendant, DANIEL LEE MOORE, on or about the 12th

day of March, in the County of Boundary, State of Idaho, did

wilfully, unlawfully, deliberately, and with malice

aforethought, but without premeditation, kill and murder Brian

PAGE 1 - CRIMINAL COMPLAINT

Drake, a human being, by using a pistol and shooting through a window hitting Brian Drake in the back from which he died, a violation of Idaho Code Section 18-4001, 18-4002, 18-4003 and 19-2520, Murder in the Second Degree, a felony.

Said Complainant therefore prays that said defendant, DANIEL LEE MOORE, be dealt with according to law.

_____
Complainant

## COUNT I, PART II

That the Defendant, DANIEL LEE MOORE, on or about the 12th day of March 2020, in the County of Boundary, State of Idaho, did use a firearm, to-wit: a pistol, in the commission of the crime alleged in COUNT I: MURDER IN THE SECOND DEGREE, a violation of Idaho Code Sections 18-4001, 18-4002 and 18-4003, and should be enhanced per Idaho Code Section 19-2520.

DATED this 28th day of August 2020.

_____ 62
Complainant

SUBSCRIBED AND SWORN to before me this 28th day of August 2020.

_____
MAGISTRATE JUDGE #390

BOND: $_____

TCN#_____

PAGE 3 - CRIMINAL COMPLAINT

# Exhibit 3 –

(Appellant's Brief – State of Idaho v. Moore)

## IN THE SUPREME COURT OF THE STATE OF IDAHO

STATE OF IDAHO,       )
                        )    No. 48817-2021
     Plaintiff-Appellant,   )
                        )    Boundary County Case No.
v.                    )    CR11-20-1076
                        )
DANIEL LEE MOORE,    )
                        )
     Defendant-Respondent.  )
                        )

_____

### BRIEF OF APPELLANT
_____

### APPEAL FROM THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF BOUNDARY
_____

### HONORABLE BARBARA A. BUCHANAN
### District Judge
_____

**LAWRENCE G. WASDEN**
**Attorney General**
**State of Idaho**

**MARK A. KUBINSKI**
**Deputy Attorney General**
**Chief, Criminal Law Division**

**KENNETH K. JORGENSEN**
**Deputy Attorney General**
**Criminal Law Division**
**P. O. Box 83720**
**Boise, Idaho 83720-0010**
**(208) 334-4534**
**E-mail: ecf@ag.idaho.gov**

**ATTORNEYS FOR**
**PLAINTIFF-APPELLANT**

**K. JILL BOLTON**
**Bolton Law, PLLC**
**424 E. Sherman Ave., Ste. 308**
**Coeur d'Alene, Idaho 83814**
**(208) 306-3360**
**E-mail: reception@kjboltonlaw.com**

**ATTORNEY FOR**
**DEFENDANT-RESPONDENT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF THE CASE........................................................................1

    Nature Of The Case ..............................................................................1

    Statement Of The Facts And Course Of The Proceedings .......................................1

ISSUES ...........................................................................................................5

ARGUMENT ...................................................................................................6

  I.    The District Court Erroneously Concluded Moore's
       Due Process Rights Would Be Violated By Use Of
       His Confession For Limited Purposes At Trial............................................6

      A.    Introduction.....................................................................6

      B.    Standard Of Review ......................................................6

      C.    The Facts Found By The District Court Do
          Not Support A Determination That Moore's
          Statements Were Involuntary............................................7

  II.    The District Court Erred By Dismissing The State's
       Case Regardless Of The Merits Of Its Suppression
       Order .......................................................................14

      A.    Introduction...................................................................14

      B.    Standard Of Review ......................................................14

      C.    The District Court Erred By Reviewing The
          Admissibility Of Evidence Presented At The
          Preliminary Hearing.......................................................15

CONCLUSION...............................................................................................17

CERTIFICATE OF SERVICE .........................................................................17

# TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE**

Arizona v. Fulminante, 499 U.S. 279 (1991) .................................................................. 10

Berghuis v. Thompkins, 560 U.S. 370 (2010) ....................................................... 9, 10, 12

Blackburn v. Alabama, 361 U.S. 199 (1960) .................................................................. 13

Colorado v. Connelly, 479 U.S. 157 (1986) ..................................................................... 7

Culombe v. Connecticut, 367 U.S. 568 (1961) ............................................................ 9, 12

Davis v. North Carolina, 384 U.S. 737 (1966) ............................................................ 7, 12

Dickerson v. United States, 530 U.S. 428 (2000) ........................................................... 11

Frazier v. Cupp, 394 U.S. 731 (1969) .............................................................................. 13

Greenwald v. Wisconsin, 390 U.S. 519 (1968) ................................................................. 8

Harris v. New York, 401 U.S. 222 (1971) .......................................................................... 6

Harris v. South Carolina, 338 U.S. 68 (1949) ................................................................ 13

Jackson v. Denno, 378 U.S. 368 (1964) ............................................................................ 7

Johnson v. New Jersey, 384 U.S. 719 (1966) .................................................................... 8

Lisenba v. People of State of California, 314 U.S. 219 (1941) ....................................... 13

Lockhart v. Nelson, 488 U.S. 33 (1988) .......................................................................... 15

Lunneborg v. My Fun Life, 163 Idaho 856, 421 P.3d 187 (2018) ................................... 15

Lyons v. Oklahoma, 322 U.S. 596 (1944) ........................................................................ 11

Malloy v. Hogan, 378 U.S. 1 (1964) ................................................................................ 11

Maryland v. Shatzer, 559 U.S. 98 (2010) ......................................................................... 7

McDaniel v. Brown, 558 U.S. 120 (2010) ....................................................................... 15

Miranda v. Arizona, 384 U.S. 436 (1966) ............................................................... passim

Oregon v. Elstad, 470 U.S. 298 (1985)......................................................................... 8, 10

Procunier v. Atchley, 400 U.S. 446 (1971).......................................................................... 8

Spano v. New York, 360 U.S. 315 (1959) ......................................................................... 12

State v. Johns, 112 Idaho 873, 736 P.2d 1327 (1987) ........................................................ 7

State v. McLean, 123 Idaho 108, 844 P.2d 1358 (Ct. App. 1992).................................... 7

State v. Moore, 148 Idaho 887, 231 P.3d 532 (Ct. App. 2010) ........................................ 15

State v. Munhall, 118 Idaho 602, 798 P.2d 61 (Ct. App. 1990) ...................................... 14

State v. Owens, 101 Idaho 632, 619 P.2d 787 (1979) ...................................................... 15

State v. Radford, 134 Idaho 187, 998 P.2d 80 (2000) ................................................ 10, 11

State v. Samuel, 165 Idaho 746, 452 P.3d 768 (2019)................................................... 7, 8

State v. Yager, 139 Idaho 680, 85 P.3d 656 (2004)......................................................... 10

Stein v. New York, 346 U.S. 156 (1953)............................................................................. 7

United States v. Johnson, 457 U.S. 537 (1982) .................................................................. 8

United States v. Patane, 542 U.S. 630 (2004)............................................................... 6, 16

## STATUTES

I.C. § 19-815A ............................................................................................................ 15, 16

<u>STATEMENT OF THE CASE</u>

<u>Nature Of The Case</u>

The state appeals from the district court's order of dismissal. The state challenges the district court's suppression of evidence. Specifically, although the state does not challenge the district court's determination there was a *Miranda* violation, it does challenge the district court's determination that the *Miranda* violation rendered Moore's statements involuntary.

<u>Statement Of The Facts And Course Of The Proceedings</u>

The state charged Moore with second-degree murder. (R., pp. 152-54.) Moore moved to suppress his statements to police, contending a violation of his *Miranda* rights. (R., pp. 308-34.) The unchallenged factual findings of the district court were as follows:

Dr. Brian Drake was killed in his chiropractic office by a single shot through a window. (R., p. 386.) Law enforcement identified Moore, another chiropractor in town, as a suspect. (R., p. 387.) Police obtained search warrants for Moore's office, homes, and cars. (R., p. 387.) They invited Moore to bring a handgun he owned—that they knew was not the murder weapon—to them for purported testing. (R., p. 387.) While Moore was at the law enforcement annex, officers executed the search warrants. (R., p. 388.)

After a little more than 17 minutes waiting in the conference room making small talk with officers, three other officers took Moore into a "'secure part of the facility.'" (R., pp. 388-89.) Before entering the secure area, Moore, at police request, emptied his pockets and was patted down. (R., p. 389.) At that point officers did not return Moore's keys. (R., p. 389.)

Two detectives started talking to Moore about the Drake murder.  (R., pp. 389-90.) About four minutes into the discussion, after Moore generally denied being involved, the detectives provided *Miranda* warnings.  (R., p. 390.)  The interview continued, with Moore continuing to deny any involvement.  (R., p. 390.)  Less than fifteen minutes into the interview, one of the detectives told Moore that unless he gave them a reason to believe he did not mean to kill Drake when he fired through the window that they would have no option but to infer intent to kill.  (R., pp. 390-91.)  Moore responded that "if you are going to do that, then I need to get an attorney."  (R., p. 391 (emphasis omitted).)  The detectives announced the end of the interview, but instructed Moore to stay in the room.  (R., p. 391.)

The detectives consulted with each other and other officers about what to do next for approximately 45 minutes while Moore waited in the interview room.  (R., p. 391.)  The police then decided to have Officer Ryan, who knew Moore, approach and question him. (R., p. 391.)  This questioning started about 61 minutes (including the 45 minutes without interaction with police) after Moore entered the secure part of the police station.  (R., p. 392.)

Ryan encouraged Moore to "do the right thing" and to explain evidence showing he was in the alley at the time the shooting there occurred, and told him that he will only make things worse for himself if he continued to claim he was only present in the alley to defecate (Moore's explanation for being at the scene of the shooting).  (R., p. 392.)  Ryan again told Moore that he would face first-degree murder charges absent his providing a version of events that did not include intent to kill Drake. (R., p. 392.)  Again, in response, Moore stated he needed to talk to an attorney.  (R., pp. 392-93.)  When Ryan asked for clarification, Moore stated a third time that he needed to talk to an attorney.  (R., p. 393.)

After allowing Moore to use the bathroom, Ryan asked Moore if he wanted an attorney and Moore responded, "I want to be able to talk to somebody who gives me my legal rights." (R., p. 394.) Ryan announced, "We're done." (R., p. 394.) At that point one hour and 24 minutes had elapsed. (R., p. 394.)

Thereafter one of the detectives entered the room to give Moore a blanket and a bottle of water that Moore had requested. (R., p. 394.) Moore asked the detective if he could "talk to Ryan one more time." (R., p. 395 (emphasis omitted).) After Ryan re-entered the room Moore stated, "[W]hat should I do if I don't have an attorney and I tell you something, then I'm—I mean, that just seems already like—I still would like to talk to you, but it's like—" (R., p. 395 (emphasis omitted).) Ryan then told Moore that he knew what Moore did and that Moore should be honest. (R., pp. 395-96.) He stated that "for the town to heal, it needs to know why Moore killed Drake." (R., p. 396.) After some back and forth, Ryan again told Moore that "if he does not explain what happened, law enforcement will be left to conclude that his killing of Drake was premeditated." (R., p. 396 (emphasis omitted).) Ryan then told Moore he knew Moore shot Drake, and that if Moore will not tell what happened then he and Ryan are wasting their time. (R., p. 396.)

Moore then expressed the need for an attorney because if he admitted killing Drake he would have nothing to bargain with. (R., p. 397.) Ryan again told Moore that he would be booked for first-degree murder and that Ryan wanted the truth. (R., p. 397.) Moore then stated, "I did not go there to murder him" and stated that he fired through the window blindly, not even knowing Drake was present. (R., pp. 397-98 (emphasis omitted).) This statement was made "approximately 1 hour and 41 minutes into the police interview." (R., p. 398.)

The district court concluded that police violated Moore's *Miranda* rights by continuing a custodial interrogation after Moore invoked his right to counsel. (R., pp. 398-412.) The district court then stated, "The Court further finds that Moore's subsequent confession was not voluntary, but rather, was the product of police coercion." (R., p. 411.)

The state moved for reconsideration of the court's determination that Moore's confession was involuntary within 14 days of entry of the court's order granting suppression. (R., pp. 414-15.) The district court denied the motion, providing legal authority and analysis omitted from the initial order. (R., pp. 526-30.) The district court then dismissed the case, reasoning that once evidence of the confession was stricken from the preliminary hearing the remaining evidence did not show probable cause. (R., pp. 538-42.) The state appealed within 42 days of entry of the order denying reconsideration and the judgment of dismissal. (R., pp. 546-48.)

<u>ISSUES</u>

I.      Although there was a *Miranda* violation, and Moore's statements are inadmissible in the state's case-in-chief, did the district court err when it concluded admission of Moore's confession at trial for any other purpose would violate due process because the confession was coerced?

II.     Did the district court err by concluding the magistrate erred at the preliminary hearing by considering evidence of the confession where Moore did not object to that evidence?

ARGUMENT

I.

The District Court Erroneously Concluded Moore's Due Process Rights Would Be
Violated By Use Of His Confession For Limited Purposes At Trial

A.      Introduction

Although the district court's finding of a *Miranda* violation was correct, its

conclusion that Moore's confession was coerced is erroneous for two reasons.  First, the

district court failed to find a constitutionally prohibited coercion.  A *Miranda* violation,

standing alone, is not the coercion necessary to constitute a due process or Sixth

Amendment violation.[1]  Second, the district court erred as a matter of law when it

concluded that Moore's will was overborne.  Review of the factors cited by the district

court show that the confession was constitutionally voluntary and not compelled self-

incrimination.

B.      Standard Of Review

"Our standard in reviewing whether a defendant's custodial statements to police

agents were voluntarily given is one of deference to the lower court's findings of fact, if

---

[1] Exclusion of unwarned statements from the prosecution's case-in-chief "is a complete
and sufficient remedy for any perceived *Miranda* violation."  United States v. Patane, 542
U.S. 630, 643 (2004) (quotation marks omitted).  Although a coerced statement cannot be
used at trial for any purpose, a statement obtained in violation of *Miranda* can be used for
impeachment.  Harris v. New York, 401 U.S. 222, 226 (1971) ("The shield provided by
Miranda cannot be perverted into a license to use perjury by way of a defense, free from
the risk of confrontation with prior inconsistent utterances.").  Moreover, also unlike a
coerced statement, a *Miranda* violation does not result in suppression of physical evidence.
Patane, 542 U.S. at 637 (the Due Process Clause "cannot be violated by the introduction
of nontestimonial evidence obtained as a result of voluntary statements").  Thus, at stake
here is the impeachment use of Moore's confession and, possibly, suppression of physical
evidence acquired as a result of his statement (noting that Moore did not move for
suppression of physical evidence).

they are not clearly erroneous; we then exercise free review over the question of whether the facts found are constitutionally sufficient to show voluntariness." State v. McLean, 123 Idaho 108, 111, 844 P.2d 1358, 1361 (Ct. App. 1992). See also Davis v. North Carolina, 384 U.S. 737, 741-42 (1966) ("It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confession was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness.").

C.      The Facts Found By The District Court Do Not Support A Determination That Moore's Statements Were Involuntary

The Due Process Clause of the Fourteenth Amendment "applies to any confession that was the product of police coercion, either physical or psychological, or that was otherwise obtained by methods offensive to due process." State v. Samuel, 165 Idaho 746, 762, 452 P.3d 768, 784 (2019). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). See also State v. Johns, 112 Idaho 873, 879 n.3, 736 P.2d 1327, 1333 n.3 (1987) ("police … coercion is a prerequisite to suppression" of a statement on due process grounds). Interrogation alone "is not inherently coercive" and has "social value in solving crime." Stein v. New York, 346 U.S. 156, 184 (1953), overruled in part on other grounds by Jackson v. Denno, 378 U.S. 368 (1964). "Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good essential to society's compelling interest in finding, convicting, and punishing those who violate the law." Maryland v. Shatzer, 559 U.S. 98, 108 (2010) (quotation marks and citations omitted). "The Fifth

Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony." Oregon v. Elstad, 470 U.S. 298, 306-07 (1985) (emphasis original).

The district court did not articulate what component of the interrogation was coercive in its initial suppression order. (See R., pp. 385-413.) Its *Miranda* analysis is not a substitute for the proper due process analysis. State v. Samuel, 165 Idaho 746, 762, 452 P.3d 768, 784 (2019) ("Whether a defendant has waived *Miranda* rights and whether a confession was voluntary have overlapping—though different—analyses.") Although failure to accede to a request for counsel was a *Miranda* violation and is "relevant to the claim that the statements were involuntary," Greenwald v. Wisconsin, 390 U.S. 519, 521 (1968), "denial of the right to counsel," like low intelligence or failure to warn of the right to silence, is "not in [itself] coercive. Rather [it is] relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect." Procunier v. Atchley, 400 U.S. 446, 453-54 (1971). See also Johnson v. New Jersey, 384 U.S. 719, 731 (1966) ("[T]he failure to grant [defendant] access to outside assistance" is a factor "tending to prove the involuntariness" of a confession, but the Supreme Court of the United States has "expressly declined to condemn an entire process of in-custody interrogation solely because of such conduct by the police."), abrogated on other grounds by United States v. Johnson, 457 U.S. 537 (1982). The failure to provide counsel when requested, although a *Miranda* violation, is alone insufficient to sustain a claim of a due process violation. The original suppression order was erroneous because the condition precedent of official coercion was not identified by the district court.

Nor was the error corrected on reconsideration. There the district court stated that the coercive aspect of the interview was "the length of Moore's detention and the repeated

and prolonged nature of his questioning." (R., p. 527.) Application of the relevant law to the facts found by the district court shows that this determination was error.

Repeated questioning over time rises to the level of coercion if it is "relentless, constantly repeated probing designed to break concentrated resistance." Culombe v. Connecticut, 367 U.S. 568, 623 (1961). The district court found that Moore was detained a total of about one hour and 41 minutes before making the inculpatory statements. (R., p. 398.) Of this 101 minute detention, the supposedly coercive interrogation lasted no more than 40 minutes. (R., pp. 392 (Officer Ryan starts questioning Moore one hour and one minute into the entire interview), 398 (incriminating statements made one hour and 41 minutes into entire interview).) The questioning that resulted in the ultimate confession occurred *after* Ryan terminated the interview but Moore asked to "**talk to [Officer] Ryan one more time**." (R., pp. 394-95 (bolding original).) When Officer Ryan re-entered the room, Moore said, "**I still would like to talk to you**." (R., p. 395 (bolding original).) The confession occurred less than 17 minutes later. (R., pp. 394, 398.) Although the length of the interview and its repeated nature are proper factors in the balancing test, they do not rise to the level of official coercion under the facts of this case.

In Berghuis v. Thompkins, 560 U.S. 370, 373 (2010), two police officers interrogated a murder suspect for a continuous three hours in an 8 by 10 foot room while the suspect sat, mostly silently, in a "hard" chair. He finally confessed when he was asked about his belief in God and whether he prayed for forgiveness. Under these facts, there was "no evidence" the "statement was coerced." Id. at 386. "It is true that apparently [the suspect] was in a straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive." Id. at 386-87. To

be held coercive, even longer interrogation must be "accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats." Id. at 387. Nor was an appeal to the suspect's religious beliefs coercive: "The Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." Id. (brackets and quotations marks omitted). See also Elstad, 470 U.S. at 304-05.

None of the district court's factual findings support the legal conclusion that police conduct, though condemnable for the *Miranda* violation, resulted in coercion that compelled Moore to confess. The district court's analysis fails on the first prong of the applicable test: the police conduct was a *Miranda* violation but did not rise to the level of official coercion.

Even if this Court should not find reversible error in the district court's failure to identify a constitutionally significant coercion, the district court still erred in its application of the totality of the circumstances test. "In order to determine the voluntariness of a confession, the Court must look to the 'totality of the circumstances' and determine whether the defendant's will was overborne." State v. Radford, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000) (citing Arizona v. Fulminante, 499 U.S. 279, 287 (1991)). "When a defendant alleges an interrogation to be coercive, the State bears the burden of proving voluntariness of the defendant's confession by a preponderance of the evidence." State v. Yager, 139 Idaho 680, 685, 85 P.3d 656, 661 (2004). Factors to consider in the totality of circumstances include: "(1) Whether *Miranda* warnings were given; (2) The youth of the accused; (3) The accused's level of education or low intelligence; (4) The length of

detention; (5) The repeated and prolonged nature of the questioning; and (6) Deprivation of food or sleep." State v. Radford, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000).

"The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused, at the time he confesses, is in possession of 'mental freedom' to confess to or deny a suspected participation in a crime." Lyons v. Oklahoma, 322 U.S. 596, 602 (1944). The determination of voluntariness "depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Dickerson v. United States, 530 U.S. 428, 434 (2000) (quotation marks and brackets omitted). "Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was free and voluntary …." Malloy v. Hogan, 378 U.S. 1, 7 (1964) (quotation marks omitted).

Of course it is impossible to weigh police coercion against Moore's powers of resistance because the district court found no constitutionally coercive police conduct. Even assuming such coercion, however, weighing any possible police coercion against Moore's power of resistance shows that the coercive tactics used in the interrogation did not overbear Moore's will. Rather, despite the officer's disregard for Moore's *Miranda* rights, Moore had the mental freedom to confess or deny participation in the crime. In short, even if the failure to accede to Moore's request for counsel is deemed coercive, such coercion did not overbear Moore's will and compel his self-incrimination.

*Miranda* warnings were given to Moore, even though officers failed to heed Moore's requests for counsel. (R., pp. 391-94.) Moore was 63 years old. (R., p. 560.) Moore is educated and intelligent, as evidenced by the fact he has been a chiropractor for years. (R., p. 560.) He was detained a total of about one hour and 41 minutes before

making the inculpatory statements. (R., p. 398.) Of this 101 minute detention, the initial interview lasted approximately 16 minutes and the second interrogation lasted about 40 minutes, with a 45 minute respite between. (R., pp. 390-92, 398.) Moore was never deprived of food or sleep. (See R., pp. 386-98.)

All of these factor weigh against Moore's confession being a product of an overborne will. Although the district court properly found a *Miranda* violation, it erred when it concluded that the *Miranda* violation resulted in a due process violation.

For example, the district court specifically stated that "the length of Moore's detention and the repeated and prolonged nature of his questioning" were "the most critical" factors. However, Moore was detained for only one hour and 41 minutes total, and interrogated for only about an hour of that time. (R., pp. 388-92, 398.) "[T]here is no authority for the proposition that an interrogation of this length is inherently coercive." Berghuis, 560 U.S. at 387 (addressing a *three hour* detention and interrogation). Moreover, Officer Ryan had ended the interview but Moore then specifically asked to talk to Officer Ryan again before he confessed about 17 minutes later. (R., pp. 394-95.) This case does not present the "grueling [sic], intensely unrelaxing questioning over protracted periods" that can violate due process. Culombe, 367 U.S. at 623.

Indeed, comparison with other cases shows that the facts of this case fall squarely on the side of finding the confession voluntary. In Davis, 384 U.S. at 746, the defendant was subjected to "daily interrogation sessions" of 45 minutes to an hour over the course of 16 days in custody, resulting in a coerced confession. In Spano v. New York, 360 U.S. 315, 322-24 (1959), "petitioner's will was overborne by official pressure, fatigue and sympathy falsely aroused" where he was "questioned for virtually eight straight hours,"

from "early evening … into the night" with the confession occurring at "almost sunrise." The mentally ill defendant in Blackburn v. Alabama, 361 U.S. 199, 207 (1960), endured an "eight-to nine-hour sustained interrogation." The defendant in Harris v. South Carolina, 338 U.S. 68, 69-71 (1949), endured days of "systemic persisten[t]" interrogation by officers acting in shifts before a threat to charge his mother induced his confession.

By way of comparison, in Lisenba v. People of State of California, 314 U.S. 219, 231 (1941), the defendant was questioned for several hours after his request for counsel was not honored. Although the denial of counsel was a misdemeanor under local law, and the interrogation itself without arraignment was also illegal, these illegalities did not "furnish an answer to the constitutional question" before the Court. Id. at 235. Although "lawless practices" of "prolonged questioning of the prisoner before arraignment, and in the absence of counsel" were "close to the line," "we cannot hold that the illegal conduct … coerced the confessions." Id. at 240.

In Frazier v. Cupp, 394 U.S. 731, 737-38 (1969), the petitioner claimed his statement was coerced because he was falsely told that his accomplice had confessed, was given a sympathetic version of facts to confess to, and his request for counsel was not honored. The Court rejected this claim because petitioner "received partial warnings of his constitutional rights," the questioning was of "short duration," and petitioner was "mature" and "of normal intelligence." Id. at 739.

All of the factors supporting the conclusion that Lisenba's and Frazier's due process rights were not violated are even stronger in this case. In both Lisenba and Frazier, as in this case, police did not respect the defendants' request for counsel. In those cases the questioning was more prolonged than in this one, and there is no suggestion those

defendants had any greater resistance to police pressures than did Moore. The relatively short detention and interrogation of Moore simply does not rise to the level of overpowering his ability to resist.

The district court erred because it did not find a constitutionally prohibited police coercion. Even if such a prohibited coercion existed in this case, the district court erred by finding that it was sufficient to overwhelm Moore's ability to resist. The district court's determination that the violation of Moore's *Miranda* rights also resulted in a denial of his due process rights was legally erroneous.

## II.
### The District Court Erred By Dismissing The State's Case Regardless Of The Merits Of Its Suppression Order

A.    Introduction

The district court found that the magistrate erred by binding Moore over at the preliminary hearing because the magistrate relied upon Moore's confession, but, as it found in granting the motion to suppress, "Moore's incriminating statements were not admissible at his preliminary hearing" and therefore the magistrate's probable cause finding was not supported by "admissible evidence." (R., pp. 539-40.) The district court erroneously reviewed the admissibility of the evidence at the preliminary hearing rather than determining if the evidence *in fact admitted* supported the magistrate's probable cause finding.

B.    Standard Of Review

"The finding of probable cause must be based upon substantial evidence upon every material element of the offense charged." State v. Munhall, 118 Idaho 602, 606, 798 P.2d

61, 65 (Ct. App. 1990). "The decision of a magistrate that there exists probable cause to bind a defendant over to district court for trial on the charges should be overturned only on a showing that the committing magistrate abused his discretion." State v. Owens, 101 Idaho 632, 636, 619 P.2d 787, 791 (1979). The elements of review of discretion are whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." Lunneborg v. My Fun Life, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

C.    The District Court Erred By Reviewing The Admissibility Of Evidence Presented At The Preliminary Hearing

The district court did not reach a decision within the outer boundaries of its discretion, consistent with the applicable legal standards, or by the exercise of reason. A defendant in a criminal case may "challenge the *sufficiency of evidence educed at the preliminary examination*." I.C. § 19-815A (emphasis added). Here the district court reviewed the *sufficiency* of the evidence only after retroactively determining its *admissibility*. No authority allows the district court to determine the *admissibility* of evidence considered at the preliminary hearing prior to assessing its sufficiency.

Generally, a court reviewing the sufficiency of the evidence "'must consider all of the evidence admitted by the trial court,'" including evidence that "was admitted erroneously." McDaniel v. Brown, 558 U.S. 120, 131 (2010) (quoting Lockhart v. Nelson, 488 U.S. 33, 41 (1988).) In the case of criminal trials, this prevents the Defendant from receiving the windfall of an acquittal for mere trial error in the admission of evidence. State v. Moore, 148 Idaho 887, 893-94, 231 P.3d 532, 538-39 (Ct. App. 2010).

The reasons for limiting review of the sufficiency of the evidence at a preliminary hearing to the evidence in fact admitted apply to review under I.C. § 19-815A. Unless so limited, review of preliminary hearings would be a *de facto* intermediate appeal of the preliminary hearing. Moreover, it would invite dismissal after every successful motion to suppress evidence if the evidence suppressed were used at the preliminary hearing or grand jury. Because I.C. § 19-815A allows only review of the sufficiency of the evidence, and not the admissibility of the evidence, the district court abused its discretion when it did not limit its review to the evidence in fact submitted to the magistrate at the preliminary hearing regardless of the correctness of the suppression.

Moreover, if the state prevails on the first issue and the evidence in question is suppressible only because of the *Miranda* violation, the evidence of Moore's confession was not improperly used at the preliminary hearing. Statements taken in violation of *Miranda* need not "be discarded as inherently tainted." <u>Patane</u>, 542 U.S. at 639 (quotation marks omitted). The *Miranda* right is violated "only upon the admission of unwarned statements into evidence *at trial*." <u>Id.</u> at 641 (emphasis added). Because consideration of evidence of the unwarned statements was proper in the probable cause determination at the preliminary hearing, the district court erred.

CONCLUSION

The state respectfully requests this Court to reverse the district court insofar as it found a violation of Moore's rights against self-incrimination and due process, as opposed to a *Miranda* violation alone, and to vacate the district court's order of dismissal.

DATED this 18th day of October, 2021.


  /s/  Kenneth K. Jorgensen
KENNETH K. JORGENSEN
Deputy Attorney General


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this 18th day of October, 2021, served a true and correct copy of the foregoing BRIEF OF APPELLANT to the attorney listed below by means of iCourt File and Serve:

K. JILL BOLTON
BOLTON LAW, PLLC
reception@kjboltonlaw.com


  /s/  Kenneth K. Jorgensen
KENNETH K. JORGENSEN
Deputy Attorney General

KKJ/dd

# Exhibit 4 –

(State Court Memorandum & Decision Granting Motion to Suppress -uncontested on *Miranda* violations)

**IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF BOUNDARY**

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **CASE NO. CR11-20-1076** |
| | ) | |
| **Plaintiff,** | ) | **MEMORANDUM DECISION** |
| | ) | **AND ORDER GRANTING** |
| **vs.** | ) | **DEFENDANT'S MOTION TO** |
| | ) | **SUPPRESS** |
| **DANIEL LEE MOORE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

THIS MATTER came before the Court on January 14, 2021, upon Defendant's Motion and Supporting Memorandum to Suppress, filed on November 30, 2020. Plaintiff State of Idaho is represented by Boundary County Deputy Prosecutor Tevis W. Hull. Defendant Daniel L. Moore is represented by K. Jill Bolton, of Bolton Law, PLLC. All parties were present in the courtroom. Through his motion, Defendant Daniel Moore seeks to suppress all statements he made during an August 27, 2020, police interview, both prior to and following the reading of his *Miranda* rights.

## I. STANDARD OF REVIEW

In *State v. Martinez-Gonzalez*, 152 Idaho 775, 275 P.3d 1 (Ct. App. 2012), the Idaho Court of Appeals set forth the standard of review for a motion to suppress, as follows:

> The standard of review of a suppression motion is bifurcated. **When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact unless they are clearly erroneous, but we freely review the application of constitutional principles to the facts as found.** *State v.*

*Willoughby,* 147 Idaho 482, 485–86, 211 P.3d 91, 94–95 (2009); *State v. Fees,* 140 Idaho 81, 84, 90 P.3d 306, 309 (2004). …

*Id.* at 778, 275 P.3d at 4 (emphasis supplied). "**At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court.**" 152 Idaho at 778, 275 P.3d at 4 (emphasis supplied).

At the suppression hearing, sworn testimony was presented from Idaho State Police (ISP) Detective Sergeant Michael Van Leuven ("Van Leuven"), ISP Detective Leslie Lehman ("Lehman"), and Defendant Daniel Moore ("Moore"). Videos of the August 27, 2020, police interview of Moore were admitted into evidence (as Preliminary Hearing 10/2/2020 Defendant's Exhibits A (MVI-0036) through F (MVI-0041)).[1] Also admitted (as Court Ex. 1) were two clips from Lehman's body camera video,[2] depicting Moore's arrival at the Boundary County Sheriff's Office Annex ("Sheriff's Annex") in Bonners Ferry, Idaho, on August 27, 2020, and his ensuing conversation with Lehman and Detective Sean Prosser ("Prosser") prior to his interview. Based upon this evidence and other facts of record, this Court makes the following findings of fact.

## II. FINDINGS OF FACT

### A. The Killing of Dr. Drake and the ISP Investigation

Dr. Brian Drake was a practicing chiropractor, with a wife and four children.[3] On March 12, 2020, at approximately 7:26 p.m., he was shot and killed in his Bonners Ferry chiropractic office while speaking with his wife on his cell phone. A single bullet entered through an exam room exterior window and struck Dr. Drake in the back, causing his death. Dr. Drake's office – the scene of his death – is located at 6811 Main Street in Bonners Ferry.[4] The defendant, Dr. Daniel Moore,

---

[1] By stipulation of the parties, the Court viewed these six DVDs prior to the suppression hearing.
[2] These video clips were played in open court.
[3] *Affidavit of Probable Cause* (filed August 28, 2020), at ¶ 8.
[4] *Affidavit of Probable Cause*, at ¶¶ 8, 9, 11, 16-17.

is a chiropractor with a Bonners Ferry office located on the same street as Dr. Drake's office. Moore is 63 years old, and has practiced chiropractic medicine in Bonners Ferry for many years.[5]

After several months of investigation by ISP, law enforcement identified Moore as a suspect in the killing of Dr. Drake ("Drake"). Moore was first contacted on March 24, 2020, by Detectives Alderson and Lehman. That conversation was not recorded. On May 6, 2020, Van Leuven and Detective Alderson re-interviewed Moore at his office. That interview was recorded.[6] During that interview, Moore was asked about firearms, and he indicated that he had purchased his wife a small caliber hand gun a few years earlier. Van Leuven subsequently obtained the firearm transfer paperwork from the store where the gun was purchased and ascertained that it was not the weapon used to kill Dr. Drake.[7] On August 26, 2020, Van Leuven sought and obtained search warrants for Moore's Bonners Ferry office (known as Moore Chiropractic), two homes he owns in Boundary County, and his white 2019 Toyota Tundra pickup and white 2011 Toyota Camry sedan[8]. *Defendant's Motion and Memorandum to Suppress Illegally Seized Evidence* (filed December 3, 2020), at Exhibits A through D. Van Leuven is the lead investigator in the Drake case.

On August 27, 2020, Lehman telephoned Moore and asked if he would bring his wife's hand gun to the Boundary County Sheriff's Office Annex for inspection right away. Lehman testified at the suppression hearing that law enforcement knew that particular hand gun was not the one used in the shooting and that the request to inspect the gun was a ruse to get Moore to come to the Sheriff's Annex. Moore agreed to bring in the gun and drove himself to the Sheriff's Annex.

---

[5] *Affidavit of Probable Cause*, at ¶ 20; *Criminal Complaint* (filed August 28, 2020) (re: Date of Birth).

[6] *Affidavit of Probable Cause*, at ¶ 21.

[7] *Affidavit of Probable Cause*, at ¶¶ 26-27.

[8] The Camry was not the subject of a separate warrant. It was included in the warrant for one of Moore's residences.

**B. Moore's Arrival at the Boundary County Sheriff's Office Annex**

Moore arrived at about 2:00 p.m. He parked his vehicle in the back parking lot and entered through a rear door. The building is a county building with multiple offices. The Sherriff's Annex offices are located at the back of the building. As he entered the building, Moore was greeted by Lehman, who thanked him for bringing the hand gun in. Lehman asked Moore if he had a second for her firearms specialist to take a look at the hand gun. She introduced Prosser to Moore, and asked Moore to come into a conference room. Once inside, Prosser took the gun from Moore, and explained that he had to photograph it and note its serial number. While Moore waited for Prosser to finish up with the gun, Lehman and Prosser engaged Moore in small talk in the conference room. They had a wide ranging conversation. They traded stories about guns, urban violence, military service, hunting, bear encounters, health insurance, COVID-19 lockdowns, etc. Moore was not arrested or restrained during their conversation; and he was not told that he was not free to leave.

Lehman and Prosser were dressed in street clothes when they met with Moore. Other officers, some in uniform, were present at the Sheriff's Annex that day. In addition to Boundary County Sheriff's deputies who work at the Annex, ISP had a number of officers in Boundary County on August 27, 2020, to aid in the process of executing the search warrants referenced above. Those officers were going in and out of the Sheriff's Annex during the time Moore was present.

Approximately 17½ minutes after his arrival at the Sheriff's Annex, while chatting with Lehman and Prosser in the conference room, Van Leuven entered the room. Van Leuven mentioned to Moore that they had talked before in Moore's office. He told Moore he had a few more questions. He said he was just finishing up with someone else, and would Moore mind waiting for a few more minutes. *Court's Ex. 1*, at 17:36 (Clip 1). Moore responded, "Sure, sure," and continued his conversation with Lehman and Prosser. *Id.,* at 17:45. After another 17 minutes had passed, three

officers entered the room: ISP Sergeant Allen Ashby, Detective Matt Clark, and Corporal Dusty Kralik. Two of them were in uniform, and one was in street clothes. They did not identify themselves to Moore,[9] but the officer in street clothes told Moore they were taking him back to a "secure area" (*Court's Ex. 1*, at 00:42 (Clip 2)) where he would have his conversation (with Van Leuven), and would need to check him for weapons before he entered the "secure part of the facility" (*id.* at 00:48 (Clip 2)). Moore complied without hesitation. He emptied his pockets and submitted to a pat down search. **Lehman told the officers she would hold onto Moore's keys.** Moore was then escorted out of the room by Sergeant Ashby, Detective Clark, and Corporal Kralik.

## C. The Police Interview of Dr. Moore [as documented on Preliminary Hearing 10/2/2020 Defendant's Exhibits A (MVI-0036) through F (MVI-0041)]

Once inside the secure area, Van Leuven and ISP Detective Gary Tolleson ("Tolleson") take Moore into an interview room, and close the door. The door to the interview room requires a key code for entry. The officers sit down at a small table, and direct Moore to a seat across the table from them. Van Leuven and Tolleson are in street clothes. All three men have bottles of water. As they take their seats, Tolleson introduces himself and Van Leuven to Moore. Van Leuven then begins the taped interview by stating the date and time (2:49 p.m.[10], August 27, 2020), his name, and that of Tolleson, and that they are interviewing Dr. Daniel Moore regarding the homicide of Dr. Brian Drake. Immediately following that statement, Van Leuven accuses Moore of killing Drake:

| VAN LEUVEN: | So, Mr. Moore, I talked to you before and you talked about the gas leak at your building. |
|---|---|
| MOORE: | Yeah. |
| VAN LEUVEN: | I found it incredibly curious that you have two chiropractors within such proximity to each other, both suffer such traumatic events in such close time. |
| MOORE: | Right. |

---

[9] Leslie Lehman identified the three officers who had entered the room at the suppression hearing.

[10] This corresponds to 3:24 minutes into Preliminary Hearing 10/2/2020 Defendant's Ex. A (MVI-0036).

| VAN LEUVEN: | And I wondered if maybe someone had something out for chiropractors in the area. **And then I thought, well, maybe you're responsible for the good doctor's death,** and you maybe meant to scare him, but didn't mean to shoot him. And you felt so bad about it that you attempted to commit suicide. |
| MOORE: | No, sir. |

*Preliminary Hearing 10/2/2020 Defendant's Ex. A (MVI-0036),* at 3:39 to 4:23.

   **About four and a half minutes into the interview, Van Leuven states: "I need to advise you of your *Miranda* rights too, just 'cause we are in a police station."** *Preliminary Hearing 10/2/2020 Defendant's Ex. A (MVI-0036),* at 07:59. He then removes a card from his wallet and reads Moore his *Miranda* rights from the card. He asks Moore if he understands his rights. Moore's response is: "Sure." *Id.,* at 08:29. Van Leuven then states: "Okay. Now, do we need to go back and ask all these questions over again?" *Id.,* at 08:30. Moore replies: "It's not going to change." *Id.,* at 08:38. Moore goes on to say that he did not know Brian Drake and did not shoot him.

   The interview continues. Van Leuven outlines the evidence the police have gathered placing Moore at the scene of the shooting and tells Moore that they know he shot and killed Drake but do not know why. Van Leuven states that he has enough evidence "to take this to a jury and convict you for murder, plain and simple." *Preliminary Hearing 10/2/2020 Defendant's Ex. A (MVI-0036),* at 12:26. Moore continues to respond that he did not know Drake and did not shoot him. Van Leuven tells Moore that search warrants are currently being executed at both of Moore's residences, his chiropractic office, and his gun shop in Montana, as well as his vehicle. He states that one of Moore's vehicles is being towed to Coeur d'Alene (Idaho) and that his other vehicles are going to be searched. Van Leuven continues to focus on the issue of intent, i.e., whether Moore intended to kill Drake or whether he intended to scare Drake by shooting through his office window.

   Approximately 14 ½ minutes into the interview, the following colloquy occurs:

| | |
|---|---|
| VAN LEUVEN: | Do you understand the importance of intent? Because it looks to me by the nature of the shooting that you didn't mean to kill him. I'm not even sure you meant to hit him. I think you just meant to scare him by putting a round through his window. But the results of that action of yours was that he died. And because of the circling of the block – |
| MOORE: | Uh-huh. |
| VAN LEUVEN: | – waiting for the clients to leave. They actually saw your truck when they were leaving in the alley, and then going back down there on foot, and then shooting him, and then coming back. Even if you didn't mean to shoot him, **if you don't explain to us your intent, then we infer your intent, based on what we see, which is first degree murder.** |
| MOORE: | Well, I didn't shoot him. And I'm sorry, but that's – that's what it is. **So, I guess if you are going to do that, then I need to get an attorney.** |

*Preliminary Hearing 10/2/2020 Defendant's Ex. A (MVI-0036),* at 17:45 to 18:45.

Van Leuven says, "Okay," and both detectives close their notepads. *Id.,* at 18:48. Moore inquires if the point of asking him to bring the gun in was just to get him to come down. Van Leuven replies, "Yeah, to have you come down here." *Id.,* at 19:02. **Van Leuven asks Moore if he has his cell phone on his person. Moore says it is in the car.** Van Leuven states: "Sit tight, we'll be right back with you. *Id.,* at 19:24. Van Leuven then says: "Okay, I am going to terminate this interview at 3:05 [p.m.]." *Id.,* at 19:28. The two detectives leave the room. This portion of Moore's interview conducted by Van Leuven and Tolleson lasted 16 minutes, i.e., 2:49 to 3:05 p.m.

Van Leuven testified at the suppression hearing that he terminated the interview "because it sounded to me like he asked for a lawyer," and he spent the next 45 minutes replaying the interview and consulting with other officers about how to proceed. One of those officers was Bonners Ferry Assistant Police Chief Martin Ryan ("Ryan"). Moore is left seated alone in the interview room for those 45 minutes. Van Leuven ultimately decides to continue the interview, but to have Ryan – who knows Moore from their many years in the Bonners Ferry community – question Moore.

One hour and one minute into the interview (inclusive of the 45 minute stoppage), Ryan enters the room and greets Moore by his first name. **He says nothing about Moore's request for an attorney.** He asks Moore how he is doing and tells him that this doesn't have to be a homicide. He says he knows Moore, knows he is a good man, and knows Moore would not have killed Drake on purpose. Ryan talks about Drake's wife and children. He asks Moore to do the right thing. Moore maintains he didn't even know Drake. Ryan responds by asking Moore why he was circling Drake's block and walking toward Drake's office. Moore says he was driving to an adjacent coffee shop, but it was closed. Moore explains that he had a stomach ache and that he parked in the alleyway adjacent to Drake's office and defecated in the alley, just as the shooting was occurring.

Ryan expresses disbelief. He says it is going to rip the community apart to see Moore booked for first degree murder; that Moore is an extremely smart man; and that he respects how Moore has handled himself, but that Moore has only made things worse for himself with the story about defecating in the alley. He asks Moore if the shooting of Drake was an accident or a mistake:

| | |
|---|---|
| RYAN: | And I know you love this town. |
| MOORE: | I do. |
| RYAN: | I love this town. I gotta tell you – with what's going on in this world right now, I love this town more than I ever have. Every day I drive down that hill, I thank God to be in this little town. |
| MOORE: | Yeah. |
| RYAN: | Okay. And you know what this is going to do, okay? |
| MOORE: | Uh-huh. |
| RYAN: | Because there's no – because you're not giving – **you're not able to say: "I made a mistake. I messed up." No, instead, you're being booked for first degree murder.** And then, the second one is the little kids, okay. I have a family of five – a woman has lost her best friend. If this was an accident, it was an accident. I can make this phone call when I leave here and let them know it's over: And no, there was no vicious thing; your husband wasn't wrapped up in something bad; this wasn't criminal, this wasn't anything, this was a mistake; and here's what happened; and he wants to be held accountable for it; he wants to be able to say he's sorry. Do you hear me? |
| MOORE: | Uh-huh. |

| RYAN: | **Okay. Are we there, Daniel?** |
|---|---|
| MOORE: | **I need to talk to an attorney then.** |
| RYAN: | **Okay. I understand. Then, we're done. I know a minute ago you said I think, but now you are telling me you want to talk to an attorney, you don't want to talk to me anymore?** |
| MOORE: | Well, it just – no – |
| RYAN: | No, I want you to say that because it's important, Daniel. You can't – I think this, I think that. Brother, I don't want to do anything to violate anything here. You know why I'm here. |
| MOORE: | Yeah. |
| RYAN: | Okay, I'm trying to be the best, truest, to fix this thing that I can. So I've painted the best picture I can for you and I've asked for your help on this. **But you have to be clear. I can only talk if you want to talk to me. Do you understand, Daniel?** |
| MOORE: | Yeah. |

*Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038),* at 10:19 to 11:55.

Despite Moore's clear invocation of his right to an attorney, Ryan continues to ask Moore to

clarify or make a decision about whether he wants to talk to Ryan or whether he wants an attorney:

| RYAN: | You did something stupid. But again, I can't heal, I can't make these phone calls, I can't talk with the paper about anything, unless you say you want to talk to me. All right? **Do you want to talk to me or not, yes or no?** |
|---|---|
| MOORE: | **I think I need to talk to an attorney.** |
| RYAN: | **Well, you do that then, thank you. All right, brother. Okay. I'm going to go, okay.** |
| MOORE: | But I really do appreciate you, and – |
| RYAN: | It's done, it's over, okay. |
| MOORE: | So, what do I do? |
| RYAN: | Well, they're going to tell you. I'm showing myself out. I got healing to do. I have work I've got to go do now, okay. |
| MOORE: | Thank you. |
| RYAN: | **At this point –** |
| MOORE: | **Yes, sir. What do you want me to do?** |
| RYAN: | **I want the truth.** |
| MOORE: | You want me to admit that – |
| RYAN: | I want you to admit the truth that – Jesus, man, you're killing me, man. Okay, buddy. |
| MOORE: | **Without an attorney, you want me to talk and say something?** |
| RYAN: | Well, again, no, I don't want you to do anything you don't want to do. All I want to do is – I want to go tell my community the truth – that's what I want to do, okay. I feel dirty, this is getting – I'm not trying to pull something from you, anything but the truth. |

*Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038),* at 12:32 to 13:47.

Moore asks to use the bathroom. Ryan tells him to hold on for one second and Ryan leaves

the room. At this point, it is approximately 1 hour and 17 minutes into the interview. Moore is left

seated alone in the room for about two minutes until Tolleson opens the door to allow him to leave

and use the bathroom. A few minutes later, Tolleson places Moore back into the room. Moore

asks him for a blanket and another bottle of water. Ryan re-enters the room and continues to ask

Moore to clarify or make a decision about whether he wants to talk to Ryan or to an attorney:

| | |
|---|---|
| RYAN: | I just can't play games with this thing anymore as far as – maybe, yeah, I want to talk to you, but I should talk to somebody. That's fine. I am going to walk out, okay. And then, **I came back in because I want to clarify with you what you want to do. What do you want to do?** Just say the words one way or the other. Either I sit down or I walk out. You tell me what to do. |
| MOORE: | Well, I'd like to talk to you. But don't you feel under the circumstances that I should have an attorney present to be able to tell me where this is taking me? |
| RYAN: | You're asking my opinion? |
| MOORE: | Yeah. |
| RYAN: | Honestly, I'll give you my opinion, but understand, I'm not the one facing this. |
| MOORE: | Yeah. |
| RYAN: | I didn't walk down that alleyway that night. I didn't make the big mistake, okay. All right. **So, you have to say: yes or no, stay or go, Martin. I want an attorney, one or the other, yes or no?** |
| MOORE: | **I want to be able to talk to somebody who gives me my legal rights.** |
| RYAN: | Okay, there it is. I understand. |

*Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038),* at 21:44 to 22:47. After some

continued back and forth, Ryan says, "We're done" (*id.* at 23:16), and leaves the room. At this

point, approximately 1 hour and 24 minutes have elapsed since the interview of Dr. Moore began.

Detective Tolleson then enters the interview room and gives Moore a blanket and bottle of

water, at which point the following colloquy takes place:

| MOORE: | Thank you, sir. Thank you. |
| TOLLESON: | You're very welcome. |
| MOORE: | Thanks. So then, what about my car and all the stuff, what happens? |
| TOLLESON: | We're going to tow your vehicle and we have search warrants and we already explained that to you. We have search warrants for your house and the vehicle, and your office. Those search warrants are being served now. |
| MOORE: | Okay, but my wife is not home. The animals are inside. |
| TOLLESON: | We're not going to harm your animals and we're not going to release them. |
| MOORE: | Okay. |
| TOLLESON: | We're trying to do this as quietly as possible. |
| MOORE: | Okay. What about – do you want to know where the key is so you don't have to break in the door? Or you just – |
| TOLLESON: | They've already gotten up there and gotten in, so I don't know about that. I don't think they broke the door, but I don't know. |
| MOORE: | All right. **Can I talk to Ryan one more time?** |

*Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038),* at 23:40 to 24:40.

Tolleson leaves the interview room, and moments later, Ryan comes back in and sits down:

| RYAN: | Okay. The detective asked me to come in here. Please tell me I came here for the right reason. |
| MOORE: | **What – what should I do if I don't have an attorney and I tell you something, then I'm – I mean, that just seems already like – I still would like to talk to you, but it's like –** |
| RYAN: | **I get it. Right. Dan, I don't know what you want me to say.** |

*Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038),* at 25:28 to 26:08. Ryan tells

Moore there is no winning here – for Ryan or for the town, and that everybody loses. He says: "I'm

sitting here with my favorite doctor, Moore, across the table from me; one of the nicest men I've

ever known and – and, *I know, I know what you did.*" *Id.* at 27:02 to 27:12. And he continues:

| RYAN: | But, Dan, what do I want? I want to heal. And I can't heal. **See, for me, it's a simple thing of honesty. And so – but it's also a question of your rights. So you say you want to talk to me – asked Marty to come back in here. That's your request. I'm here, man. If you want to tell me something, tell me. But when you're laying this guilt trip on me. What do I do?** |
| MOORE: | No. |

*Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038),* at 27:16 to 27:39.

The conversation continues in the same vein, with Ryan repeating: "I'm asking for the truth. Just so you know, I know the truth. What hurts me is that I can't go forward and talk to the press. I can't go forward and talk to this family. I can't make this phone call to this wife and tell the truth. I have to say something different now and I want the truth." *Id.*, at 27:49 to 28:06.

Ryan reminds Moore that his children and Moore's children were in a play together years ago; that he knows Moore loves this town; and that for the town to heal, it needs to know why Moore killed Drake. Moore asks Ryan why the police are so positive that he did it. Ryan says that the police are good at their jobs, and that they have it all – the what, where, when, how, and who; but that they don't know why Moore did it. Moore maintains that he didn't even know Drake. Ryan tells Moore that saying why he did it is the only thing that will heal. Moore sits in silence, as Ryan exhorts him to "do the right thing." (*id.*, 32:17). He says he is "positive" Moore did it (*id.*, at 32:37), and for Moore to: "Just explain it. Get it out, and be done with it, please." *Id.*, at 33:20 to 33:25.

When Moore reiterates that he went into the alley to defecate (not to shoot Drake). Ryan asks Moore why he asked Ryan to come back in. Moore says, "I guess just 'cause I wanted to talk to you." *Preliminary Hearing 10/2/2020 Defendant's Ex. D (MVI-0039),* at 00:48. Ryan tells Moore that Moore knows what Ryan is hurting for, and that he needs honesty from Moore to make some phone calls, to get things arranged, and to share with the community. He continues to press Moore to tell him what happened and why. **Ryan tells Moore that if he does not explain what happened, law enforcement will be left to conclude that his killing of Drake was premeditated.** Ryan says that Moore knew what Ryan was asking for when he left, and Moore called him back in:

RYAN:   This is why I can't talk you anymore. Okay, then. Because if you can't do this, then I got – when I know – *I know*. And so if you can't do this then we are wasting our time, okay? You called me in here for nothing.

| | |
|---|---|
| MOORE: | **If I have an attorney – just hear me out. How am I going to plead to anything if I'm sitting here spilling my guts to you and I don't have an attorney that gives me my rights?** |
| RYAN: | Again, see – that's – you understand, Daniel. **You keep saying this. I can't answer that question. How do you do that? I don't know**, okay. I know what we have right now. And the only person who could change what we have right now is you. All right? And so, you have to decide how. If you want to change what we have, then you change it. **But if you mention an attorney, and you keep on doing it, if you even mention it, I'm just – because – and it's your right. You have a right to an attorney. But when I leave, and you call me back in and say I want to talk to you again, well then, we restart everything again.** I come back up here. What do you want, Dan? Because you know I just want to heal my town. I want to call the wife and tell her this was just a bad mistake. I want to do something. Okay? And so, I'm hurting here too, buddy. |
| MOORE: | I love the town. |
| RYAN: | Good. Prove it. Because I know I'd drive off that cliff. *Prove it.* If that's what you want to do. Man, Daniel, You know I feel so bad. Your eyes are screaming at me. Your eyes are fricking screaming at me. God dang, buddy. |
| MOORE: | **If I plead to that, I have nothing left to negotiate with.** |
| RYAN: | **The truth. Right? How is the truth not the right thing?** |
| MOORE: | Maybe I watched too many movies. |
| RYAN: | **We have certain degrees, you know, first degree, second degree, manslaughter, all the way down, you know. So we have to decide where we are at. But Daniel, I'm not here to punish you.** I'm not here to punish this town. That's not what we're here to do. Okay. **Do you agree that you need to be held accountable for making a mistake? Do you agree, yes or no?** |
| MOORE: | Yeah. |
| RYAN: | **You tell me, to what degree should you be held accountable to? You tell me. What mistake did you make? Or was it complete malice, anger, and I'm going to end this man forever?** |
| MOORE: | No, I didn't even know him. |
| RYAN: | Okay, then you tell me. Okay, I just got to know, that's it. I just got to know because that's how – we're not going to – **tell you what, you're not going to be booked for first degree murder if you didn't commit first degree murder. Right now I am just going off of what we have.** Okay, partner? I'm not sure they would book you for less if you could tell me the truth. But all I want is the truth. I don't want anything else. I don't want anything else. I don't want to waste my time with anything else. |
| MOORE: | **I did not go there to murder him.** |
| RYAN: | Okay, I believe you a hundred percent. I believe you a hundred percent, okay. I do. I don't doubt you. Daniel, I'll talk to these guys. |

|        | I'll drive you down to the jail myself. I'll walk you in there. Okay, buddy? |
|--------|------|
| MOORE: | Okay. |
| RYAN:  | Okay. Can we clean this up? Then, can I go make some phone calls? And what do I tell people? You tell me what you want me to tell people. Tell me the truth, Daniel. |
| MOORE: | It wasn't intentional. |
| RYAN:  | I know. I know. |
| MOORE: | I couldn't even see inside. He had his blinds pulled. |
| RYAN:  | Okay. |

*Preliminary Hearing 10/2/2020 Defendant's Ex. D (MVI-0039),* at 03:10 to 7:40.

Moore makes the statement: "I did not go there to murder him," at approximately 1 hour and

41 minutes into the police interview. As the interview continues, Moore confesses to killing Drake.

### III. ISSUE PRESENTED

The issue before the Court is whether to suppress all statements made by Moore during his

August 27, 2020, police interview, both prior to the reading of his *Miranda* rights and after those

rights were read and he invoked his right to counsel. Moore argues that his statements were

obtained illegally in violation of his rights under the Fifth Amendment, and must be suppressed.

### IV. ANALYSIS

#### A. Moore was subjected to custodial interrogation from the start of his interview.

In *State v. Hansen*, 138 Idaho 791, 69 P.3d 1052 (2003), the Idaho Supreme Court stated:

> ***Miranda v. Arizona* requires that a person be informed of his or her Fifth Amendment privilege against self-incrimination prior to custodial interrogation; otherwise, incriminating statements are inadmissible.** *State v. Doe,* 137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002). **A person is in custody whenever subjected to a restraint on his or her liberty in any degree similar to a formal arrest.** *State v. Doe,* 130 Idaho 811, 814, 948 P.2d 166, 169 (Ct.App.1997) (citing *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550, 556 (1984); *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). **A person is interrogated whenever subjected to express questioning or its functional equivalent, i.e. anything reasonably likely to elicit an incriminating response.** *State v. Frank,* 133 Idaho 364, 370, 986 P.2d 1030, 1036 (Ct.App.1999) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297, 307–09 (1980)).

*Id.* at 795, 69 P.3d at 1056 (2003) (emphasis supplied). The first issue for this Court to determine is whether Moore underwent custodial interrogation, and if so, when did it commence?

1. Moore was in custody from the start of his police interview.

The Idaho Court of Appeals has stated:

> **Custody for *Miranda* purposes, means a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.** *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293, 298 (1994); *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. at 2631, 81 L.Ed.2d at 556–57 (1984). **It requires more than a circumstance where a suspect was not free to leave.** *Shatzer,* —— U.S. at ——, 130 S.Ct. at 1224, 175 L.Ed.2d at 1058 ("Our cases make clear, however, that the freedom of movement test identifies only a necessary and not a sufficient condition for *Miranda* custody."). **The determination of custody does not depend on the subjective views harbored by either the interrogating officers or the person being questioned.** *Stansbury,* 511 U.S. at 323, 114 S.Ct. at 1529, 128 L.Ed.2d at 298–99. **Instead, the test is an objective one and "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."** *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317, 336 (1984). **A court considering whether an individual is in custody should consider the totality of the circumstances surrounding the interrogation.** *State v. James,* 148 Idaho 574, 577, 225 P.3d 1169, 1172 (2010). **Factors to be considered by the court include the time and location of the interrogation, the conduct of the officer or officers, the nature and manner of the questioning, and the presence of other persons.** *State v. Albaugh,* 133 Idaho 587, 591, 990 P.2d 753, 757 (Ct.App.1999); *State v. Medrano,* 123 Idaho 114, 117–18, 844 P.2d 1364, 1367–68 (Ct.App.1992). **The burden of showing custody rests on the defendant seeking to exclude evidence.** *State v. Munoz,* 149 Idaho 121, 129, 233 P.3d 52, 60 (2010); *James,* 148 Idaho at 577, 225 P.3d at 1172.

*State v. Hurst,* 151 Idaho 430, 436, 258 P.3d 950, 956 (Ct. App. 2011) (emphasis supplied).

Additionally, the United States Supreme Court has stated:

> **An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.** Cf. *Michigan v. Chesternut,* 486 U.S. 567, 575, n. 7, 108 S.Ct. 1975, 1980, n. 7, 100 L.Ed.2d 565 (1988) (citing *United States v. Mendenhall,* 446 U.S. 544, 554, n. 6, 100 S.Ct. 1870, 1877, n. 6, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). **Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her " 'freedom of action.' "** *Berkemer, supra,* 468

U.S., at 440, 104 S.Ct., at 3150. Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. **In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.** …

*Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 1530 (1994) (quoted in *Hurst*, 151 Idaho at 437, 258 P.3d at 957) (emphasis supplied).

As a preliminary matter, this Court concludes (based upon the findings of fact set forth in Section II.B above), that Moore was not in custody, nor subject to interrogation, from the point of his arrival at the Sheriff's Annex through the duration of his conversation with Lehman and Prosser. During that period of time, there was no restraint on Moore's freedom of movement of the degree associated with a formal arrest. He was in a conference room with two plainclothes detectives engaged in small talk about current and social events. Nothing was said about the killing of Dr. Drake, and the detectives in no way restrained Moore to prevent him from leaving. The Court finds that a reasonable person in Moore's position would not have understood his conversation or time spent with Lehman and Prosser to be any form of custodial interrogation.

However, the analysis changes at the point when their small talk is brought to an end (after about 35 minutes) by the entry into the conference room of three officers – two of them in uniform. Those officers told Moore that they were taking him back to a "secure area" for his conversation (with Van Leuven) and that they would need to check him for weapons before entering the "secure part of the facility." Moore submitted to the pat down search; Lehman took his keys; and the three officers escorted Moore out of the conference room back to the secure area. Once

inside the secure area, Moore was taken to an interview room by Van Leuven and Tolleson, where he was seated across a table from the two detectives. The door to the interview room was closed and that room required a key code for entry. Moore's cell phone was in his car. Van Leuven began the interview by stating that they were interviewing Moore regarding the homicide of Dr. Drake, and his first words directed at Moore were to accuse Moore of being responsible for Drake's death.

In determining whether Moore was in custody, this Court must consider the totality of the circumstances surrounding the interrogation, including "the time and location of the interrogation, the conduct of the officer or officers, the nature and manner of the questioning, and the presence of other persons." *Hurst*, 151 Idaho 430, 436, 258 P.3d 950, 956. Here, the interview of Moore took place in a room located in – as Moore was told – a "secure area" or "secure part of the facility." Before Moore entered the secure area, his car keys were taken from him. There were two detectives with Moore in the interview room. The door to the room was closed, and the room required a key code for entry. Finally, the lead detective started the interview by telling Moore that he believed that Moore was responsible for Dr. Drake's death.

Considering the totality of these circumstances, this Court concludes that a reasonable person in Moore's position seated in that interview room hearing that the police believed he killed Dr. Drake would have understood that he was not free to leave. Accordingly this Court finds that Moore was in custody from the start of his interview with Van Leuven and Tolleson.

2. The questioning of Moore constituted interrogation from the start of the interview.

"[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police

should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 1689-1690 (1980) (footnotes omitted) (quoted in *State v. Frank*, 133 Idaho 364, 370, 986 P.2d 1030, 1036 (Ct. App. 1999)).

As discussed earlier, Van Leuven started the interview with Moore by accusing Moore of being responsible for Drake's death, and both he and Tolleson continued from there expressly questioning Moore, trying to get him to confess to killing Drake. Accordingly, this Court finds that the questioning of Moore constituted interrogation from the start of the interview.

\*\*\*\*

For the foregoing reasons, this Court finds that Moore was subjected to custodial interrogation from the start of his interview with Van Leuven and Tolleson. Therefore, the officers should have read Moore his *Miranda* rights before they started questioning him.

Accordingly, any and all statements made by Moore from the start of the interview with Van Leuven and Tolleson until he was read his *Miranda* rights are suppressed.

### B. Moore unequivocally invoked his right to counsel to Van Leuven and Tolleson.

1. Applicable Law

The Idaho Court of Appeals has stated:

Fifth Amendment rights to counsel and to remain silent as enunciated by the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). ... apply whenever an accused is subject to custodial interrogation by law enforcement officers. *Id.* ... **A request for counsel ... must be scrupulously honored, and interrogation may not resume until an attorney is present or the suspect himself reinitiates the conversation.** *Edwards v. Arizona,* **451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378, 384 (1981).** *See also Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). **If the right to counsel has been invoked, the police may not reinitiate interrogation of the detainee in the absence of an attorney.** *Minnick v. Mississippi,* **498 U.S. 146, 153–54, 111 S.Ct. 486, 491–92, 112 L.Ed.2d 489, 497–98 (1990);** *State v. Tapp.* 136 Idaho 354, 360, 33 P.3d 828, 834 (Ct.App.2001).

*State v. Perez*, 145 Idaho 383, 386, 179 P.3d 346, 349 (Ct. App. 2008) (emphasis supplied).

Additionally, the Idaho Supreme Court has stated:

> After a suspect has been advised of the right to remain silent and of the right to counsel pursuant to *Miranda*, police may not proceed with questioning if the suspect indicates a desire to remain silent. *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 722–23; *State v. Rhoades*, 119 Idaho 594, 602, 809 P.2d 455, 463 (1991). **An individual's right to cut off questioning is grounded in the Fifth Amendment and must be "scrupulously honored."** *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975). **However, police officers are only required to cease questioning if the invocation of *Miranda* rights is clear and unequivocal.** *See Davis v. United States*, 512 U.S. 452, 459–60, 114 S.Ct. 2350, 2355–56, 129 L.Ed.2d 362, 371–72 (1994); *Varie*, 135 Idaho at 853, 26 P.3d at 36. **The United States Supreme Court held that in order to effectively invoke the right to counsel, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.... If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."** *Davis*, 512 U.S. at 459–62, 114 S.Ct. at 2355–56, 129 L.Ed.2d at 371–73. This "clear articulation" rule is also applicable to a defendant's assertion of his right to remain silent. *State v. Law*, 136 Idaho 721, 724–25, 39 P.3d 661, 664–65 (Ct.App.2002) (citing *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir.1996); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994)); *see also Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir.2005); *State v. Whipple*, 134 Idaho 498, 502–04, 5 P.3d 478, 482–484 (Ct.App.2000). "Thus, a suspect's ambiguous or equivocal comment that does not plainly express a desire to remain silent or to terminate the interview will not obligate police to cease questioning." *Law*, 136 Idaho at 725, 39 P.3d at 665.
> ... "I don't think I should answer that," is not sufficiently clear such that a reasonable officer in the circumstances would understand it as an invocation of the right to remain silent. **The phrase, "I think," like the phrase "maybe I should" is equivocal.** *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir.2003). ...

*State v. Payne*, 146 Idaho 548, 558-559, 199 P.3d 123, 133-134 (2008) (emphasis supplied).

Accord *State v. Davis*, 162 Idaho 874, 876, 406 P.3d 886, 888 (Ct. App. 2017) ("Davis's statement that, 'I think I need to talk to a lawyer before I say anything else,' is equivocal.").

Lastly, in *State v. Person*, 140 Idaho 934, 104 P.3d 976 (Ct. App. 2004), the Idaho Court of Appeals explained:

When an individual in custody invokes his right to an attorney, all questioning must cease, and further interrogation may not take place until counsel has been made available or the accused re-initiates further discussion. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884– 85, 68 L.Ed.2d 378, 385–86 (1981); *State v. Cheatham*, 134 Idaho 565, 574, 6 P.3d 815, 824 (2000). Further interrogation is allowed only when it is shown by a preponderance of the evidence that the accused initiated further discussions and knowingly and intelligently waived the right to counsel he had earlier invoked. *Cheatham*, 134 Idaho at 574–75, 6 P.3d at 824, 825 (citing *Smith v. Illinois*, 469 U.S. 91, 95, 105 S.Ct. 490, 494–95, 83 L.Ed.2d 488, 493 (1984)). An individual's right to cut off questioning pursuant to *Miranda* must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975); *State v. Law*, 136 Idaho 721, 724, 39 P.3d 661, 664 (Ct.App.2002). Measurement of whether the accused's right to cut off questioning was scrupulously honored requires evaluation of what the police did, and when, after that right was invoked. *See* Wayne R. Lafave et al., Criminal Procedure § 6.9(f) (2d ed.1999).

*Id.* at 938-939, 104 P.3d at 980-981. The Court of Appeals in *Person* further reasoned:

The state asserts that Person delivered a virtual torrent of incriminating statements after declaring he needed his attorney, and contends that "the officers did not even have the opportunity to make a meaningful interjection into Person's stream of confession." **After reviewing the videotapes that document the entirety of the interrogation at issue, we conclude that the state's depiction of these events is inaccurate in this regard. At one point one of the detectives queried Person "... you told us you want to talk to your attorney?"—to which Person replied "I do." Instead of then terminating the interrogation, the detective meaningfully interjected "No, this is a decision you have to make." The detective thus pretended that some clarification or further "decision" from Person was needed even after Person had clearly and unequivocally invoked his right to counsel. Furthermore, after another of Person's attempts to invoke his right to counsel, the detectives hesitated until Person began to speak again.** After another moment during which Person further incriminated himself, he paused and looked down at which point the detective positioned at the left corner of the screen, at Person's right, signaled the other person in the room to not interrupt Person—making a "shushing" motion by raising his index finger to his lips.

**The detectives did not scrupulously honor Person's request for counsel, instead requesting multiple confirmations of Person's intent to cease the interview and consult his attorney. The district court's determination that Person waived his right to counsel shortly after he had invoked that right is not supported by the evidence. All of Person's statements made after his invocation of the right to counsel at two hours, forty-six minutes, and two seconds approximately comprising the final hour of Person's time in the interrogation room, should therefore have been suppressed.** Person's statements before this point in time are not suppressed.

*Id.* at 941-942, 104 P.3d at 983-984 (emphasis supplied).

2. Analysis

   a. Moore unequivocally invoked his right to counsel to Van Leuven and Tolleson.

   The August 27, 2020, police interview of Moore started at 2:49 p.m.[11] Approximately 15 minutes into the interview, Van Leuven tells Moore that, "if you don't explain to us your intent, then we infer your intent, based on what we see, which is first degree murder." Moore responds by saying: "Well, I didn't shoot him. And I'm sorry, but that's – that's what it is. So, I guess if you are going to do that, then I need to get an attorney." This invocation occurred 15 minutes and 19 seconds into the interview. Based upon the video evidence, this Court finds Moore's invocation of his right to an attorney to be unambiguous and unequivocal. The video establishes that Van Leuven told Moore that if he did not explain to them his intent in killing Drake, they would infer his intent to have been first degree murder. Moore is clear in his response – that he did not shoot Drake and that if the police are going to make that inference, "then I need to get an attorney."

   The video shows that the detectives understood this to be an invocation by Moore of his right to an attorney, because in response, Van Leuven says, "Okay." He terminates the interview, the detectives close their notepads, get up and leave the room. Van Leuven testified that he terminated the interview because it sounded to him like Moore asked for an attorney.

   b. Police did not cease questioning Moore after he invoked his right to counsel.

   "An individual's right to cut off questioning pursuant to *Miranda* must be 'scrupulously honored.'" *Person*, 140 Idaho at 938, 104 P.3d at 980. The Idaho Supreme Court in *Edwards v. Arizona* makes it clear that "an accused, … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has

---

[11] This corresponds to 3:24 minutes into Preliminary Hearing 10/2/2020 Defendant's Ex. A (MVI-0036).

been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-485, 101 S.Ct. 1880, 1885 (1981). However, "[f]urther interrogation is allowed only when it is shown by a preponderance of the evidence that the accused initiated further discussions and knowingly and intelligently waived the right to counsel he had earlier invoked." *Person*, 140 Idaho at 938, 104 P.3d at 980.

The determination of whether Moore's "right to cut off questioning was scrupulously honored requires evaluation of what the police did, and when, after that right was invoked." *Person*, 140 Idaho at 939, 104 P.3d at 981. The facts in this case show that after Moore's clear and unequivocal invocation of counsel at 15 minutes and 19 seconds into his interview with Van Leuven and Tolleson, Van Leuven asked Moore if he had a cell phone on his person. Moore said his phone was in his car. Van Leuven told him to "sit tight"; he terminated the interview, and the two detectives left the room. Moore was left seated alone in the interview room for 45 minutes. Then, Van Leuven, instead of cutting of questioning, sends in Assistant Police Chief Ryan – who knows Moore from their many years in the Bonners Ferry community – to continue the interrogation of Moore. Moore had not asked to talk to Ryan. Ryan entered the room and continued the interrogation of Moore without ever mentioning Moore's request for an attorney.

Based upon these facts, this Court finds that because police failed to cease questioning Moore when he unequivocally invoked his right to counsel at 15 minutes and 19 seconds into the interview, all statements made by Moore to Ryan after that invocation must be suppressed.

    c.  Moore did not knowingly, intelligently and voluntarily waive his right to counsel.

Once Moore invoked his right to counsel, questioning of him could only continue if Moore "initiated further discussions and knowingly and intelligently waived the right to counsel he had earlier invoked." *Person*, 140 Idaho at 938, 104 P.3d at 980. As fully detailed in the

Findings of Fact above, once Moore stated "then I need to get an attorney," he did not initiate any further discussion with law enforcement or do anything to indicate that he was waiving his right to an attorney. Rather, he sat quietly in the closed interview room for 45 minutes waiting to be formally charged and arrested. It was law enforcement, not Moore, who re-initiated questioning. Moore only asked to speak with police at 1 hour 25 minutes and 40 seconds into the interview after Detective Van Leuven ignored his clear invocation of his right to counsel and sent Assistant Police Chief Ryan in to try to persuade him to confess. So, the question is whether Moore knowingly and intelligently waived the right he had earlier invoked. In that regard, the Idaho Supreme Court in *State v. Adamcik*, 152 Idaho 445, 272 P.3d 417 (2012), stated:

> ... "A district court's conclusion that a defendant made a knowing and voluntary waiver of his *Miranda* rights will only be disturbed on appeal if the conclusion is not supported by substantial and competent evidence." *State v. Payne*, 146 Idaho 548, 558, 199 P.3d 123, 133 (2008).
>
> **In determining whether a defendant has voluntarily, knowingly and intelligently waived his *Miranda* rights, this Court must consider the totality of the circumstances.** *Doe*, 137 Idaho at 523, 50 P.3d at 1018; *Payne*, 146 Idaho at 559, 199 P.3d at 134. **The factors the Court must consider include: "(1) Whether *Miranda* warnings were given; (2) The youth of the accused; (3) The accused's level of education or low intelligence; (4) The length of detention; (5) The repeated and prolonged nature of the questioning; and (6) Deprivation of food or sleep."** *Doe*, 137 Idaho at 523, 50 P.3d at 1018. "Any waiver of *Miranda* warnings must be knowing, intelligent, and voluntary." *Id.*

*State v. Adamcik*, 152 Idaho 445, 468, 272 P.3d 417, 440 (2012) (emphasis supplied).

Similarly, in *State v. Cordova*, 137 Idaho 635, 51 P.3d 449 (Ct. App. 2002), the Idaho Court of Appeals explained:

> **In order to find a violation of a defendant's due process rights by virtue of an involuntary confession, coercive police conduct is necessary.** *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986); *State v. Whiteley*, 124 Idaho 261, 268, 858 P.2d 800, 807 (Ct.App.1993). **The state must show by a preponderance of the evidence that the defendant's statements were voluntary.** *Whiteley*, 124 Idaho at 268, 858 P.2d at 807.

> The proper inquiry is to look to the totality of the circumstances and
> then ask whether the defendant's will was overborne by the police conduct.
> *Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 1252, 113 L.Ed.2d
> 302, 316 (1991); *Troy,* 124 Idaho at 214, 858 P.2d at 753. **In determining the**
> **voluntariness of a confession, a court must look to the characteristics of the**
> **accused and the details of the interrogation, including: (1) whether *Miranda***
> **warnings were given; (2) the youth of the accused; (3) the accused's level of**
> **education or low intelligence; (4) the length of the detention; (5) the repeated**
> **and prolonged nature of the questioning; and (6) deprivation of food or sleep.**
> *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d
> 854, 862 (1973); *Troy,* 124 Idaho at 214, 858 P.2d at 753.

*Id.* at 638, 51 P.3d at 452 (emphasis supplied).

The most critical factors in this case in determining whether Moore's re-initiation of the

conversation with police constituted a voluntary, knowing, and intelligent waiver of his *Miranda*

right to an attorney, and whether his confession was voluntary, are the length of his detention and

the repeated and prolonged nature of his questioning by Assistant Police Chief Ryan.

When Ryan entered the room to continue the interrogation of Moore, about 1 hour and 1

minute had elapsed since the interview started. A summary of the events from that point follows:

▪ **01:01:00** - Assistant Police Chief Ryan enters the room and continues the interrogation. He

does not mention Moore's request for an attorney. He repeatedly entreats Moore to "do the right

thing" for the town and for Drake's family, and to admit the shooting was an accident or a mistake.

▪ **01:12:24** - Moore (in response to Ryan asking him: "Are we there, Daniel?") makes a

second unequivocal invocation of his right to counsel, saying: "I need to talk to an attorney then."

▪ **01:12:25**: In response to this second invocation, Ryan first says: "Okay. I understand.

Then, we're done," but quickly adds: "I know a minute ago you said I think, but now you are

telling me you want to talk to an attorney, you don't want to talk to me anymore?" The video is

clear: Moore never said "I think." He unequivocally stated "I need to talk to an attorney."

- **01:12:25 to 01:13:47** – Ryan does not terminate the interview, but pretends that Moore's invocation of counsel was ambiguous. He continues to ask Moore to clarify or decide whether he wants to talk to Ryan or to an attorney, saying: "Do you want to talk to me or not, yes or no?"

- **01:13:48** – Moore responds by saying: "I think I need to talk to an attorney."

- **01:13:49 to 01:16:45** – Ryan initially acknowledges Moore's statement by indicating that he is terminating the interview, saying: "Well, you do that then, thank you. All right, brother. Okay. I'm going to go, okay." Moore replies, "Thank you." Ryan stands up and walks to the door, but does not leave. Instead, he turns to Moore and restarts the conversation, saying: "At this point." Moore then looks up at him and asks: "Yes, sir. What do you want me to do?" Ryan replies: "I want the truth," and then, "I want you to admit the truth that – Jesus, man, you're killing me, man."

- **01:16:46 to 01:20:38** – Ryan leaves the room. Moore is allowed to use the bathroom.

- **01:20:39** – Ryan comes back in and picks up right where he left off, disregarding Moore's two prior unequivocal requests for an attorney, and continuing to claim that Moore has not made his desire to cease the interview and consult an attorney clear. Ryan tells Moore: "I will continue to talk to you, but you never ever – 'cause you won't clearly say what you want to do." *Preliminary Hearing 10/2/2020 Defendant's Ex. C (MVI-0038)*, at 20:31 to 20:36.

- **01:23:43** – Moore responds to Ryan's repeated calls for clarity, by saying "I want to be able to talk to somebody who gives me my legal rights." This is Moore's third unequivocal invocation of his right to counsel. To which Ryan responds, "Okay, there it is. I understand."

- **01:24:20** – Ryan leaves the room.

- **01:24:21 to 01:24:39** – Moore is left seated alone in the room.

- **01:24:40 to 01:25:40** – Tolleson comes in and gives Moore a blanket and a bottle of water; and in response to a question from Moore, explains that search warrants are being executed on Moore's residence, cars, and office. Moore asks to talk to Ryan one more time.

- **01:26:28 to 1:41:29** - Ryan reenters the room, and Moore starts talking about why he needs an attorney to help him in this interrogation. Ryan says: "I don't know what you want me to say." He tells Moore that he "knows" and is "positive" that Moore killed Dr. Drake, and he continues to exhort Moore to "do the right thing," and to "tell the truth." He asks Moore to: "Just explain it. Get it out, and be done with it, please." Moore explains why he needs an attorney to help negotiate with the police during this interrogation. To which Ryan replies, "You have a right to an attorney. But when I leave, and you call me back in and say I want to talk to you again, well then, we restart everything again." Ryan then asks Moore to "prove" his love for the town by admitting his guilt.

- **01:41:20** – Moore makes his first incriminating statement. He says "I did not go there to murder him." Ryan goes on to elicit more incriminating statements from Moore about the crime.

****

The foregoing facts establish a pattern of badgering and overreaching by Assistant Police Chief Martin Ryan in order to "wear down the accused [Moore] and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 494 (1984). When Ryan first entered the interview room, Moore had already requested counsel 46 minutes earlier and had been alone in that room since his invocation. Ryan just continued the questioning without mentioning Moore's prior invocation of counsel. When Moore made a second unequivocal request for an attorney at 01:12:24, Ryan did not cut off questioning; but rather, pretended that the request was ambiguous and pressed Moore for clarification and for a decision as to whether he wanted to talk to an attorney. At 01:13:48, Moore

made a third – this time equivocal – request for an attorney. At 01:23:43, after Ryan continued to insist that Moore had not made his desire to cease the interview and consult with an attorney clear, Moore made a fourth unequivocal request for an attorney. After this fourth invocation, questioning is cut off, but Moore is again left alone in the interview room. Moore then reinitiates the conversation by explaining to Ryan why he needs an attorney during the interrogation ("How am I going to plead to anything if I'm sitting here spilling my guts to you and I don't have an attorney that gives me my rights?"). The response by Ryan is: (1) to feign ignorance as to his prior invocations of counsel ("You keep saying this. I can't answer that question. How do you do that? I don't know, okay?"); and (2) to acknowledge he has a right to an attorney, but to imply that he has now waived that right by reinitiating the conversation ("You have a right to an attorney. But when I leave, and you call me back in and say I want to talk to you again, well then, we restart everything again."). Also, throughout the course of the interview, police not only work to convince Moore that he has not made a clear request for an attorney, they also repeatedly tell him that if he does not confess, they will infer premeditation on his part and he will be booked for first degree murder.

Considering the totality of these circumstances, this Court finds that Moore's will was overborne by the badgering and overreaching of police such that his waiver of his *Miranda* right to counsel was not made knowingly, voluntarily, and intelligently. The Court further finds that Moore's subsequent confession was not voluntary, but rather, was the product of police coercion.

Accordingly, because the police violated Moore's due process rights by eliciting a confession by engaging in coercive police conduct, the Court concludes that any and all incriminating statements made by Moore after his invocation of his right to counsel at 15 minutes and 19 seconds into the interview, were involuntary, and are thus, suppressed.

The remarks made by Circuit Judge Alex Kozinski in his concurring opinion in *Collazo v. Estelle*, 940 F.2d 411 (9th Cir. (Cal.) 1991), apply equally to this case. Judge Kozinski wrote:

> **As the Supreme Court said in *Edwards*, the police may not undercut the prophylactic rule of *Miranda* by refusing to accept a suspect's assertion of the right to counsel.** *See Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981); *see also Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 490–91, 112 L.Ed.2d 489 (1991). **The *Edwards–Minnick* line of cases "is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.' "** *McNeil v. Wisconsin*, 501 U.S. 171, ——, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 1180, 108 L.Ed.2d 293 (1990)); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). We cannot allow police to advise suspects that they will pay dearly for taking advantage of their right to counsel precisely because some suspects will succumb to the pressure ...
>
> This case is difficult only because ***Edwards* allows an exception where the second round of questioning is initiated by the suspect.** *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85. The dissent does a masterful job of showing that the *Edwards* exception might apply to Collazo because he initiated the second interrogation. **In my view, however, the police forfeit the benefit of the *Edwards* exception once they use the type of pressure tactics demonstrated in this record. Because *Edwards* is designed to prevent police from badgering suspects into giving up their right to counsel, the narrow exception to *Edwards* cannot apply in a case where the police actually engaged in badgering. If police want to keep the *Edwards* escape hatch open, they must cease their interrogation as soon as the suspect asserts his right to counsel, and then hope he changes his mind on his own. Any other rule would invite police misconduct and enmesh the courts in the type of metaphysical unscrambling of which this case is a perfect example.**

940 F.2d at 426-427 (emphasis supplied).

## V. CONCLUSION AND ORDER

NOW, THEREFORE, based on the foregoing, and regarding Defendant Daniel Moore's police interview on August 27, 2020, IT IS HEREBY ORDERED THAT:

1. Any and all statements made by Defendant Daniel Moore from the start of his interview with Detectives Van Leuven and Tolleson at 2:49 p.m., until he was Mirandized approximately four and one-half minutes later, are suppressed, and thus, are inadmissible and excluded from trial.

2. Any and all statements (including the alleged confession) made by Defendant Daniel Moore after he invoked his right to counsel to Van Leuven and Tolleson at approximately 15 minutes and 19 seconds into the interview are suppressed, and thus, are inadmissible and excluded from trial.

In sum, this Court deems inadmissible, and excludes from trial, any and all statements made by Defendant Daniel Moore from the start of his interview at 2:49 p.m. until the interview concluded (except for statements made between the reading of *Miranda* rights at four and one-half minutes into the interview and the invocation of the right to counsel at 15 minutes and 19 seconds).

IT IS SO ORDERED.

DATED:   __2/12/2021 03:53 PM__   .

_Barbara Buchanan_
**Barbara Buchanan**
**District Judge**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic mail, on __2/12/2021 04:04 PM__ , to:

Tevis W. Hull
Boundary County Prosecutor
prosecutor@boundarycountyid.gov

tevis.hull@gmail.com
apluid@boundarycountyid.org

K. Jill Bolton
BOLTON LAW, PLLC
reception@kjboltonlaw.com

jill@kboltonlaw.com

_Jamie Wilson_
Deputy Clerk

# Exhibit 5 –

(City of Bonners Ferry Job Descriptions)

<u>POLICE CHIEF</u>

**General Statement of Duties:**

Directs the operation of the police department including administrative and investigatory work. Performs other related duties as assigned and such other duties as prescribed by statute and ordinance.

**Distinguishing Characteristics of Class:**

Receives general direction from Mayor and council, and responds directly to citizens. Incumbent of this class is totally responsible for all police functions and activities.

**Examples of Duties:**

Assigns work to subordinate staff, checks progress and reviews results and reports;

Hires, assigns, promotes, demotes, terminates department employees per City policy;

Plans and prepares budget requests an authorizes departmental expenditures;

Supervises training for staff;

Investigates crimes;

Supervises and checks preparation of department, personnel, offense, traffic, federal and other reports;

Attends meetings, conventions and training workshops;

Speaks at public meetings;

Coordinates department activities with other law enforcement agencies;

Work a regular scheduled patrol shift;

Do related humane work.

**Required Skills, Knowledge and Abilities:**

Skill in using standard police equipment. Considerable knowledge of laws, codes, statues, ordinances; standard police operations, rules, regulations affecting department procedures. Ability to supervise and coordinate activities of staff; to represent the department and city effectively; to communicate clearly and concisely both orally and in writing; to establish and maintain effective working relationships, to make sound decision.

**Acceptable Educations and Experience:**

Associate degree in Police Science, or considerable experience in law enforcement inclusive of some supervisory experience.

**Necessary Special Requirements:**

Valid, current Idaho driver's license. Must meet the requirements prescribed by Chapter 19, Section 5115, Idaho Code.

Note: Incumbent is appointed by Mayor and council.

Page 33 of 35
Approved by city Council
City of Bonners Ferry,job descriptions 2011 proposed 24may2011 5/24/11

2.0004

<u>ASSISTANT POLICE CHIEF</u>

Page 34 of 35
Approved by city Council
City of Bonners Ferry,job descriptions 2011 proposed 24may2011 5/24/11

**2.0005**

## PATROLMAN

**General Statement of Duties:**

Performs as assigned patrol shift in the enforcement of law and order; to take special assignments in the protection of life and property and do related work as required.

**Distinguishing Characteristics of Class:**

Positions in this class can be distinguished by receiving general direction from the superior officer (Assistant Chief or Police Chief).

**Examples of Duties:**

Patrols assigned roadways to observe traffic for violations of traffic laws and ordinances; assists stranded motorists; checks for suspicious vehicles; determines violations and makes arrests.

Responds to a variety of citizen complaints such as break-ins, robberies, domestic quarrels, assaults and cases of vandalism; prepares initial investigation reports; gathers evidence and interviews victims and witnesses.

Reports to accident scenes to render first-aid, control traffic in the area; investigates accidents and prepares reports on details after determining responsibility for the same.

Conducts criminal investigation; serves as witness in civil trials and appears as complaint in criminal actions;

Investigates auto, aircraft, and industrial accidents; conducts searches for lost, missing, or drowned persons; assists county concerning death investigation and transportation of dead bodies; delivers emergency messages; performs investigations of narcotic offenders.

Books prisoners into jail, fills out appropriate forms and stores trustee's belongings and valuables, takes finger prints and mug shots, and transports prisoners to and from court. Performs related duties as assigned.

Do related humane work.

**Acceptable Education and Experience:**

High School education or equivalent combination of experience and education which provides the required skills, knowledge and abilities to enforce laws and ordinances.

**Necessary Special Requirements:**

Basic Peace Officers Standards and Training (P.O.S.T.) certificate within one year. Must meet requirements prescribed by Chapter 19, Section 5115, Idaho Code.

Page 35 of 35
Approved by city Council
City of Bonners Ferry,job descriptions 2011 proposed 24may2011 5/24/11

2.0006

Exhibit 6 –

(Opinion Letter and Curriculum Vitae of Law
Enforcement Procedures Expert Matt Jones- Evocavi
LLC)

# Evocavi LLC

*Re: Opinion Moore v. City of Bonners Ferry et al.*, District of Idaho Case No. 2:22-cv-00376-BLW

I have been retained by Bolton Law, PLLC to review evidence and provide opinions in this case based upon my extensive training and experience as a law enforcement officer, law enforcement trainer, researcher and publisher as set forth in detail in my curriculum vitae enclosed herewith.

A.  <u>Opinion Summary</u>:

    1.    Law enforcement officers are commonly trained on the following topics:

        a.  *Miranda* and the rights afforded individuals during custodial interrogations. This includes that a suspect in custody must be advised of his right to remain silent, to have counsel present during questioning, that if the suspect cannot afford counsel, that counsel will be provided for him at public expense, and that anything said may be used against the suspect at a trial.

        b.  *Edwards v. Arizona* training that instructs law enforcement to cease questioning a suspect in custody after the suspect invokes his right to counsel. The case of *Edwards v. Arizona* sets a bright line rule for law enforcement to follow and requires that when a

suspect in custody says he wants an attorney, police must stop

questioning the suspect and may not resume the questioning until

the suspect has counsel with him or reinitiates the questioning on

his own.

2. Law enforcement, like all people, are vulnerable to confirmation bias.

Confirmation bias is the tendency for people to receive information and

process it in a way that confirms their current preconceptions, attitudes,

and beliefs. In law enforcement, confirmation bias corrupts the

investigative process because it causes an investigation to focus on and

gather facts that support a specific theory. (Nickerson, 1998). When an

individual is driven by confirmation bias, they seek out, pay closer

attention to, and better remember information consistent with their own

preference and beliefs. Individuals driven by confirmation bias also may

tend to avoid, discount, and forget information that challenges those

beliefs and preferences. (Klayman & Ha, 1987). When information is

ambiguous, people, including law enforcement officers, are adept at

interpreting it in ways that concur with preconceptions, attitudes, and

beliefs. (Schlosser et. al, 2021).

3. During the custodial interrogation of Daniel Moore on August 27, 2020,

Defendant Ryan violated long standing police policy and procedure,

well-known and established among the policing community throughout

the United States, that prohibits the continued interrogation of a suspect

in custody after the suspect has invoked his right to counsel. Despite Daniel Moore's clear and unequivocal repeated requests for counsel, Ryan continued to interrogate Moore. Ryan's conduct defied very well-established legal precedent that law enforcement officers throughout the country are well trained to follow.

4. During the custodial interrogation of Daniel More on August 27, 2020, Defendant Ryan employed coercive tactics that have been well documented as risk factors that can contribute towards eliciting a false confession (i.e., deception and theming tactics to include minimization and maximization) and eliciting statements that are involuntary and inculpatory.

5. During the custodial interrogation of Daniel More on August 27, 2020, Defendant Ryan employed non-traditional coercive tactics by using the social influence tactics of "authority" (i.e., as a person in a position of authority, Defendant Ryan provided advice to  Dr. Moore about what he should do) and "scarcity" (i.e., implying to Dr. Moore that this is the only opportunity he will have to provide his side of what happened before he (Defendant Ryan) leaves).

6. During the custodial interrogation of Daniel Moore on August 27, 2020, Defendant Ryan engaged in leading and suggestive questions, which undermined the reliability of much of the information elicited from Dr.

Moore because it often cannot be determined if the information came directly from Dr. Moore or from Defendant Ryan suggesting it to him.

7. Law enforcement officers involved in homicide investigations are typically trained and aware that family members who could benefit from the death of the crime victim should be thoroughly investigated. Law enforcement in this case likely did not thoroughly investigate Jennifer Drake as a suspect as they cleared her as a suspect to Mutual of Omaha Insurance Company within only a few weeks of Brian Drake's death to permit her to collect a $1 million life insurance policy.

8. Law enforcement appear to have been influenced by confirmation bias in failing to thoroughly investigate Jennifer Drake. Instead law enforcement hastily discounted Drake as a suspect despite obtaining ample evidence of her dishonest responses to law enforcement questions and the multiple motives Jennifer Drake had to kill her husband. Said officers appear to have been driven by confirmation bias in pursuing Daniel Moore as a suspect. The pursuit of Moore followed an early suggestion by Jennifer Drake that a chiropractor from whom her husband poached patients was the likely culprit. The pursuit of Moore continued even despite evidence that Moore had an alibi for his whereabouts from the Bonners Ferry Coroner with whom Moore had spent the evening and was with at the time of Brian Drake's shooting death. The pursuit of Moore ignored the fact that Moore was financially well-off, had more patients than he

wanted, was continuously voted by his community as the best Chiropractor in town and had no financial motive to kill Drake. The pursuit of Moore ignored that Moore had zero criminal history in his more than 60 years of age at the time of Drake's death. The pursuit of Moore ignored that he had no relationship with Brian Drake.

B. Basis for my opinions:

1. My 21 years as a law enforcement officer, including my own participation in interrogations of suspects and investigations of homicides as a homicide detective.

2. My training as a law enforcement officer, including but not limited to the numerous training courses relating to suspect interviews as set forth on my curriculum vitae.

3. Training I have given to law enforcement as set forth on my curriculum vitae.

4. Research, studies, and publications relating to police interrogations, homicide investigations and confirmation bias as set forth in my curriculum vitae.

Kassin, S. M., Drizin, S. A., Grisso, T., Gudjonsson, G. H., Leo, R. A., & Redlich, A. D. (2010). Police induced confessions: Risk factors and recommendations. *Law and human behavior*, *34*, 3-38.

Hill, C., Memon, A., & McGeorge, P. (2008). The role of confirmation bias in suspect interviews: A systematic evaluation. *Legal and criminological psychology*, *13*(2), 357-371.

Cialdini, R. B., & Cialdini, R. B. (2007). *Influence: The psychology of persuasion* (Vol. 55, p. 339). New York: Collins.

Oleszkiewicz, S., Madfors, M., Jones, M. S., & Vredeveldt, A. (in press). Proximity-based evidence disclosure: Providing an operational purpose for disclosing evidence in investigative interviews. *Psychology, Public Policy, and Law*

5. My review of the video-taped interrogations of Daniel Moore on August 27, 2020.

6. Other case details, including, but not limited to:

    a. Jennifer Drake's interviews with law enforcement on March 16, 2020, March 17, 2020, March 26, 2020, and April 3, 2020.

    b. Emily Zemacke interview with law enforcement on March 23, 2020.

    c. Mick Mellet, the City of Bonners Ferry Coroner, interviews, and polygraph examination report with law enforcement, establishing an alibi for Daniel Moore on the date and time of the murder of Brian Drake.

    d. Other case information which may be presented to me during my testimony or provided as the case develops.

C. Exhibits that will be used to summarize or support opinions

    a. Excerpts from the interrogation of Daniel Moore and interviews

b. All police reports from any federal, state, county, task force, and
   local agencies involved to include, ,search warrants, search
   warrant returns, tip logs, forensic data extractions of any
   electronics equipment, emails, app tracking software, and social
   medial accounts, cell phone call detail records, and any
   information elicited from google geofence search warrants.

D. Qualifications – see attached curriculum vitae.

E. Cases in which expert testimony given in the last 4 years by trial or
   deposition – see attached curriculum vitae.

F. Compensation to be paid for the study and testimony in the case. - I am paid
   $250 per hour for my study and testimony in this case.



   Respectfully,


   *Matthew S. Jones*
   _____
   Matthew Jones

## CURRICULUM VITAE
## MATTHEW S. JONES

### Contact Information
Matthew Jones
Email: mjones@evocavigroup.com

### Education
M.A.  Forensic Psychology, University of North Dakota (2018).
B.S.   Political Science / Criminal Justice, University of Akron (1997).

### Work Experience
2021 – Present   Consultant, Police Practices Expert- Interview techniques
2020 – Present   Owner of Evocavi, LLC (Science-Based Interview Training Company)
2017 – 2021   Homicide Detective, Tempe Police Department (retired, July 2021)
2017            Robbery Detective, Tempe Police Department
2011 – 2017   Task Force Officer, US Marshal's Violent Offender Task Force (AZ District)
2009 – 2017   Detective, Criminal Apprehension and Surveillance Unit, Tempe Police
2008 – 2009   Patrol Officer, Tempe Police
2007 – 2008   Patrol Officer, Phoenix Police
2000 – 2007   Patrol Officer, Independence Police

### Professional Awards
2001   Top Academic Achievement Award, University of Akron Police Academy
2001   Class President Award, University of Akron Police Academy
2001   Volunteer Award, Silver & Gold of Greater Cleveland
2001   Certificate of Recognition, Ohio State Attorney General
2002   Courageous Service Award, Ohio State Congress
2009   Meritorious Service Award, Tempe Police Department
2013   Meritorious Service Award, Tempe Police Department
2017   Distinguished Service Award, Tempe Police Department
2019   Outstanding Officer of the Year Award, South Tempe Rotary Club
2019   National Institute of Justice (NIJ) L.E.A.D.S Scholar Award
2020   Humanitarian Award, Tempe Police Department
2021   Distinguished Service Award, Tempe Police Department

**Interview Related Trainings (attended as a student)**
- 2002 Reid Interview and Interrogation (Basic and Advanced)
- 2013 Reid Interview and Interrogation (Basic and Advanced)
- 2016 High Value Detainee Interrogation Group: Sensemaking by Paul Taylor, Ph.D.
- 2016 Cognitive Interview (Wichita, KS) by Edward Geiselman, Ph.D.
- 2016 Cognitive Interview (Tempe, AZ), by Edward Geiselman, Ph.D.
- 2016 Basic Forensic Interviewing
- 2017 High Value Detainee Interrogation Group: HIG Core Interview Class
- 2017 High Value Detainee Interrogation Group: ORBIT/Motivational Interviewing, by Laurence Allison, Ph.D.
- 2017 High Value Detainee Interrogation Group: Cognitive Load & Deception, by Aldert Vrij, Ph.D.
- 2018 Cognitive Interview (NTSB, Ashburn, VA), by Ron Fisher, Ph.D.
- 2022 Webinar: Understanding Sexual Assault Trauma and Considerations for Conducting a Trauma-Informed Interview, by Forensic Technology Center of Excellence

**Interview Trainings (provided as an instructor)**
- 2018 Rapport/Trust (Field Validation Research Project, as a coach)
- 2019 Airforce OSI, Cognitive Interview Class as a Co-Instructor at FLETC, Glynco, GA
- 2019 Science-Based Interview Course for LE, for Tempe PD and Mesa PD (Jul.)
- 2019 Science-Based Interview Course for LE, for Tempe PD and Mesa PD (Aug.)
- 2019 Science-Based Interview Course for LE, for Wichita PD (Nov.)
- 2019 Science-Based Interview Course for LE, for Wichita PD (Dec.)
- 2020 Intro. to Science-Based Interviewing, for NCIS at FLTEC, Glynco, GA (Oct.)
- 2021 NCIS Basic Instructor Interview Course (Feb.)
- 2021 NCIS Basic Interview Course at FLETC, Glynco, GA (Apr.)
- 2021 NCIS Basic Interview Course at FLETC, Glynco, GA (May)
- 2021 Air Force OSI Interview Course, Co-instructor (Jun.)
- 2021 NCIS Supervisor Interview Course-virtual (Jun.)
- 2021 Wichita PD Patrol Interview Course (Jun.)
- 2021 NCIS Field Training Agent Interview Course, (Jul.)
- 2021 NCIS Field Training Agent Interview Course, (Aug.)
- 2021 Wichita PD Advanced Evidence Disclosure Course (Aug.)
- 2021 Wichita PD Advanced Evidence Disclosure Course (Aug.)
- 2021 Air Force OSI Advanced Evidence Disclosure Course (Aug.)
- 2021 Air Force OSI Advanced Evidence Disclosure Course (Aug.)
- 2021 Sumter County Sheriff's Office, Advanced Evidence Disclosure Course (Sept.)
- 2021 Sumter County Sheriff's Office, Advanced Evidence Disclosure Course (Sept.)
- 2021 Wichita PD, Interview Course for Detectives (Oct.)
- 2021 Amazon Inc., Interview Course for Corp. Security Investigators, Seattle, WA (Nov.)
- 2021 NCIS Basic Interview Course at FLETC, Glynco, GA (Dec.)
- 2022 NCIS Basic Interview Course at FLETC, Glynco, GA (Jan.)
- 2022 NCIS Basic Interview Course at Kingsland Police Training Center (Feb.)
- 2022 NCIS Basic Interview Course at FLETC, Glynco, GA (Apr.)

- 2022 Amazon Inc., Interview Course for Corp. Security Investigators, Seattle, WA (Apr.)
- 2022 Wichita PD, Proximity-Based Evidence Disclosure (May)
- 2022 Wichita PD, Proximity-Based Evidence Disclosure (Jun.)
- 2022 Amazon Inc., Interview Course for Corp. Security Invst., Washington, DC (Jun.)
- 2022 NCIS Basic Interview Course at FLETC, Glynco, GA (Jun.)
- 2022 NCIS Field Agent Interview Course- virtual (Jul.)
- 2022 NICS Field Agent Interview Course- virtual (Aug.)
- 2022 NCIS Basic Interview Course at FLETC, Glynco, GA (Aug.)
- 2022 Amazon Inc., Interview Course for Corp. Security Investigators, London, ENG (Sept)
- 2022 Kansas Law Enforcement Training Center, Hutchinson, KS (Oct.)
- 2022 Wichita Police Department 5-Day Interview Course, Wichita, KS (Oct.)
- 2022 NCIS Basic Interview Course at FLETC, Glynco, GA (Nov.)
- 2022 California P.O.S.T, Train the Trainer 5-Day Interview Course, Monterey, CA (Nov.)
- 2023 Topeka PD, Proximity-Based Evidence Disclosure (Feb.)
- 2023 U.S. Customs Border Protection – Office of Professional Responsibility, 4-Day Interview Course, Ashburn, VA (Feb.)
- 2023 F.B.I Behavior Analysis Unit, Proximity-Based Evidence Disclosure- virtual (Mar.)
- 2023 California P.O.S.T, Train the Trainer 5-Day Interview Course, San Diego, CA (Mar.)
- 2023 Title IX Investigators (UC & OSU) 4-Day Interview Course- virtual (May)
- 2023 Amazon Inc., Interview Course for Corp. Security Investigators, Seattle, WA (Jun.)
- 2023 California P.O.S.T, 5-Day Interview Course, Milpitas, CA (Jun.)


**Speaking Engagements**
- 2017 International Investigative Interviewing Research Group Conference
- 2017 High Value Detainee Interrogation Group Symposium, Panel Group Presenter
- 2018 High Value Detainee Interrogation Group Symposium, Panel Group Presenter
- 2019 Interviewed by Northwestern University film crew for short documentary film on Internalized False Beliefs related to law enforcement interview techniques
- 2019 Arizona State University Sandra Day O'Connor School of Law, Criminal Procedure Class on Law Enforcement Interview Methods
- 2020 RTI Annual SAKI Conference: *Identifying and Investigating Sex Offenders- Suspect Interviewing*
- 2020 IACP Annual Conference, Investigative Interviewing: *The Science of Building Rapport and Detecting Deception*
- 2021 Podcast "Police Interrogation Techniques" (Panel presenter)
- 2021 High Value Detainee Interrogation Group Annual Conference (Panel presenter)
- 2021 American Society of Evidence-based Policing 5th annual conference, *Obtaining Information through investigative interviewing*: *Translating research into practice* (panel presenter)
- 2021 Quattrone Center for the Fair Administration of Justice: *Interrogating Without Coercion: How police and policy makers are reforming interrogations to eliminate coercion and prevent false confessions (webinar)*

- 2021 El Paso County Public Defender's Office False Confession Conference: *How Coercive Interview Tactics Contribute to Eliciting a False Confession*
- 2022 IIIRG Conference at the University of Winchester, London: *Proximity-Based Evidence Disclosure: Training U.S. Investigators in research-informed tactics.*
- 2022 Quattrone Center for the Fair Administration of Justice: Science-Based Interviewing (Sept.)

## Collaborations with Researchers
- 2016 HIG funded field validation study of HIG Core Interviewing five-day class with the Tempe Police Department
- 2017 HIG funded field validation study of Apptek Interview room transcription platform software
- 2018 HIG funded field validation study of Rapport / Trust building with Chris Meissner, Ph.D.
- 2019 HIG funded training assessment / field validation study of a five-day Science-Based Interview Curriculum for Local Law Enforcement with Melissa Russano, Ph.D.
- 2019 HIG funded field validation study of sleep alertness and interviewing with local law enforcement, Zlatan Krizan, Ph.D.
- 2020 HIG funded: Disclosing evidence and information in Interviews: What we know and how it works with Simon Oleszkiewicz, Ph.D.
- 2022 Strategic Community Engagement for Patrol Officers, with Christian Meissner PhD and Amelia Mindhoff PhD, Iowa State University (seeking funding from NSF/NIJ)

## Consultations on Civil and Criminal Cases
- 2021   Boston College Innocence Program, *Commonwealth v. Erasmo Saul Gutierrez*
- 2021   People's Law Office, *Jesus Sanchez v. Village of Wheeling* (testified)
- 2021   Justin Bonus, Esq, *People of the State of New York v. James Jenkins* (testified)
- 2021   Loevy & Loevy, *Victor Rosario v. Waterhouse, D. Mass* (testified)
- 2022   Murphy, Pearson, Bradley, & Feeney, *People of the St. of CA v. Jeffrey Civian*
- 2022   The Legal Aid Society, *People of the State of New York v. Devon Miller*
- 2022   The Legal Aid Society, *People of the State of New York v. Louis Bonilla*
- 2022   The Legal Aid Society, *People of State of New York v. Renee Long*
- 2023   *People of Michigan v. Janafer Maynard (testified)*
- 2023   McArthur Justice Center, *Marcel Brown v. City of Chicago* (testified)

## Publications in peer-reviewed journals
- Brimbal, L., Meissner, C. A., Kleinman, S. M., Phillips, E. L., Atkinson, D. J., Dianiska, R. E., ... & Jones, M. S. (2021). Evaluating the benefits of a rapport-based approach to investigative interviews: A training study with law enforcement investigators. *Law and Human Behavior*, *45*(1), 55.
- Krizan, Z., Miller, A. J., Meissner, C. A., & Jones, M. (2023). The impact of alertness vs. fatigue on interrogators in an actigraphic study of field investigations. *Scientific Reports*, *13*(1), 6135.

- Oleszkiewicz, S., Madfors, M., Jones, M. S., & Vredeveldt, A. (in press). Proximity-based evidence disclosure: Providing an operational purpose for disclosing evidence in investigative interviews. *Psychology, Public Policy, and Law.*

## Instructional Manuals
- Oleszkiewicz, J.S., & Jones, M.S. (2022). *Proximity-Based Evidence Disclosure for Investigators.*

## Technical Working Group (TWG) Involvement
- 2018    High Value Detainee Group (HIG) (TWG) interview curriculum development with NYPD and LAPD.
- 2020    Naval Criminal Investigative Service (NCIS) (TWG) for new interview curriculum development
- 2020    RTI International (TWG) for sex crimes investigations
- 2022    California Commission on Peace Officer Standards and Training (TWG) to create a new statewide science-based interview curriculum for Detectives

## Board Positions
2019 – 2021    Arizona Homicide Investigator's Association

## Current Professional Affiliations
Arizona Homicide Investigators Association
American Psychology-Law Society
National Institute of Justice L.E.A.D.S Scholar Program (Alumni)
National Police Foundation
The American Society of Evidence-Based Policing

# Exhibit 7 –

(Excerpts from transcripts of Appeal Motion to Suppress Hearing, January 14, 2021)

```
 1              IN THE DISTRICT COURT

 2       OF THE FIRST JUDICIAL DISTRICT OF IDAHO

 3          IN AND FOR THE COUNTY OF BOUNDARY

 4   _____

 5   STATE OF IDAHO,        )     CASE NO.

 6          Plaintiff,      )     CR11-20-1076

 7            VS.           )

 8   DANIEL LEE MOORE,      )

 9          Defendant.      )

10   _____

11            TRANSCRIPT OF PROCEEDINGS

12                MOTIONS HEARING

13      BEFORE THE HONORABLE BARBARA A. BUCHANAN

14   _____

15            Bonner County Courthouse

16                Sandpoint, Idaho

17                January 14, 2021

18

19   FOR THE STATE:      Boundary Co. Prosecuting Attorney
                         6452 Kootenai Street
20                       Bonners Ferry, Idaho  838
                         BY:  TEVIS HULL, ESQ.
21

22   FOR THE DEFENDANT:  Bolton Law, PLLC
                         424 E. Sherman Ave., Suite 308
23                       Coeur d'Alene, Idaho   83814
                         BY:  K. JILL BOLTON, ESQ.
24

25   Reported by:  Kathryn Plizga, RPR, CSR 1063
```

1    Q.   Right.

2    A.   It's always — it's a sensitive area because

3    you want to be sensitive to the person's rights —

4    but it's also an area where you're having to think

5    carefully about case law that you've read and see how

6    the facts that you're presented with fit into what

7    you know, and hope you make the right choice.

8         So generally we try to err on the side of

9    making the right choice rather than pushing it.

10    Q.   And so the right choice in this case based

11    on your training was when Dr. Moore made the

12    statement about counsel, was for you guys to pack up

13    your things and leave?

14    A.   In my mind I wasn't exactly sure what had

15    been said, but it sounded to me like he asked for a

16    lawyer.

17    Q.   Right.

18    A.   So I wanted to basically leave the room, and

19    that's what we did.

20         MS. BOLTON:  I'm sorry, Your Honor, if I

21    could just have one moment?

22         THE COURT:  You may.

23    BY MS. BOLTON:

24    Q.   I'm sorry, just one follow-up question.

25         You said that you — I don't know if I

1   completed your background, training and experience.

2   I kept moving on to the next question.

3         But tell us a little bit more about your

4   training.

5         You're POST certified, right?

6      A.   I am.

7      Q.   And you have been a detective for how many

8   years?

9      A.   Since 2006.

10     Q.   And included among your training and your

11  experience you said is the — um — you know, you're

12  kept up to date on the law?

13     A.   We have periodic legal updates.

14     Q.   Right.  When you have a question about the

15  law, what do you do?

16     A.   It depends on the situation.  Most often I

17  will call the county prosecutor in which I have the

18  question and ask them because they're the ones that

19  are going to be — they're the ones that are going to

20  have to deal with whatever I do.

21        If it's more of a general question or a

22  department policy kind of question, then that will go

23   to the AG's office.  We have AG's in our office down

24  in Redding.

25     Q.   Would you say that it would be an important

1   issue whether or not someone you have accused or are
2   about to charge with murder has asserted his right to
3   counsel?
4           Would you say that that's an important
5   question?
6       A.   Certainly.
7       Q.   So, who did you call?
8       A.   It being an important question, yes.  It
9   being something that I would call and talk to the
10  prosecutor about, not necessarily.
11      Q.   So did you call and talk to a prosecutor
12  about it in this case?
13      A.   I spoke with Tevis on the phone generally,
14  but I don't recall exactly what was said.
15      Q.   I want to just say that I recall asking you
16  this question at the last preliminary hearing where
17  you testified about this.  And I asked you if you had
18  spoken with anybody besides the other law enforcement
19  officers and you said no.
20      A.   Uh-huh.
21      Q.   So which is it?
22      A.   I was speaking to lots of people on the
23  phone.  It's difficult for me to remember exactly who
24  I talked to at what point.
25      Q.   Just so I'm clear, you understand you're

1  under oath?

2      A.    I do.

3      Q.    And you're subject to penalty of perjury for

4  making knowingly false statements?

5      A.    Yes.

6      Q.    So when you were at the preliminary hearing

7  you were called to testify about these same exact

8  questions.  You remember that, right?

9      A.    I don't have that in front of me, but I

10  remember answering questions at the preliminary

11  hearing.

12      Q.    So if you said at the preliminary hearing

13  that you didn't speak to any attorney and you didn't

14  speak to Tevis Hull, would that testimony have been

15  right or is this testimony right?

16      A.    I spoke with Tevis on the phone.  I don't

17  recall exactly when that was in sequence if that's

18  what you're asking.

19      Q.    Maybe my question needs to be clear.  Did

20  you ask Tevis Hull for advice on whether or not

21  Dr. Moore had asserted his Fifth Amendment privilege?

22      A.    No.

23      Q.    So you didn't make a call for advice from an

24  attorney about that important question?

25      A.    No.

1            MS. BOLTON: That's all I have, Your Honor.

2            THE COURT: Do you have any follow-up

3 questions?

4                  RECROSS EXAMINATION

5 BY MR. HULL:

6     Q. During that 45-minute break the Court has

7 already seen the videos. For the public, they may

8 not understand the context of this, but after you

9 were with the defendant and you left the room before

10 Marty Ryan, who is the assistant police chief of

11 Bonners Ferry went into the room with the defendant,

12 there was about a 45-minute time period when no law

13 enforcement was with the defendant, is that correct?

14     A. Yes, I believe so. I wasn't there. I don't

15 know if anybody went in the room or not.

16     Q. And during that time of that 45 minutes, did

17 you discuss with other law enforcement the comment

18 made by the defendant with regard to counsel?

19     A. Yes.

20     Q. Did you have a tape recording?

21     A. I did.

22     Q. Did you listen to the comment that he made?

23     A. I did.

24     Q. And based upon listening to the comment

25 outside of the room, did you discuss that comment

# Exhibit 8 –

(Transcript of M. Mellet Interview by Alderson and Van Leuven, May 19, 2020)

**K20-18**

**Mick Mellett Interview – May 19, 2020**

Detective Richard Alderson:

All right. Today is May 19th, 2020. By my watch, it is 12:41. I am Idaho State Police, Detective Richard Alderson. With me-

Detective Sgt. Michael Van Leuven:

Detective Sgt. Michael Van Leuven.

Mick Mellett:

Mick Mellett, Boundary County Funeral Director Coroner.

Detective Sgt. Michael Van Leuven:

Mick or Mr. Mellett, the reason why we asked you to come talk to us today, specifically, obviously we're investigating the death of Dr. Brian Drake, and we came across this story of a neighboring chiropractor named Dr. Moore, who we understand that you're friends with, who had a gas leak incident occur at his office, which is approximately 500 feet North of Dr. Drake's office on Sunday, which was approximately three or four days after Dr. Drake's homicide.

Detective Sgt. Michael Van Leuven:

I found that to be suspiciously coincidental and reached out to you on the phone, and you mentioned to me on the phone earlier that Dr. Moore had been with you at your residence, which is not uncommon the day that Dr. Drake was killed. And we wanted to talk to you about that today and sort of get all that on the record. Can you tell us about... I guess first let's start with the gas leak that was on Sunday.

Mick Mellett:

All right.

Detective Sgt. Michael Van Leuven:

Tell us what happened that day.

Mick Mellett:

I got up, I had a friend up, we went out to breakfast. Dan's pickup was at the office. Didn't think a whole lot about it.

Detective Sgt. Michael Van Leuven:

Who was your friend's name?

Mick Mellett:

Dan Ellen Harkness in Spokane.

Detective Sgt. Michael Van Leuven:

Ellen Harkness. And where'd you go to breakfast?

Mick Mellett:
Chic-N-Chop. And when we finished, we stopped at the grocery store.

Detective Sgt. Michael Van Leuven:
Which one?

Mick Mellett:
Safeway.

Detective Sgt. Michael Van Leuven:
What time did you initially go by, on your way to Chic-N-Chop and see his-

Mick Mellett:
I would guess 8:30-ish. I don't know.

Detective Sgt. Michael Van Leuven:
AM?

Mick Mellett:
AM.

Detective Sgt. Michael Van Leuven:
And what truck did you see?

Mick Mellett:
His pickup was there.

Detective Sgt. Michael Van Leuven:
Which pickup?

Mick Mellett:
The white one, I believe.

Detective Sgt. Michael Van Leuven:
RQ shows he's got a Tundra and a Chevy registered to him.

Mick Mellett:
Then it's a Tundra. And I don't remember, he's changed the... He hasn't Tundra now, and I don't... He had a Tundra before, I don't remember which rig it was, but it was his rig.

Detective Sgt. Michael Van Leuven:

You recognize that to be the vehicle that he commonly drives?

Mick Mellett:

Correct. And basically when we were... After breakfast, made a fairly quick stop at Safeway. Heading home, noticed his pickup was still at the office, which was somewhat unusual for him to be there on Sunday. Pulled in-

Detective Sgt. Michael Van Leuven:

About what time?

Mick Mellett:

I don't know, probably 10:30, 11:00. Of the dispatch log, would probably about 10 minutes before I called for the fire department. And I actually have a key to his office, let myself in, walked in and the-

Detective Sgt. Michael Van Leuven:

When you first went to the door, did you see that it was locked?

Mick Mellett:

It's locked-

Detective Sgt. Michael Van Leuven:

Did you jiggle the door?

Mick Mellett:

Yep.

Detective Sgt. Michael Van Leuven:

And did you knock on the door or anything?

Mick Mellett:

Nope. If he's there after hours, it's normally locked.

Detective Sgt. Michael Van Leuven:

Just because he doesn't want people from the public walking in while he's-

Mick Mellett:

[crosstalk 00:03:53]-

Detective Sgt. Michael Van Leuven:

... there by himself. When you use the key and you open the door, then what happened?

Mick Mellett:

Opened the door and instantly had a gas smell.

Detective Sgt. Michael Van Leuven:

Overwhelming gas smell or just the odor?

Mick Mellett:

Reasonably strong. I won't say overwhelming, but enough gas that you could definitely tell it was a gas leak. And walked in, called for Dan. He had felt woozy and laid down on one of his exam tables.

Detective Sgt. Michael Van Leuven:

How do you know he'd felt woozy? Did-

Mick Mellett:

He told me later.

Detective Sgt. Michael Van Leuven:

Later, he told you?

Mick Mellett:

Yeah. He said, he'd come down the office to change the air filters in the furnace and furnace was downstairs, went downstairs, changed them and as he came out of the basement, he felt funny and laid down.

Detective Sgt. Michael Van Leuven:

Did he say why he thought he was feeling funny? I mean, did he think-

Mick Mellett:

This-

Detective Sgt. Michael Van Leuven:

... it was a gas leak?

Mick Mellett:

No. Dan had a respiratory issue four or five years ago and almost died, ended up in Kootenai Medical Center probably... I think he was in a coma for six weeks, probably.

Detective Sgt. Michael Van Leuven:

What kind of problem did he have?

Mick Mellett:

They thought... I don't know if they really ever pinned it down, but he had been down in Belize and had gone through one of these underground river raft trips. And they questioned whether he'd gotten into like some [bat poop 00:05:39] and the fungus but, back when that happened, Karen called me over to the ER and he doesn't-

Detective Sgt. Michael Van Leuven:

That's his wife?

Mick Mellett:

His wife. And he really didn't have any recollection of being in the ER. Shipped him to Coeur d'Alene. They put him in an induced coma.

Detective Sgt. Michael Van Leuven:

When was this?

Mick Mellett:

I don't know. It's gotta be five, six years ago. And they held him in an induced coma for... God, I want to say six weeks.

Detective Sgt. Michael Van Leuven:

On a ventilator?

Mick Mellett:

Yeah. And they... Basically, as he came out of that, he doesn't have a real good sense of smell. He doesn't notice foul odors and things. Anyway, I called for-

Detective Sgt. Michael Van Leuven:

Let me ask you a question.

Mick Mellett:

Mm-hmm (affirmative).

Detective Sgt. Michael Van Leuven:

You'd mentioned before that he sometimes goes out with you to collect bodies.

Mick Mellett:

Yep.

Detective Sgt. Michael Van Leuven:

Has that been a pretty common thing over the years for him to do that?

Mick Mellett:

It has been. He doesn't go out normally on first calls. What he does is when I have a death in Coeur d'Alene or Spokane, or I'm taking an autopsy down, he'll go with me.

Detective Sgt. Michael Van Leuven:

Where I'm going with this is, he has likely in that experience with you smelled the odor of decomposing bodies, which is a foul odor. Have you personally noticed that he smelled those odors or complained of them before the Belize incident and has not complained of them after the Belize incident?

Mick Mellett:

He doesn't notice them. I mean, the odors I deal with before he was in the hospital, he was far more attuned to the odors. I won't say he doesn't smell that decomposition, which can be pretty strong, but it doesn't seem to bother him that much.

Detective Sgt. Michael Van Leuven:

You personally noticed the difference between the before smell and the after the incident, his ability to smell it?

Mick Mellett:

Yeah. And I mean, even when cooking things and things he doesn't necessarily... In a house that you're cooking dinner, he doesn't necessarily notice the aromas from cooking and things. It isn't that he can't smell, it's just his smell was fairly diminished, and basically he even has some... He would probably never acknowledge it, but he has some memory issues from when that happened. Between that and the gas leak. And he's over at my house three or four days a week, probably routinely.

Detective Sgt. Michael Van Leuven:

How long has that been a thing?

Mick Mellett:

Years. I got a divorce four and a half years ago and I kind of got adopted. They spend a lot of time with me.

Detective Sgt. Michael Van Leuven:

He and his wife?

Mick Mellett:

Yeah. Dan, more commonly, but Dan and Karen. If she's going down to Sandpoint or Coeur d'Alene... They actually have two daughters now in Coeur d'Alene and she'll go down and help babysit or something and he'll be over at my place. [crosstalk 00:09:33].

Detective Sgt. Michael Van Leuven:

Going back to the gas incident, you open the door, you smell the odor of gas. Did you call out his name?

Mick Mellett:

I called for him and he-

Detective Sgt. Michael Van Leuven:

And, he didn't respond?

Mick Mellett:

I didn't hear him respond. Have you been in his office?

Detective Sgt. Michael Van Leuven:

Yep.

Mick Mellett:

I basically came in the front door, walked down in front of the desk and turned to go back to where his exam rooms are. And he came out of the exam room, fuzzy-headed. It was far enough along that he was somewhat unstable. [Gattie 00:10:11] took him outside, into the fresh air called the fire department. Fire department came up.

Detective Sgt. Michael Van Leuven:

When you're looking down the hallway and the receptionist's desk is on your left. There's a door right in front of you, that's an exam room. And then there's a door to the left of that, and that-

Mick Mellett:

There's three doors and I believe he was in the second exam room.

Detective Sgt. Michael Van Leuven:

The room that's basically right across from the door that goes downstairs?

Mick Mellett:

No. Past that.

Detective Sgt. Michael Van Leuven:

Past that?

Mick Mellett:

Yeah. And anyway, I took him outside, talked to him and called the fire department, the ambulance. Kelly came up. Basically, they come out with the fire department routinely and-

Detective Sgt. Michael Van Leuven:

Who's Kelly?

Mick Mellett:

One of the MTS.

Detective Sgt. Michael Van Leuven:

Did you call 911?

Mick Mellett:

I just called Dispatch Direct, not 911.

Detective Sgt. Michael Van Leuven:

Called Dispatch Direct. When he came out woozy, did he say anything?

Mick Mellett:

He would just... Basically, my memory is he just didn't feel good and he was a little unstable. I got him outside in the air and I went back in-

Detective Sgt. Michael Van Leuven:

Did he acknowledge to you that there was a gas leak in the building?

Mick Mellett:

No.

Detective Sgt. Michael Van Leuven:

No.

Mick Mellett:

I told him that there was a gas leak in the building and took him out. And I went back in and basically he drove himself home. And since then, he's told me he doesn't know how the hell he got home. As Kelly... The paramedics showed up, I asked him to go out and check him out and he wasn't comfortable going up alone so we had enough firemen there. I told the fire chief that I was going to take Kelly, the paramedic, up to the house and have him checked Dan out.

Detective Sgt. Michael Van Leuven:

To your house?

Mick Mellett:

No, to Dan's house.

Detective Sgt. Michael Van Leuven:

To Dan's house.

Mick Mellett:

When I came out and Dan had gone home, I called Karen and told her that there was a gas leak and I said, "Dan's not quite there." I said, "Keep an eye on him." She's a nurse.

Detective Sgt. Michael Van Leuven:

It seems to me that given the totality of the circumstances, it would be unusual for him to just jump in his truck and drive home. [crosstalk 00:12:52].

Mick Mellett:

I don't think that he even realizes that he did it. I went up, took Kelly up to the house. Karen upset that he came in, basically went back to one of the bedrooms and laid down. Didn't feel that... Had Kelly check him out and we felt that he needed to go to the hospital so I loaded him up in my rig and the actual ambulance didn't show. Well, at least when I was there, it didn't show up at the office and Kelly was the only one with me up at the house. We took him out, put him in my rig, took him over to ER and they put him on oxygen and he really doesn't have hardly any recollection. He knows he went down to change the filter and he knows that he woke up basically in the hospital and he wasn't completely coherent in

his conversation when he was going to the... I mean, he was, I guess, talking, but some things just didn't flow right.

Detective Sgt. Michael Van Leuven:

What sort of things was he saying?

Mick Mellett:

Oh, he just had commented that he was changing the filter out. And then he'd gotten woozy-feeling and went up and laid down, and I don't even remember. He thought Karen was upset with him and she was upset about circumstances because he damn near died several years ago. But she wasn't dressed so she got her... I took him to the hospital and then she came over to the hospital shortly thereafter.

Mick Mellett:

And then once she got there and we knew everything was fine, I went back up to the... I told him, I'd go back up to the office. And, while I was up there, Avista showed up and they had found the connection that was leaking and tightened it. And I think it was just because they were there, he went ahead and changed the meter outside. And I stayed there for a while and told him when he got done to just lock the door knob and I'd come down and lock things up. The fire department put the fans on and blew the gas out of the building and then checked everything else out.

Detective Sgt. Michael Van Leuven:

Okay. Anything else about that day? The gas leak day.

Detective Richard Alderson:

Oh, yes. I'm sorry, I missed it. When you came in and he called, was the basement door open or closed?

Mick Mellett:

I honestly don't remember. I think it was partially open, but I don't honestly remember.

Detective Richard Alderson:

Did you ever observe Dr. Moore on the exam table? Like when you called for him [crosstalk 00:16:33]-

Mick Mellett:

Oh, yeah. I mean, there are days that he'll-

Detective Richard Alderson:

No, I mean, sorry. When you came and called. I didn't understand if you said [crosstalk 00:16:46]-

Mick Mellett:

He had just gotten up from the exam table when I got back to the room.

Detective Richard Alderson:

You saw him on the [crosstalk 00:16:53]-

**Mick Mellett:**

Yeah.

**Detective Richard Alderson:**

I had pictured you more of back at the reception's chair [crosstalk 00:16:58]-

**Mick Mellett:**

No. Because I smelled the gas, I headed in. No reason for his rig to be there. And I went in specifically looking to make sure he was or wasn't there.

**Detective Richard Alderson:**

Got you.

**Mick Mellett:**

And later in the day, basically I had gone downstairs to where the furnace was and the old furnace filters was sitting there, that he'd changed out. He actually did change the filter, but there was a dirty filter sitting there.

**Detective Richard Alderson:**

That's [inaudible 00:17:34] my place. I haven't had any experience with gas. I grew up in the south east United States and there is not a lot of gas down there. What's your experience with gas leaks and smells? Is that from-

**Mick Mellett:**

I'm on the fire department. There are two type... And we go out on a fair number of gas calls. There really are three types of gas calls we go out on. One will be carbon monoxide, where a detector is going off, doesn't have any odor. The other two that we go out on are either when somebody has been digging in the yard or ice has broken a gas pipe outside, or going to a house and there's a loose fitting on a gas appliance of some sort. I've been on the fire department for, shit, 35 years or so. To any of us, gas is a very distinctive. The caps on in the natural gas because... They put capstan in it to give a foul order, kind of a rotten egg type odor. It's a very distinctive odor and been around it enough that knew what it was when I opened the door.

**Detective Richard Alderson:**

Right away. What else? And the night... Sir, I apologize. I got mixed up. What was the order that the ambulance, the fire department and Avista showed up?

**Mick Mellett:**

I called down to dispatch, told them we had a gas leak and Dave got there, Winey... I think the paramedic showed up just right about the same time Dave did. Firetruck showed up four or five minutes later, I would guess. And Dan had left at that point and a little concerned so I took the paramedic up to the house and he checked him out at the house, and I think he even felt that his communicative skills were impaired.

**Detective Sgt. Michael Van Leuven:**

This was Kelly?

Mick Mellett:

Yeah.

Detective Sgt. Michael Van Leuven:

What's Kelly's last name?

Mick Mellett:

Oh... I believe it's Hillman. H-I-L-L-M-A-N. Don't trust my spelling. His wife is a... He's a paramedic and she works for Dr. [Jayden's 00:20:44] office as a physician's assistant.

Detective Richard Alderson:

That's [inaudible 00:20:53].

Detective Sgt. Michael Van Leuven:

Going back to, was it Thursday?

Detective Richard Alderson:

Yes. The March 12th.

==Detective Sgt. Michael Van Leuven:==

==Thursday, March 12th, about 7:26 PM is when the shooting occurred?==

Mick Mellett:

Yeah.

Detective Sgt. Michael Van Leuven:

And where were you at the time the shooting occurred?

==Mick Mellett:==

==At my house. And Karen was out of town and Dan came over for dinner. He would normally... I cannot honestly tell you what time he got there. He's traditionally there between quarter to six... 5:30 and 6:00, 6:15 at the latest. By the time he closes the office, he goes home and puts the dogs out and comes down. And the only reason that I-==

==Detective Sgt. Michael Van Leuven:==

==Let me pin you down on the time here. He came over for dinner that night, and what's the latest that he would have gotten to your house?==

==Mick Mellett:==

==6:15.==

==Detective Sgt. Michael Van Leuven:==

Once he got to your house, did he leave your house before the shooting happened?

Mick Mellett:
No.

Detective Sgt. Michael Van Leuven:
And how sure are you on your times for that day?

Mick Mellett:
I'm very sure in that my... I carry a fire department pager, and we listened to the pager, basically. He came over his gun shot and ambulance went out, police went out and I just had my pager sitting on a table and next to where we were sitting and it was oddly vague coming over the pager. And we sat there listening, they're searching areas and they're doing this and that. And he... I don't know, probably 8:30 or so, he wasn't feeling good and he left. He just told me that he went down to the office and used the bathroom down there. He might've had diarrhea and threw up, came back up to the house probably 15, 20 minutes later and asked if I had any Imodium and I gave him some Imodium and if I remember right, he grabbed a Sprite and headed home.

Mick Mellett:
And then after he left, I called Mark and basically just asking if... I said, "What's going on tonight?" I said, "Am I going to get called out?" And he told me, "Yep. You're going to be called out." And I made that phone call just a few minutes after Dan had left the second time.

Detective Sgt. Michael Van Leuven:
What time about, did he leave your house and go home?

Mick Mellett:
It was 8:00, 8:30. He would normally stay a little later than that, but wasn't feeling good. And the only reason that as sure as I am about the date... I mean, if you asked me, what other days that week he came over, I couldn't tell you. The only reason I can tell you that he was there that night is we were sitting there listening to the pager, and had it not been for that pager, I couldn't have told you that he was there, though-

Detective Sgt. Michael Van Leuven:
Do you remember having a conversation with him about what the pager might mean?

Mick Mellett:
Well, we just happened to wonder what the hell was going on. And that day I am absolutely sure of. Was he there normally? He's not there Monday, lots of times, Tuesday, Thursdays. Hell, there's nights that... I mean, he was at my house last night. He was at my house one night before last.

Detective Sgt. Michael Van Leuven:
Firearms. What firearms are you aware that Dr. Moore owned or possessed?

Mick Mellett:

His son has some guns in the safe. I believe he has a smaller caliber rifle. I want to say like a .243. I believe he has a shotgun. Colton is in Germany right now, but when he was in high school, he did trap shooting. Dan and Karen took a concealed weapons class a couple of years ago. And Karen has a pistol. I am not sure if it's a... I want to say it's a .380. I don't know if it's a .380 or 9mm but it's a purse gun, and when she went through the... She went through the class and then went through... there was like a law part of it and basically found out the liability in carrying a gun and I don't think she's ever carried it, and I don't think she shot it over once or twice. I think she got it and that's been several years.

Mick Mellett:

But guns that they have... In fact, we were talking last night. I've got some family here and they were talking about guns. I got a son-in-law that's getting into guns. And Dan basically said that there were several, but other than that, pistol he bought, in theory, for Karen to carry.

Speaker 4:

Unknown caller.

Mick Mellett:

I don't think they... They haven't bought a gun that I'm aware of and he owns a gun shop. Bonners Ferry Funeral.

Christine:

Hi, this is Christine from [inaudible 00:27:36].

Mick Mellett:

He is a co-owner of-

Detective Sgt. Michael Van Leuven:

You say he owns a gun shop?

Mick Mellett:

He's a co-owner of Booze 'N Bait in Troy.

Detective Richard Alderson:

That with the bear?

Mick Mellett:

Yeah.

Detective Richard Alderson:

It's got the funny bear-

Mick Mellett:

Drinking a bottle.

Detective Richard Alderson:

Drove by that out near Libby. Right?

Mick Mellett:

Yeah. It's in Troy.

Detective Richard Alderson:

It was in Troy. We were going out to Libby and saw that.

Mick Mellett:

And he said he, he doesn't have much to... He's the financial backer of the business and his partner kind of runs it.

Detective Sgt. Michael Van Leuven:

The little pistol you're talking about, they actually bought at the North 40 in Ponderay.

Mick Mellett:

Yeah, I don't remember.

Detective Sgt. Michael Van Leuven:

Wonder why he didn't buy it from his own business?

Mick Mellett:

Because I don't think he owned it then. And because he's an Idaho resident, he can't buy a pistol in Montana and bring it into Idaho. I don't know. I think he's had the Booze 'N Bait they bought a couple, two years ago, three years ago, something like that.

Detective Sgt. Michael Van Leuven:

His son, Colton, the guns that Colton has in the safe, have you ever seen those guns?

Mick Mellett:

Nope.

Detective Sgt. Michael Van Leuven:

Don't know what guns he had?

Mick Mellett:

Nope. Don't even know if Dan knows the combination to it.

Detective Sgt. Michael Van Leuven:

Is it a big gun safe?

Mick Mellett:

Yeah, it's probably a 12 or 15-gun gun safe.

Detective Sgt. Michael Van Leuven:

Have you ever known Dan to have access to a revolver?

Mick Mellett:

Not that I'm aware of.  I mean he'd have access to any of my guns, but I've got a .357 revolver, but I don't think it's been shot in 10 years and he wouldn't know where my guns are at.

Detective Sgt. Michael Van Leuven:

As far as him having a beef with Dr. Drake, was there anything like that that you remember him talking about Dr. Drake being upset that maybe clients were-

Mick Mellett:

I don't know that he even knew Dr. Drake. I would guess Dan has 50% of the business in the community and there's one, two, three... There's, five or six other chiropractors here. But I know he has commented that he didn't know him, hadn't met him. I don't think he's met the one down the street. He has Pam Svec is a chiropractor out across from Safeway. When he was ill, she filled in a few days in the office there.

Detective Sgt. Michael Van Leuven:

Svec, S-V-E-C-K?

Mick Mellett:

S-E-V-E-I-C, I believe.

Detective Alderson:

Svec. Do you know what the name of her chiropractor business is?

Mick Mellett:

I don't. When you drive out of town, there's a green house that [Gladden 00:31:06] has right across the street. And it's in that building.

Detective Sgt. Michael Van Leuven:

Is it the downstairs of the real estate building?

Mick Mellett:

No, that's another one. And then-

Detective Sgt. Michael Van Leuven:

S-V-E-C. She took-

Detective Richard Alderson:

S-V-E-[crosstalk 00:31:22]-

**Mick Mellett:**

She helped fill in when he was in the hospital in the coma.

**Detective Sgt. Michael Van Leuven:**

Pam did?

**Mick Mellett:**

Yeah. And then there's a couple of retired chiropractors that work out of their homes and I know Shelton isn't open anymore, but he was up by the Mennonite store up there. He had a chiropractic office there. I have not known him to ever comment about any of the chiropractors and we talk about a lot of things.

**Detective Richard Alderson:**

Well, I wanted to head out. Sorry. I have some questions. Just out of curiosity, what are you all like when y'all hang out? Just in a lot of time, are you all like drinking buddies? What do y'all do? Just sit around and talk?

**Mick Mellett:**

Watch TV, talk, watch movies. Watched a lot more movies more recently. I mean really more talk and he-

**Detective Richard Alderson:**

Was he-

**Mick Mellett:**

... He's not a non-drinker, but I doubt if he has a drink a month. Basically, because of my occupation, I predominantly don't drink at home. I have lots of liquor but I won't drink alone. And I mean, once in a while they'll have one drink. I've never seen him drunk, I don't think and I've known him, even as we've traveled together, he just doesn't drink a hell of a lot.

**Detective Richard Alderson:**

And just to make sure, the .243 and the shotgun that you talked about, some that you mentioned specifically, those were Colton's in the safe or those are-

**Mick Mellett:**

Those are Colton's. Foster Mill. I believe it's Foster that got Colton into a shooting trap when he was in high school and he was fairly accomplished at it. I want to say it's a .243, it's a smaller caliber rifle that he used for deer hunting. I don't know what other guns he may have other than... I know that yet a number of years ago, they... I don't remember if it was a 9mm or a .380 semi-auto because I was over at their house one night and when they went through that concealed weapons permit, they showed it to me and I mean, it's a semi-auto but I don't remember. I didn't pay that much attention to the caliber.

**Detective Richard Alderson:**

You had mentioned that around eight o'clock, he left your place to go use-

Mick Mellett:

I would guess 8:00, 8:30.

Detective Richard Alderson:

... to use the bathroom at his office. That seems odd to me because his home is closer, right?

Mick Mellett:

No. No. His office is right down... I live right next to the funeral home. His office is before you ever get out to the highway. And he lives up in, what they call Christmas Tree Hills.

Detective Richard Alderson:

Is that common for him to go use his chiropractic bathroom instead of yours?

Mick Mellett:

No, but he had diarrhea and he made the comment that he didn't want to stink up my bathroom.

Detective Richard Alderson:

He just doing you a solid [crosstalk 00:35:32].

Mick Mellett:

I think initially he was planning to go home and got in the pickup and realized he wasn't going to make it home and stopped at the office and then came back up to the house to see if I had any Imodium and then he went home-

Detective Richard Alderson:

Got you.

Mick Mellett:

... and spent the rest of the night, one end or the other.

Detective Richard Alderson:

Got you.

Detective Sgt. Michael Van Leuven:

If he had had a problem with Dr. Drake, blaming Dr. Drake for taking his clients or the fact that his own business wasn't doing as well as he thought it should, based on-

Mick Mellett:

He would've commented.

Detective Sgt. Michael Van Leuven:

What's that?

Mick Mellett:

He would have commented.

Detective Sgt. Michael Van Leuven:

He would have told you that. That would have been a topic of conversation, I would assume. You'd know that.

Mick Mellett:

We would about between my divorce and kids and business and everything else. Either Karen or Dan, I would tell anything to, they would tell anything to me. Other than the fact that there's too damn many chiropractors in Bonners Ferry, I've never heard him bring a specific chiropractor up or have negative comments. He just doesn't understand why there'd be a new one come into town and it's like, he doesn't understand why the hell somebody would open a business in Bonners Ferry with six, seven chiropractors in here already. And like I said, part of them are retired and moved in here. But they certainly don't do a lot of business.

Detective Sgt. Michael Van Leuven:

Because Drake was very busy. When he was up here for those two and a half sometimes and he'd come up, he'd spend the night. He'd see patients the whole day, he'd spend the night and then he'd see patients again in the morning before he drive back south.

Mick Mellett:

And I've had people telling me the various chiropractors they go to... I happen to go to Dan. I haven't heard anything negative about Drake from anybody. I haven't really heard anything negative. People tend to go to whoever they like, and I haven't heard anybody be negative about any of them really.

Detective Sgt. Michael Van Leuven:

Some hard questions. Is it possible that Dan was upset about something else and was suicidal and was attempting to take his life? Because-

Mick Mellett:

I'm with him enough and we talk about things. Dan is probably the least suicidal person. I mean, I wouldn't be concerned about that at all. He's actually pretty mellow about going with the flow. I've never heard him make a comment about him being fed up with the world and to hell with it.

Detective Sgt. Michael Van Leuven:

He had some business dealing maybe 10 plus years ago regarding some property here in town that he was upset with somebody about something that happened with that property. Was the property-

Mick Mellett:

He was upset with-

Detective Sgt. Michael Van Leuven:

It was 10 acres.

Mick Mellett:

He owned lots of-

Detective Sgt. Michael Van Leuven:

He was clearing trees off of it.

Mick Mellett:

Well, the piece of property that I'm aware of, that he was upset about. He owned 10 or 12 lots, South of the airport that he bought and they had water and everything supposedly to them. And then Three Mile Water basically said, "Well, you're going to have to upgrade the water line remotely from where... " Not on his property, but actually the rebuild their line. You know where Dave Limey lives?

Detective Sgt. Michael Van Leuven:

No.

Mick Mellett:

You know where the... Weekly has this gun thing.

Detective Sgt. Michael Van Leuven:

I'm going to say no.

Mick Mellett:

Well, you get up to the top of the hill and the old highway makes loop up there and there's a subdivision, right... It actually is right here to this hill.

Detective Sgt. Michael Van Leuven:

I thought the property that we'd been told about was this way up [crosstalk 00:40:02]-

Mick Mellett:

Well, and it could be. Dan used to invest in property. He had a piece above the school that he sold. At one time he owned Bear Creek lodge. He owned the Rose Inn which is the white house just before the golf course. He had the 12 lots. He has bought and sold-

Detective Sgt. Michael Van Leuven:

Lots of property.

Mick Mellett:

... a lot of property. He had an issue with a piece of property over in Troy, I know, because of Montana laws that held him liable for... They decided they had a clause in it that if financing were not available and I don't know well, he requested a level... What do I want to say? Level interest loan and Andrew got [inaudible 00:41:15]-

Detective Sgt. Michael Van Leuven:

Sorry about that.

Mick Mellett:

Go ahead.

Detective Sgt. Michael Van Leuven:

No, I'm going to put this on mute, so that doesn't happen again.

Mick Mellett:

But I know had to pay some money to get out of that land deal. Elderly woman over there. Probably the most upset he'd ever... and not screaming, yelling, mad, just upset about the County. I say the County, the airport board, the lots that he bought up there were in the flight path and they wanted to restrict him being able to build on them. And I told him to hire an attorney and I said, that's called takings. If they won't let you use property that was subdivided for that purpose, sell it to the County and he never pushed it and small town didn't want to push it.

Detective Sgt. Michael Van Leuven:

The gas leak. Both Dave Winey and the Avista guy that showed up said in all their years, they've never seen anything like that. The Avista guy said those lines don't work themselves loose. That once they're tight, they're tight. And if they have a leak in an appliance in a house, whether it's a furnace or something else, usually it's because the line itself fails, like in a joint or it wears a crack in it. But the fitting itself doesn't come loose once it's tightened. And certainly-

Mick Mellett:

Normally, they have pipe dope on them.

Detective Sgt. Michael Van Leuven:

Well, he basically said that, looking at that and feeling the tightness of that, that it was pretty obvious to him that someone had loosened that fitting up.

Mick Mellett:

And I did not see it. I went down after the fire department was done and things, and I know where it was, but I didn't go down, didn't see it. I know they said it was loose, but to be honest, I don't think there's a pair... I'd be amazed if there's a pipe wrench. I would bet money there's not a pipe wrench in that office. And I think that-

Detective Sgt. Michael Van Leuven:

Well, we know there wasn't a leak on Friday because everybody was there. Patients coming and going and business was open. He gets there on a Sunday. They're telling me. I'm not an expert here. I'm talking to the people that are, that do this for a living, and they're saying that that didn't come loose on its own.

Mick Mellett:

When I asked Dave and Avista, they said the line was loose.

Detective Sgt. Michael Van Leuven:

Well, specifically we asked in some detail because I want to make sure that we got this right. Could it have come loose on its own? Could you have bumped it and loosened it? And they said, no, that this was somebody had to intentionally back that off.

Detective Sgt. Michael Van Leuven:

You're saying that he's your close friend and that he wouldn't have any reason to hurt himself? Look at the evidence of-

Mick Mellett:

Yeah. And I can't answer that. I can just tell you that he has never made any comments about being depressed, never made... I mean, and I spend a lot of time with him. He's-

Detective Sgt. Michael Van Leuven:

You're the coroner-

Mick Mellett:

No, I-

Detective Sgt. Michael Van Leuven:

You have a lot of experience. You look at-

Mick Mellett:

No.

Detective Sgt. Michael Van Leuven:

... this the same way. I can. [crosstalk 00:44:58]-

Mick Mellett:

No, I understand that. I just-

Detective Sgt. Michael Van Leuven:

What I'm saying is you're the one that's saying he was with you, you're giving him an alibi for that he couldn't have done the shooting. We've got other people, multiple people but one person in particular who was a patient of his, who then became a patient of Drake's and said that there were other people that had left Moore for Drake. And when they heard that this had happened to Drake, the first thing they thought was Dr. Moore got his way. And-

Mick Mellett:

There's is... No. I understand that. I know that, like I said, you ask me any other night and if he was at my house or not, he's there three, four nights a week. But that night I know he was there.

Detective Sgt. Michael Van Leuven:

And I'm just following that-

Mick Mellett:

That's fine. I-

Detective Sgt. Michael Van Leuven:

Follow me through my logic here.

Mick Mellett:

I know.

Detective Sgt. Michael Van Leuven:

You know the facts of the case pretty well?

Mick Mellett:

Mm-hmm (affirmative).

Detective Sgt. Michael Van Leuven:

The nature of how he was shot through a window with one round. It tumbled before it hit him. It key-holed him in the back, six inches off center line. The odds of that shot killing him are not high. I mean, if you were to shoot somebody in the torso like that, I don't know, will you tell me, how many times out of ten would the person die versus... I mean, they had to just get that just right to nick that-

Detective Richard Alderson:

Pulmonary artery.

Detective Sgt. Michael Van Leuven:

... that pulmonary artery to probably bleed out, right?

Mick Mellett:

Well, I guess I go back to Deegan during the Weaver incision, he had a vest on and it caught the rib and killed him, right? It could happen-

Detective Sgt. Michael Van Leuven:

I'm not saying it's not possible.

Mick Mellett:

... I guess, I'm dumbfounded at gunshot wounds, period. I don't deal with... I mean, hell what do I deal with up here? A few year-

Detective Sgt. Michael Van Leuven:

Well, what I'm getting at is this, if you look at the whole nature of that, it... We've thought through this a lot and gamed this out a lot. It's consistent with someone that's not necessarily wanting to kill him, it's someone who wanted to hurt him or scare him. I mean, they wouldn't have known for sure that they were even going to hit somebody. I mean, they're shooting from a dark place into a light place. Maybe they hear him on the phone, Maybe they don't.

Mick Mellett:

Was the shade down or up?

Detective Sgt. Michael Van Leuven:

Shade was down. I mean, if you really looked through the cracks, you could see some cracks, but from the angle of the gun, the person either had to be two, or... If you saw, they had to either be two or three feet away standing, or maybe a little farther away in a vehicle, but they couldn't have been any farther than that, if you look at the trajectory, shoots him this far off center line and one shot and he dies.

Detective Sgt. Michael Van Leuven:

I mean, it's not consistent with somebody who wanted to murder him, in my opinion. It's consistent with somebody who wanted to scare him or maybe hurt him. But I think that if Moore was upset with Drake businesswise or whatever else, and he went to scare him or hurt him, that would have been exactly the kind of thing that he would have done. A single shot through the window and then continue on, on foot. And we have the eyewitness who says, he sees him coming out between the fence and the sidewalk there on main street or 95, and then walking north. And then as he walks north, he cuts back between those two buildings. That guy gets in his car, drives around to where he is and he's gone. He'd drive all around the blocks, nobody else on foot.

Detective Sgt. Michael Van Leuven:

That guy either had to get in a vehicle and drive away from there. And we've got hours and hours and hours of video footage that we still haven't gone through from all these cameras to try to look at, or he goes back into his office. If he then finds out the next day, "Oh, I didn't mean to... That the guy died and he realizes he did this thing. I mean, I can't imagine the guilt and fear that a person would feel.

Mick Mellett:

Like I said, any other night... That night, I know where he was at. There isn't a question because I don't know if dispatch records all their traffic. I mean, we were sitting there listening and wondering what the hell was going on. And that night, I know where he was-

Detective Sgt. Michael Van Leuven:

Are you sure?

Mick Mellett:

I am absolutely positive, and I've... Patients come and go, I've never heard him speak negatively other than the fact of why the hell are there so many chiropractors here. I've never heard him make a negative comment about another chiropractor. He's traditionally... I mean, there are four girls in his office and they're working from the time he gets there at 6:37 in the morning until 5:30 at night.

Detective Sgt. Michael Van Leuven:

No money problems?

Mick Mellett:

Mm-mm (negative).

Detective Sgt. Michael Van Leuven:

He mentioned something, and I don't remember exactly how he said it, but it struck me as a little odd about being concerned about his wife being upset. And I think you kind of alluded earlier to the fact that he'd had a couple of other previous near death experiences.

Mick Mellett:

He had one that I... He actually had a brain tumor, God, 15 years ago. Went through treatment, it was benign. I believe they did the... It was about the time I met him. And then when he ended up in Coeur d'Alene for a couple of months, between the hospital and rehab. He made the comment when he got home, Karen wanted to know what had happened and on the way to the hospital, "I don't know why she's mad at me." And it's like, "You only have so many lives." But and she wasn't mad at him and he was just a little loopy and, "Well, I think she's mad at him."

Detective Sgt. Michael Van Leuven:

In your mind and your heart, as your close friend, you're 100%, know he was with you, know he didn't do this and you don't think that-

Mick Mellett:

I know the night of the shooting, he didn't do it. And I will tell you that in the time I've spent with him, he has never led me to believe that he was depressed or suicidal. He can be a little accident-prone, but Dan is not a mechanical person. I go down and hang pictures on the wall in the office. [Laelani 00:52:22] will call me up and they painted some offices and I went down and hung their pictures. There are virtually no tools in that office. I take them down.

Detective Sgt. Michael Van Leuven:

Of the other people that have access to that office, has there been any problems within the office that somebody might want to cause a gas leak?

Mick Mellett:

Not that I'm aware of. He had someone that he'd left. He's had a couple of people leave. There was a masseuse that was in there and friction between the girls and they decided it was better that she not be there. She's got her own office now. He had a bookkeeper that left but I don't know of anybody that I would point a finger at and say, they're just really pissed at him.

Mick Mellett:

I know he's getting to the point where he'd like to retire and he basically has people that he treats at their home that can't get out of their homes, or I guess he's got one family that financially, they just like being waited on, but he goes up and treats a family up North that... I know he was up there Friday night and Sunday. He gets a phone call and he drives out into town.

Mick Mellett:

He isn't somebody... He gets fed up with political issues, doesn't understand the thought process of about 50% of the population but he got along and he served on the ambulance board, number of years. And when he told me he was appointed to that, I said, "Are you flipping nuts?" I spent enough time on

city council that I said, "It can hurt your business and just why do you want that headache?" And he got into it and realized, "Well, I don't want this headache."

Mick Mellett:

But, no. He is not... In my... I have never heard him talk about, "I'm fed up with the world and to hell with it." And like I said, I'm with him. If I need help lifting at my office, he comes over. If I'm driving at night, a lot of times he goes with me. He needed help clearing some things out. He had a spot down at Smokey Acres. I went down and help load up and bring stuff home. And when they bought the business in Troy, I went over and helped him do some painting. I mean, I'm with them a lot. Predominantly, Dan, but Karen is... Probably half the time Karen comes over. I've known both of them for almost since they moved up here.

Mick Mellett:

And neither one of them... I mean his dad died a couple of years ago. Karen's parents had died in the last couple of years or several years but, enjoys his family and they're constantly on their life. Like all of us, he's questioning whether he can afford to retire, but he's not... I mean, hell, we were supposed to be on a cruise about what was it? The end of March, 1st of April, we were all going on a cruise and before we all backed out of it and there wasn't... Kind of depressed that we didn't get out and get our feet in the sand.

Detective Sgt. Michael Van Leuven:

About 10 minutes after the shooting occurred? Probably about the same time that you might've been seeing the pager activity, because there was some delay in the time the 911 call started down there and there's two 911 calls coming in, one from the wife, one from the RP across the street up here. Anyway about 10 minutes after the actual shooting, Dan made a telephone call. Do you remember who he called?

Mick Mellett:

I would assume at that time of night, it probably was wife or kids. I don't remember.

Detective Sgt. Michael Van Leuven:

You don't remember?

Mick Mellett:

I mean, he doesn't make a lot of calls, so I would... Do you know the number he called?

Detective Sgt. Michael Van Leuven:

I don't know the number off the top of my head.

Mick Mellett:

If you have the number, his wife was out of town and my suspicion is that the phone number that he called... I would guess that the phone number, if you have that record is 208-290-

Detective Richard Alderson:

I'll get it.

Detective Sgt. Michael Van Leuven:

Is that the number? We've got-

Mick Mellett:

208-290-2867.

Detective Sgt. Michael Van Leuven:

No. We got 2995.

Mick Mellett:

That one I don't-

Detective Sgt. Michael Van Leuven:

2867, is that his wife?

Mick Mellett:

2867 is his wife and 80067 is also one of their numbers.

Detective Sgt. Michael Van Leuven:

All right. Well-

Mick Mellett:

267.

Detective Sgt. Michael Van Leuven:

Anything else?

Detective Richard Alderson:

I've covered the follow ups. You said... just I want to know who the pronoun it was referring to. The antecedent, if you will. My English teacher [inaudible 00:59:39] should be very proud of me right now. You said his dad died a couple of years ago. Whose dad?

Mick Mellett:

Dan's dad. Both... Dan's dad died three or four years ago, and then Karen's mother died six years, seven years ago, and then her dad died a couple of years ago.

Detective Richard Alderson:

Is that his biological dad?

Mick Mellett:

I think stepdad.

Detective Richard Alderson:

Stepdad and then-

Mick Mellett:

He basically raised him, but I think he's actually his stepfather. And he died of cancer. They had a house down on the... They had a furniture store in Lewistown and then their house was on the lake there by Harrison.

Detective Richard Alderson:

Do you know how his biological dad died? Or-

Mick Mellett:

His biological dad died of cancer.

Detective Sgt. Michael Van Leuven:

How do you know that?

Mick Mellett:

I knew him and I went down and handled the arrangements.

Detective Sgt. Michael Van Leuven:

His biological dad?

Mick Mellett:

Oh, his... That I have no idea. I think they were... I don't know what happened to him.

Detective Richard Alderson:

Never talked to you about it?

Mick Mellett:

Yeah. I mean, it happened when Dan was... And I don't know if he died or if they were divorced. I mean, but the person I'm speaking of his father died-

Detective Sgt. Michael Van Leuven:

It was his stepdad [crosstalk 01:01:19]-

Mick Mellett:

... was a stepdad and he's who raised him.

Detective Sgt. Michael Van Leuven:

Got you.

Detective Richard Alderson:

And I just want to circle back because I'm trying to make sure I understand. Your understanding was that Dan could smell normally and then he went to Belize and somehow from that was-

Mick Mellett:

He does not have the capability. Foul orders, he does not... I won't say can't smell them, he just is limited in his sense of smell. I'm not going to say that he can't smell anything. It's just, I know that he is limited in what he can smell. When we were-

Detective Sgt. Michael Van Leuven:

But from-

Mick Mellett:

... at the office, he couldn't smell any gas in the office when I was in there.

Detective Richard Alderson:

But when he's explained to his friends, when he explains to you why he can't smell, that's what he ties it to. Is that true?

Mick Mellett:

He's made comment that since he was down there, that his sense of smell isn't what it was. It isn't that he can't smell anything, he has commented that since then, he doesn't seem to be able to smell food and things.

Detective Sgt. Michael Van Leuven:

The Avista guy says, he gets there. By the time he got there, that it had already been aired out. That the doors were open, fans were on, fire department had already aired the building out. And he said, "I smelled the faint odor of gas, but nothing really significant because it had been aired out." He said, he goes to the meter first and he's looking at the meter, and the first thing that he does in order to... because he's a certified leak investigator or whatever, is he turns it back on so they can find the source of the leak. And he says, "After I turned it back on, I went back to the door and immediately could smell the odor of gas." That this wasn't like a slow leak, this was a significant leak of gas.

Detective Sgt. Michael Van Leuven:

The fire chief said the same thing, but I put a lot more stock into what the Avista guy said because he's the expert. He's the one that's certified to deal with gas leaks and deals with gas leaks all the time. He says to us that this was intentional, that this was not an accident, that those things don't fail on their own, that somebody had to go down there with a wrench and loosen that thing up. Given that, how do you explain it? I mean-

Mick Mellett:

Can't.

Detective Sgt. Michael Van Leuven:

Well, either Dan did it-

Mick Mellett:

I can't tell you what happened. I have a key to the place. I didn't do it.

Detective Sgt. Michael Van Leuven:

Don't you think it's odd?

Mick Mellett:

I didn't see how loose that connection was. I-

Detective Sgt. Michael Van Leuven:

He said it was just loose.

Mick Mellett:

Well, I didn't see it. I didn't go downstairs. I smelled gas. I called the fire department. I left to take the paramedic up to his house and got him to the hospital and by the time I got back, they said they found a leak and they shut it off and all that-

Detective Sgt. Michael Van Leuven:

I get it. I got you.

Mick Mellett:

I wasn't... I didn't see it. I don't know how loose it was. I trust Brian. I trust Dave. As far as how it happened, couldn't tell you. I know that when I have been in that office doing things, I don't think there's a hammer in there, I don't think there's a wrench in there and there's a screwdriver and I'm not sure there's even a pair of pliers. I don't know... I didn't see any tools there I don't... In what I've seen over the years, I've never seen Dan work on a water pipe, a gas pipe or any of that stuff.

Detective Sgt. Michael Van Leuven:

I got you. I'm trying to figure out-

Mick Mellett:

I can't tell you. I can tell you that in my opinion, he's not suicidal. I can tell you that, at least to me, he hasn't talked negatively about any of the chiropractors. And when the comment I heard from him, after the shooting is that he'd never met him. And to be honest, I don't know why I would necessarily try to meet my competition anyway.

Detective Sgt. Michael Van Leuven:

Let's take Drake out of this.

Mick Mellett:

I don't know how that would have gotten out loose and I mean, I have a key, I don't know how much of the staff have keys. Dan and I assume Karen have keys.

Detective Sgt. Michael Van Leuven:

Dan says that he's got a key, Karen's got a key and you've got a key.

Mick Mellett:

And I assume that the masseuse had a key. I don't know if he got it... I assume he got it then.

Detective Sgt. Michael Van Leuven:

He said just the three people.

Mick Mellett:

But, I can't answer that. And-

Detective Sgt. Michael Van Leuven:

I just find it very suspicious that the gas was... According to Avista, someone had backed that off. It was a Sunday when nobody else was around, he was the only person in the office. And when you find him, he's not on the floor, passed out. He's not trying to make it to a door. He's lying on an exam table and he's still woozy. Why didn't he try to go outside?

Mick Mellett:

Couldn't answer that. I-

Detective Sgt. Michael Van Leuven:

Since this has happened, have you had occasion to talk to him about it to see how he feels about it or what his memory is?

Mick Mellett:

Basically, what he's told me is he went in Sunday morning. His wife tends to sleep late. He gets up and putters around and, I believe he actually went to... I think he went to Sandpoint that morning, got the filters. And I don't know that. and then stopped by to change the filters out.

Detective Sgt. Michael Van Leuven:

Any other things going on in his life that might cause depression?

Mick Mellett:

Not that I-

Detective Sgt. Michael Van Leuven:

Problems with his wife, problems with his kids?

Mick Mellett:

No.

Detective Sgt. Michael Van Leuven:

Money problems, depression problems?

**Mick Mellett:**

Not that I'm aware of. He has two daughters that both now live in... One has lived in Coeur d'Alene, married. One got married a year ago. Her and her husband live in Coeur d'Alene. She works for... just secretarial for the federal Department of Justice. He's a teacher.

**Detective Sgt. Michael Van Leuven:**

Do you think if he had been depressed about something to the point where he would consider taking his own life, that he would have talked to you about it?

**Mick Mellett:**

I would think so.

**Detective Sgt. Michael Van Leuven:**

If he had talked to you about it, would you tell me?

**Mick Mellett:**

Yes. And probably before I would tell you, I would have talked to a doctor and I would have talked to his wife. I honestly don't know that Dan would even know. He is not mechanical.

**Detective Sgt. Michael Van Leuven:**

Well, if he didn't do it, that begs a whole another question is, who did it?

**Mick Mellett:**

Well, and I understand that but he... I mean, he has tools at the house. If he had a water leak at the house, basically piping, hired to fixed, and it was just the girl cleaning the yard bumped it with a lawnmower and it was a rotten pipe. But I don't see him doing that mechanical type of like plumbing, changing a faucet out or any of that type of thing, which would be the same type of working.

**Mick Mellett:**

I mean, hell, let's be honest, at that point I do a hell of a lot more of it than he does. And Hellen was up... I think she came up... I don't remember if she came up Friday that weekend or she came up Saturday. But I cannot answer how a fitting would have gotten as loose as what you're saying it was. I wasn't aware that it had-

**Detective Sgt. Michael Van Leuven:**

I assumed that I was going to hear the answer from both the fire chief and from Avista that, "Yeah, this thing happens from time to time." Both of them said in their whole careers, they've never seen a fitting back off that had been in play. The Avista guy said, the only time-

**Mick Mellett:**

I [crosstalk 01:11:01]0-

**Detective Sgt. Michael Van Leuven:**

... you see a fitting back off is when it's first installed and it's not installed properly, but anything that's been in place for a long period of time, unless it's been jiggled, sometimes people move a stove in or out, he said, "You might see a failure in the line," but he said, "You're going to see the failure in the line, not the fitting. The line will crack."

Detective Sgt. Michael Van Leuven:

He said, his opinion, somebody had to intentionally back that thing off, in this situation where it was a furnace, not a movable appliance, been in place for a long period of time, no recent work on it-

Mick Mellett:

I just... In the things I've been involved in, in the fire department, probably more common are the stoves and things.

Detective Sgt. Michael Van Leuven:

Sure. I assume-

Mick Mellett:

I would say probably it's a new stove being put in.

Detective Sgt. Michael Van Leuven:

Yes.

Mick Mellett:

It's probably more of ours are aligned, either that's dug into, drilled into, that sort of thing. I mean, it isn't... Gas leaks in my mind are not abnormal. I mean, we seem to go out on a lot of them.

Detective Sgt. Michael Van Leuven:

Sure. But in the facts in this case-

Mick Mellett:

Well, well, and I don't know... Like I said, I didn't see the fitting. I don't know how loose it is. I trust Brian and Dave. And when I went in the building, it was a strong gas smell. I mean, you'll go in sometimes and people say, "I think I smell gas." I opened the door and it was gas.

Detective Sgt. Michael Van Leuven:

Well, was it Brian, Avista?

Detective Richard Alderson:

Yes.

Detective Sgt. Michael Van Leuven:

Brian, his comment about the significance of the leak was that, he was in the building and when he first got there, they'd already aired it out and he sort of smelled trace gas, but not a lot amount. And then he goes, he opens the meter up, goes back in and as long as it took him to go from opening the meter up to

going back in the office, strong smell again. He said it wasn't a slow leak, it was a significant leak, and then describes the fitting and he said, "I just tightened it back up and it was fine."

Mick Mellett:

[crosstalk 01:13:17] there's a pipe. I mean, I'll agree that I don't know that I've seen a lot of leaks from fittings that I guess going back it's somebody put a new stove in and didn't get them tightened down or something. I mean, we find them, but they're not like a waterline that... And really, even waterlines don't back off. I mean, they just don't. I mean, you put pipe dope on them or Teflon and you cinch them down and they normally stay.

Detective Sgt. Michael Van Leuven:

If Dan didn't do it, then that begs the next question, who did do it? And is there somebody in his office that has a problem that wants to-

Mick Mellett:

Nothing I'm aware of.

Detective Sgt. Michael Van Leuven:

... cause a problem on Friday and loosens it up before they leave the office? I mean, somebody had to do it according to-

Mick Mellett:

I don't disagree. If that scenario is correct, that somebody loosened it, I'm not aware of... I mean, I know all three... Well, I know all four of the girls somewhat that worked for him. I'm not aware that any of them have any heartburn about anything.

Mick Mellett:

He's had some employees that have left, that he's terminated, but they shouldn't have a key to the place. Although I'm not aware that, when the last time he changed the key because I've had one for years. And basically I have it because I had a knee surgery and I'd go down there and-

Detective Sgt. Michael Van Leuven:

Well, he's your friend. You-

Mick Mellett:

[crosstalk 01:15:00]-

Detective Sgt. Michael Van Leuven:

Sure.

Mick Mellett:

Well, he actually let me go down and use the laser on my knee. And that's the reason.

Speaker 4:

Unknown caller.

Mick Mellett:
Periodically, they'd need it to have something done and I've gone over or let somebody in. Bonner's Ferry funeral.

Speaker 5:
Hello?

Mick Mellett:
Hello?

Speaker 5:
Yeah. Hi, this Mick?

Mick Mellett:
Yes, it is.

Speaker 5:
Oh, [inaudible 01:15:33].

Mick Mellett:
Huh?

Detective Sgt. Michael Van Leuven:
Ben stop tape. By my watch, it is 13:57.

# Exhibit 9 –

(Benton County Sheriff's Office, Oregon- Report #20202077-
Reference Photo Lineup, Isach Spain-Ireland AKA Funderburg-
August 24, 2020)



# BENTON COUNTY SHERIFF'S OFFICE

## Incident Report



**CASE NO: 202002077**

| | | |
|---|---|---|
| Reported: 8/24/2020 1:35:00PM | BegDT: 8/24/2020 1:34:59PM | Ofc/Dep: DUFFITT,CHRISTOPHER |
| | EndDT: 8/24/2020 1:35:00PM | Status: INACTIVE |
| | | Status DT: 8/28/2020 12:00:00AM |

Location: CORVALLIS

Premise Type: SINGLE FAMILY RESIDENCE

OFFENSE(S):

    AOA|OTHER   AOA-OTHER

SUMMARY:

AOA REPORT FOR IDAHO STATE POLICE INVESTIGATIONS

Forward to Idaho State Police Attn:
Detective Sean Prosser
Idaho State Police Investigations
615 W. Wilbur Ave.
Coeur d'Alene, ID 83815
Office: 208-209-8670
Cell: 208-661-6837

REPORTING DEPUTY:
Christopher Duffitt #435/49020

INVOLVED PERSON(S):
  *OTHER:*
    FUNDERBURG, ISACH JAMES
  (Home)  *1810 NE SEAVY AVE A*
      *CORVALLIS, OR 97330*

Date of Birth: 01/18/2001   M   W
(Home): 5417454546
(Mobile):

Ofc/Dep: DUFFITT,CHRISTOPHER

On Monday, August 24, 2020, I spoke with Detective Sean Prosser with the Idaho State Police. Detective Prosser asked that our agency assist with a photo lineup with a witness to a homicide in Idaho. The witness is named, Isach Funderburg aka SpainIreland (DOB: 01-18-2001) and lives at 1810 NE Seavy Avenue, Corvallis. Detective Prosser sent me the photo lineup but did not tell me who the suspect was. I printed the photos in color and placed them in their own folders. I drove to Isach's residence and read him the admonition statement and explained the process. In substance, Isach told me the following:

Isach was outside working on my Volkswagen in Bonners (Idaho). There was a shooting across the street. There were two gunshots. His fiancée came outside and he saw someone walking out from behind a building. He yelled at the suspicious person and they took off running, he followed with his dogs. Isach said this happened a while ago and he would do his best with the lineup.

I showed Isach the six photos in separate folders. I handed the folders to him one at a time and he opened them individually and looked at



the pictures. Isach said the photos didn't seem to look like the person who he "recognized to do it".

Isach was not able to make a positive identification. Isach picked one photo and stated he picked the man because the suspect he witnessed was "tall" like what he assumed of the male in this photo. Isach said the male in this photo had shoulders like the suspect. Isach said it was dark out when he saw the suspect and nothing about this males face matched anything he saw. Isach went through the photos and said he didn't think it was a couple of them, but said that one of the men didn't look like he could run like he saw the suspect run.

Isach appeared to try and compare the photos and the face shape to what he remembered to the side profile of the suspect. It was clear that Isach was looking at the photos for facial similarities and not picking any of the photos and a positive identification.

Isach told me the suspect had a wide nose and tried to compare two photos (photos with notes). I had Isach write some notes on photos that he thought were similar. Isach told me that he remembered the suspect to be a black male. Isach told me the male with the white hair and goatee, had similar ears and nose to the suspect. (Notes on picture)

I asked Isach to look at the male's photo that drew his attention the most. I asked him on a scale from 1-10, with one being not sure at all and ten being positive, how sure he was that this was the same guy from the incident. Isach said a "3 or 4". Isach did not make a positive identification, it was just that this guy looked similar. Isach told me this photo was similar but the male he saw had a wider nose. Isach's description of the male suspect was: small amount of facial hair, hoody over face, flat nose shape with big nostril flares, stubby chin, big tall ears, and darker skin.

This interview was recorded with BWC and this video will be entered into evidence and provided to the ISP.

Forward to Idaho State Police Attn:
Detective Sean Prosser
Idaho State Police Investigations
615 W. Wilbur Ave.
Coeur d'Alene, ID 83815
Office: 208-209-8670
Cell: 208-661-6837

REPORTING DEPUTY:
Detective Lt. Christopher Duffitt #435/49020

| Agency Name | INCIDENT/INVESTIGATION | Case# |
|---|---|---|

**Agency Name**
*Benton County Sheriffs Office*

# INCIDENT/INVESTIGATION REPORT

Case# *2020-02077*

Date / Time Reported
*08/24/2020 13:35 Mon*

Last Known Secure
*08/24/2020 13:34 Mon*

At Found
*08/24/2020 13:35 Mon*

**ORI** *OR0020000*

**Location of Incident** *Corvallis OR 97330*

Gang Relat | Premise Type *Single Family* | Zone/Tract *BCSO*

## INCIDENT DATA

| | Crime Incident(s) | (Com) | Weapon / Tools | | | Activity |
|---|---|---|---|---|---|---|
| #1 | *Aoa-other* *AOA* | O | Entry | Exit | Security | |
| #2 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |
| #3 | Crime Incident | ( ) | Weapon / Tools | | | Activity |
| | | | Entry | Exit | Security | |

**MO**

## VICTIM

| # of Victims *0* | Type: | | Injury: | | | | | |
|---|---|---|---|---|---|---|---|---|
| V1 | Victim/Business Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |

Home Address / Home Phone

Employer Name/Address / Business Phone / Mobile Phone

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

**CODES:** V- Victim (Denote V2, V3) O = Owner (if other than victim) R = Reporting Person (if other than victim)

## OTHERS INVOLVED

Type: INDIVIDUAL/ NOT LAW ENFORCEMENT    Injury:

| Code *M* | Name (Last, First, Middle) *FUNDERBURG, ISACH JAMES* | Victim of Crime # | DOB */2001* Age *19* | Race *W* | Sex *M* | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

Home Address *CORVALLIS, OR 97330* / Home Phone

Employer Name/Address / Business Phone / Mobile Phone

Type:    Injury:

| Code | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

Home Address / Home Phone

Employer Name/Address / Business Phone / Mobile Phone

## PROPERTY

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## Status

Officer/ID# *DUFFITT, C. (49020)*

Invest ID# *(0)*    Supervisor *(0)*

Complainant Signature | Case Status | Case Disposition: | Page 1

*R_CS11BR* | , CJSO1906 # bcchrisduf | Sys#: 1 | 08/28/2020 07:58

*Benton County Sheriffs Office*

Case # *2020-02077*

| Status Codes | | 1 = None 2 = Burned 3 = Counterfeit / Forged 4 = Damaged / Vandalized 5 = Recovered 6 = Seized 7 = Stolen 8 = Unknown | | | | |
|---|---|---|---|---|---|---|
| | IBR | Status | Quantity | Type Measure | Suspected Type | |
| D | | | | | | |
| R | | | | | | |
| U | | | | | | |
| G | | | | | | |
| S | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

NARRATIVE
AOA REPORT FOR IDAHO STATE POLICE INVESTIGATIONS

REPORTING DEPUTY:
Christopher Duffitt #435/49020

## REPORTING OFFICER NARRATIVE

*Benton County Sheriffs Office*

| | | |
|---|---|---|
| | | OCA |
| | | *2020-02077* |
| Victim | Offense | Date / Time Reported |
| | *AOA-OTHER* | *Mon 08/24/2020 13:35* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

On Monday, August 24, 2020, I spoke with Detective Sean Prosser with the Idaho State Police. Detective Prosser asked that our agency assist with a photo lineup with a witness to a homicide in Idaho. The witness is named, Isach Funderburg aka Spainlreland (DOB:        2001) and lives at                    Corvallis. Detective Prosser sent me the photo lineup but did not tell me who the suspect was. I printed the photos in color and placed them in their own folders. I drove to Isach's residence and read him the admonition statement and explained the process. In substance, Isach told me the following:

Isach was outside working on my Volkswagen in Bonners (Idaho). There was a shooting across the street. There were two gunshots. His fiancée came outside and he saw someone walking out from behind a building. He yelled at the suspicious person and they took off running, he followed with his dogs. Isach said this happened a while ago and he would do his best with the lineup.

I showed Isach the six photos in separate folders. I handed the folders to him one at a time and he opened them individually and looked at the pictures. Isach said the photos didn't seem to look like the person who he "recognized to do it".

Isach was not able to make a positive identification. Isach picked one photo and stated he picked the man because the suspect he witnessed was "tall" like what he assumed of the male in this photo. Isach said the male in this photo had shoulders like the suspect. Isach said it was dark out when he saw the suspect and nothing about this males face matched anything he saw. Isach went through the photos and said he didn't think it was a couple of them, but said that one of the men didn't look like he could run like he saw the suspect run.

Isach appeared to try and compare the photos and the face shape to what he remembered to the side profile of the suspect. It was clear that Isach was looking at the photos for facial similarities and not picking any of the photos and a positive identification.

Isach told me the suspect had a wide nose and tried to compare two photos (photos with notes). I had Isach write some notes on photos that he thought were similar. Isach told me that he remembered the suspect to be a black male. Isach told me the male with the white hair and goatee, had similar ears and nose to the suspect. (Notes on picture)

I asked Isach to look at the male's photo that drew his attention the most. I asked him on a scale from 1-10, with one being not sure at all and ten being positive, how sure he was that this was the same guy from the incident. Isach said a "3 or 4". Isach did not make a positive identification, it was just that this guy looked similar. Isach told me this photo was similar but the male he saw had a wider nose. Isach's description of the male suspect was: small amount of facial hair, hoody over face, flat nose shape with big nostril flares, stubby chin, big tall ears, and darker skin.

This interview was recorded with BWC and this video will be entered into evidence and provided to the ISP.

REPORTING DEPUTY:
Detective Lt. Christopher Duffitt #435/49020

Admonition Statement

VIEWER: You will be asked to look at a group of photographs. The fact that the photos are shown to you should not influence your judgment in any way. You should not conclude nor guess that the photographs contain the picture of the person who committed the crime. You do not have to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Keep in mind hairstyles, beards and moustaches are easily changed. Please do not indicate to other witnesses that you have or have not made an identification. I, _Isach  SpainIreland_ ,

Address: _1810 NE SEAUY AVE, CORVAMIS, OR, 97330_

do identify photo # ___ to be the subject who

_Not able to make a positive Identity._

_____

Viewer Signature: _____

Date: _8-24-2_ Time: _4:20._ Officer ID: _DuFFiTT._

# Idaho State Police
# Photo Line-Up

### Case Number: K20-18



**Signature:** _____ **Date:** _____

**Print Name:** _____

Similar to ~~victim~~
Suspect
- His facial features are similar to the guy I saw
Although I remember a wider nose.

# Idaho State Police
# Photo Line-Up

### Case Number: K20-18



Signature: _____ Date: _____

Print Name: _____

*Similar nose and ears to suspect.*

# Idaho State Police
# Photo Line-Up

### Case Number: K20-18



Signature: _____ Date: _____

Print Name: _____

# Idaho State Police
# Photo Line-Up

**Case Number: K20-18**



**Signa**

**Print Name:** _____

# Idaho State Police
# Photo Line-Up

**Case Number: K20-18**



Signature: _____ Date: _____

Print Name: _____

# Idaho State Police
# Photo Line-Up

**Case Number: K20-18**



**Signa**

**Print Name:** _____